APPEAL, BROWN, TERMED

# United States District Court
## Northern District of Illinois – CM/ECF LIVE, Ver 4.2 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:02–cv–06998
### *Internal Use Only*

| | |
|---|---|
| USA v. Johnson | Date Filed: 09/30/2002 |
| Assigned to: Honorable William J. Hibbler | Date Terminated: 03/11/2003 |
| Demand: $0 | Jury Demand: None |
| Case in other court:  11–01326 | Nature of Suit: 510 Prisoner: Vacate Sentence |
| 11–01443 | Jurisdiction: U.S. Government Defendant |
| ND IL, :96–CR–00379 | |

Cause: 28:2255 Remedies on motion attacking sentence

**Plaintiff**

| | | |
|---|---|---|
| **United States of America** | represented by | **David E. Bindi** |
| | | United States Attorney's Office (NDIL) |
| | | 219 South Dearborn Street |
| | | Suite 500 |
| | | Chicago, IL 60604 |
| | | (312) 353–5300 |
| | | Email: david.bindi@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Darryl Lamont Johnson** | represented by | **Terence H. Campbell** |
| | | Cotsirilos, Tighe &Streicker |
| | | 33 North Dearborn Street |
| | | Suite 600 |
| | | Chicago, IL 60602 |
| | | (312) 263–0345 |
| | | Email: tcwolfram@aol.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Lorinda Meier Youngcourt** |
| | | Lorinda Meier Youngcourt |
| | | Attorney at Law |
| | | P.O. Box 206 |
| | | Huron, IN 47437 |
| | | (812)849–9852 |
| | | Email: lmyoungcourt@incrimlaw.org |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| | | | |

| 12/18/2009 | 87 | 3 | MEMORANDUM – *Corrected – In Support of Reconsideration of Brady and Johnson v. Mississippi Claims* (Attachments: #1 Exhibit, #2 Exhibit, #3 Affidavit, #4 Affidavit)(Campbell, Terence) (Entered: 12/18/2009) |
|---|---|---|---|
| 12/21/2009 | 88 | 132 | MOTION by Defendant Darryl Lamont JohnsonConsideration of Brady v. Maryland and Johnson v. Mississippi Claims (Attachments: #1 Exhibit, #2 Exhibit, #3 Affidavit, #4 Affidavit)(Campbell, Terence) (Entered: 12/21/2009) |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee – Respondent, | ) | |
| | ) | No. 02 C 6998 |
| vs. | ) | |
| | ) | Hon. William J. Hibbler |
| DARRYL JOHNSON | ) | |
| | ) | Death Sentence Imposed |
| Defendant – Appellant – Petitioner. | ) | |

**DARRYL JOHNSON'S MOTION FOR CONSIDERATION OF HIS**
***BRADY v. MARYLAND* AND *JOHNSON v. MISSISSIPPI* CLAIMS**
**and**
**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT**

Defendant Darryl Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe &

Streicker, and Lorinda Meier Youngcourt, moves the Court for consideration of his *Brady v.*

*Maryland*[1] and *Johnson v. Mississippi*[2] claims. In support thereof, Mr. Johnson presents the

following supplemental memorandum of law.

**I.      Motion requesting the court to reconsider the *Brady* and *Johnson* claims.**

In its Memorandum Opinion and Order (Doc 71 filed 5/15/2009) ruling on Mr. Johnson's

renewed and amended motion for discovery, the Court stated that the reason it was denying the

discovery request with respect to Mr. Johnson's *Brady* claims was because "he has not formally

moved the Court to reconsider the decision regarding the *Brady* claim and that claim is not

---

[1] This argument was originally set out at pages 47-53 of his §2255 motion timely filed on
September 30, 2002.

[2] This claim was originally set out at pages 54-56 of his §2255 motion.

1

currently pending." Op. at 2.  Pursuant to the Court's Order. Mr. Johnson formally requests that

the Court reopen and reconsider the *Brady* claim.

Both the legal and factual landscape of this case have changed markedly since Judge

Conlon issued her March 11, 2003 Memorandum Opinion and Order denying Mr. Johnson's

*Brady* claim, stating

> The materiality standard under *Brady* is the same as the prejudice standard for an
> ineffective assistance of counsel claim under *Strickland.  See Id.* at 694 (the
> standard of materiality applicable to withheld impeachment evidence was adapted
> from the formulation of prejudice in *Strickland v. Washington*, 466 U.S. 688, 694
> (1984).  For the same reasons Johnson failed to establish prejudice for his
> ineffective assistance of counsel claim, he fails to establish materiality for his
> *Brady* claim.

Op. at 13-14 (Doc 20).

The legal landscape changed when the United States Supreme Court issued its opinion in

*Massaro v. U.S.*, 538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), holding that a federal

criminal defendant may properly bring an ineffective assistance claim for the first time in a

§2255 motion.  "In most cases a motion brought under §2255 is preferable to direct appeal for

deciding claims of ineffective-assistance" because "[w]ithout additional factual development . . .

an appellate court may not be able to ascertain whether the alleged error was prejudicial." *Id.* at

504-505, 123 S.Ct. at 1694, 155 L.Ed.2d at 720-721.

Since the reopening of the ineffective-assistance claims, Mr. Johnson has established new

facts regarding information that was in the possession of the government at the time of his trial --

information the government did not disclose to the defense, and information which would have

significantly impeached, if not outright refuted, Warden Vanyur's testimony.  *See, e.g.,*

Supplemental Brief in Support on Ineffective Assistance Claim (filed 12/17/2009).  As this Court

remarked in its May 15, 2009 ruling on discovery:

2

> The affidavit of the BOP Warden [Mark A. Bezy] provides a factual foundation for Johnson's claim that the government expert's testimony misled the jury regarding the BOP's ability to confine him immediately and indefinitely while at the same time minimizing the risk that Johnson would continue to be a danger to society. Moreover, the government has produced some information regarding other inmates held in strict conditions of confinement, also which seems to contradict the testimony of the government's expert and which could lend credibility to the testimony Johnson's expert might provide.

Op. at 7 (Doc 71). These new facts warrant reconsideration of the *Brady* claim because they substantially undermine the two arguments that the March 2003 opinion relied upon in denying the claim: (1) that the government did not suppress evidence, and (2) that the evidence was not material.

Mr. Johnson has demonstrated that the government *was* in possession of significant impeachment evidence that it failed to turn over to the defense. This includes the information which the government has belatedly disclosed regarding other inmates held in strict conditions of confinement, as well as all the extensive information contained in Warden Bezy's two affidavits regarding the policies and procedures in place at the time of Mr. Johnson's trial that were routinely used to neutralize the risk of future dangerousness posed by certain inmates, and a large and growing number of inmates who were, at the time of Mr. Johnson's trial, being held under those conditions. EX C and EX D. It is indisputable that the government failed to disclose this information to trial counsel. Additionally, as this Court recognized, this information would have constituted relevant impeachment evidence with respect to Warden Vanyur's testimony. As such, it was material to a central issue in the case – namely, the "future dangerousness" aggravating factor, and more specifically, the credibility of Warden Vanyur's testimony regarding the BOP's inability to impose strict conditions of confinement as long as was necessary to alleviate a risk of future danger posed by an inmate.

The government would not be unduly prejudiced by Mr. Johnson's request to reopen the *Brady* claim. As this Court acknowledged in its May 15, 2009 order on the discovery motion, the IAC claim and the Brady claim are "intertwined," Op. at 2, and in light of the significant factual overlap with respect to these claims, reopening the *Brady* claim would not burden the government's ability to litigate its interests in this §2255 proceeding. Indeed, the legal analysis with respect to the materiality of the *Brady* claim is essentially identical to the prejudice analysis of the ineffective assistance of counsel claim. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (opinion of Blackmun, J.) (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of "prejudice" in *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Given the significant similarity in both the underlying facts and the applicable legal test dispositive of these two claims, Petitioner respectfully requests that the Court reopen and reconsider the *Brady* claim.

For the same reasons as those articulated above, we also respectfully request that the Court reopen and reconsider Johnson's claim under *Johnson v. Mississippi*, 486 U.S. 578 (1988). *See* Initial Memorandum in Support of §2255 Motion, 54-56 (Doc 4, filed 9/30/02). As with the IAC and *Brady* claims, this issue relies on the same operative facts regarding Warden Vanyur's false and misleading testimony. Moreover, resolution of this claim will necessarily rely on similar legal analysis to that involved in determining *Strickland* prejudice – namely, whether there is a reasonable probability that the incorrect and misleading testimony provided by Warden Vanyur affected the outcome of the sentencing proceedings.

Finally, it should be noted that despite the March 2003 ruling on the *Brady* and *Johnson* claims, a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure was never entered in Mr. Johnson's case. In other words, the judgment technically need not be "reopened"

because it was never final to begin with.  This Court has maintained jurisdiction over all the claims in this proceeding since inception, and it maintains the inherent authority to reconsider any and all rulings in this matter until a final judgment is entered.  *See Ruehman v. Village of Palos Park*, 842 F. Supp. 1043, 1062-63 (N.D. Ill. 1994); Rule 54(b), Federal Rules of Civil Procedure ("any order or other decision, however designated, that adjudicates fewer than all the claims or rights and liabilities . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

**II.     The Government Violated *Brady* by failing to turn over evidence concerning inmates housed under special conditions of confinement**

**A.     Applicable Law**

Due process requires that the prosecution disclose any evidence favorable to the accused where the evidence is "material either to guilt ***or to punishment"***. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, 218 (1963) (emphasis added).  The *Brady* disclosure requirement extends to evidence that impeaches the credibility of prosecution witnesses. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

In short, a defendant is entitled to relief under *Brady* when he establishes that "1) the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and 3) that the evidence was material to an issue at trial." *United States v. Earnest*, 129 F.3d 906, 910 (7th Cir. 1997).

**B.     Mr. Johnson was established the government violated *Brady v. Maryland***

The government, whether through its prosecutors or the Department of Justice, suppressed evidence.  The record clearly shows that at the time of Mr. Johnson's penalty phase

trial, a number of inmates were housed by the BOP under conditions that virtually eliminated any contact with other inmates, prison staff, and particularly the outside world.

In the mid-1980's through the mid-1990's, USP-Marion had what it termed the "K-Unit" where inmates who posed a high security risk were housed under extremely strict conditions of confinement.  They were single celled, recreated alone, and had no contact with other inmates. EX D at 13.

Eight months prior to Mr. Johnson's sentencing hearing, the defendant in *United States v. Luis Felipe*, (Case No. S16-94CR395 (S.D.N.Y.)) was sentenced in a conspiracy case involving murders and drug trafficking similar to that alleged in Mr. Johnson's case.  At the sentencing hearing, the district court noted that based on the record developed at trial, it found that there was a great danger that the defendant might attempt to order additional murders of others unless necessary conditions of confinement were imposed to limit his contact and communication with other individuals.  For that reason, the district court issued a special direction to the BOP that the defendant be confined so that:(1) he could not have any contact with other prisoners; (2) he could only correspond with and have visits from family members that were approved by the district court; (3) any and all correspondence and visits, other than with counsel, were to be monitored and copies of each piece of correspondence were to be sent to the United States Attorney's Office for the Southern District of New York; and (4) the defendant was not permitted to have telephone contact with anyone.  Luis Felipe was sent directly to ADX by the sentencing court and housed in a side pocket cell in total isolation from other inmates.  EX D at 12.

In *United States v. Anthony Jones*, (Case Nos. WMN-96-0458 and WMN-97-0355 (D. Md.)), the district court, pursuant to 18 U.S.C. § 3582(d), imposed special conditions of confinement on the defendant at his sentencing.  These conditions included: (1) no contact with

other inmates; (2) no telephone privileges other than with counsel, and only at times and under conditions to be set by the BOP; (3) no visiting privileges other than legal visits with counsel, and supervised visits with his mother to the extent approved by the BOP, and only at times and under conditions to be set by the BOP; (4) all ingoing and ongoing mail is to be reviewed by the BOP.

In *United States v. Peter Rollack*, (Case No. 97CR1293 (S.D.N.Y.)), the court entered a sentencing order pursuant to a plea agreement that included the following conditions of confinement: (1) no communication with any co-defendants or any member of the racketeering enterprise (i.e., gang) charged in the indictment; (2) outside of counsel, no correspondence or visits with anyone other than family members and significant others approved by the court and the BOP, and that any such correspondence and visits will be subject to monitoring; (3) the prosecution will be given notice of any family members or significant others the defendant seeks to place on his visiting list and will have the right to file objections with the court as to those visitors being approved.  Rollack was also sent directly to a "special housing unit" (i.e., a control unit) from his sentencing for a minimum of 18 months, after which his housing designation could be reviewed by BOP.

In *United States v. Ramzi Yousef*, (Case No. S12-93 CR 180 (S.D.N.Y.)), the district court stated that there was an identifiable risk that the defendant might try to order additional acts of violence from prison, and therefore imposed special conditions of confinement to neutralize that risk.  Those conditions included: (1) that the defendant be incarcerated in an administrative detention facility (i.e., control unit); and (2) outside of counsel, the defendant was only allowed to visit with family members that could positively proof they were related to the defendant.

For more than 20 years, Thomas Silverstein was incarcerated at USP-Leavenworth in solitary confinement under a "no human contact" order.  EX D at 15.  He was housed in a cell underground, where his cell lights were kept on 24 hours of the day, and was constantly monitored by correctional officers.  In 2005, when USP-Leavenworth was downgraded to a medium-security facility, Silverstein was transferred to ADX Florence, where he continues to be housed – indefinitely -- under the strictest conditions of confinement in an area of the facility known as "Range 13." *See* Deposition of John Vanyur, *Silverstein v. Federal Bureau of Prisons*, Case No. 07-CV-2471 (D.Colo. February 27, 2009) at 58 (Attached as Exhibit A).  Indeed, even Warden Vanyur admits that Silverstein, one of the most notorious inmates in the federal prison system, has had a clean conduct record due to controls placed on him by the BOP.  *Id.* at 57-58.

In addition to the aforementioned individuals, there are other BOP inmates who have been incarcerated under strict conditions of confinement for indefinite periods of time, in excess of 12 to 15 years, including Clayton Fountain, Barry Mills, Norman Matthews, Adolph Reynoso, and T.D. Bingham.  Contrary to Warden Vanyur's testimony, it is not only legal for the BOP to impose such conditions on inmates indefinitely, it is – and was at the time of Johnson's trial -- a well-established practice.  Notably, these conditions – such as no telephone use and severely limited visitation and correspondence privileges – are precisely the measures which Warden Vanyur testified would be illegal and unavailable to the BOP in the imposition of Mr. Johnson's sentence.

The conditions of confinement created for Aryan Brotherhood inmate David Sahakian were available at the time of Mr. Johnson's trial.  During his pre-trial detention, Sahakian was held in the USP-Marion I-Up Unit where he was separated from the rest of the prison population and continuously monitored by an officer.  EX D at 13-14.

8

Whether it come as an order of the sentencing court or is constructed by the BOP under Special Administrative Measures ("SAM's"), federal inmates were being held at the time of Mr. Johnson's trial and continue to be held today under conditions which either severely or totally restrict their communication with other inmates and the outside world.  EX D.

As set out in the March 2003 Order and Opinion, the government has never contested that evidence relating to BOP practices was favorable to the defense.  Op. at 13.

The materiality standard under *Brady* is the same as the prejudice standard for an ineffective assistance of counsel claim under *Strickland*.  *See United States. v. Bagley*, 473 U.S. 667, 693(1984) (Evidence is material under *Brady* if there is a reasonable probability that the result of the proceedings would have different had the evidence been disclosed).

While there were a number of aggravating and mitigating circumstances raised by the parties, the most powerful penalty phase evidence was devoted to Mr. Johnson's potential for future dangerousness and whether a sentence less than death could prevent that potential danger. In the government's opening statement to the penalty phase, the prosecutor argued to the jury that Mr. Johnson had to be executed in order to keep others safe:

> You will hear that simply by uttering the words, the defendant will have ended the lives of three people.  You've already heard how he can order brutal beatings, in addition to these murders, simply by saying so.  Tr. 1772.

> [T]hese threats and orders did not stop once the defendant was jailed on this charge.  Tr. 1774.

> Richie Wash told [Delano Finch] that the [Mr. Johnson] wants you to find someone to knock off somebody in Roger Stewart's family so that they know that we're serious, and he wants to you have somebody knock off Lance Cleaton because he saw who killed Blunt and he saw who killed Jello. Tr. 1775.

> That, ladies and gentlemen, will be the evidence regarding the defendant's future dangerousness. Tr. 1776.

9

During the defense penalty case, Mr. Johnson presented the testimony of Dr. Mark Cunningham to testify that Mr. Johnson could be housed by the BOP in such a manner as to virtually eliminate the potential for future acts of violence.  Tr. 2248-2332.  Anticipating this evidence, the government had Warden Vanyur present in the courtroom to hear Dr. Cunningham's testimony.  *E.g.*, Tr 2467, 2468, 2475, 2482.  The next day, Vanyur testified as an expert rebuttal witness for the prosecution.  Tr. 2462-2509.  As set out in detail in Johnson's Reply in Support of his His §2255 Motion (Doc 19, filed 3/6/2003), Vanyur testified:  that the BOP could not hold any prisoner indefinitely without telephone and correspondence privileges, Tr. 2482-83; that even inmates at ADX Florence had " a lot of contact with inmates", "frequent and constant contact with staff unrestrained", TR 2489-90, and "one fifteen-minute phone call per month" as well as "five visits per month" and "virtually unlimited correspondence with the outside world" Tr. 2485; that even the most dangerous inmate would eventually end up in general population with "in excess of twelve visits a month", "as many phone calls as he could pay for or get someone to accept as collect charges", and "unlimited correspondence privileges", Tr, 2472, 2477.

In its closing, the government painted a terrifying future in the event the jurors returned a verdict for anything other than the death penalty.

> [L]adies and gentlemen, as long as the defendant has the ability to convey his orders to his followers, either on the street or in prison with him, nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe. It doesn't matter where he is locked up.
> * * *
> [I]nmates with no out-dates, those inmates that are facing life, like the defendant, they are the most dangerous, they have nothing to lose.  And that's why people like Mr. Johnson poses {sic} this threat. Tr. 2593
>
> Now, couple that with his background that you've heard about of all the other orders he gave, he truly poses a future dangerousness. . . . There is no way to completely shut somebody off in the prison with communicating with somebody

10

on the outside.  And as you heard, there is very ingenious ways that they even communicate among one another in prison.  That is why Mr. Johnson, no matter where he is, no matter when he is, is a future danger, he poses it to society as a whole, because through his own actions, his own words, and use your common sense, that no one is safe from the defendant.  Tr. 2594.

[A]fter he is locked up when we as a society should feel safe, he is out there ordering more people killed.  That is the type of evidence that is here.  And that is why no one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live.  Tr. 2598.

In its rebuttal closing argument, the government continued to bang the drum and openly stated that in order to insure everyone's safety, Mr. Johnson had to be executed.

[T]he federal regulations do not allow somebody to go directly to the control unit. That's what they're describing. That's what those pictures were.  The control unit at ADX Florence, you know he will not be going there.  Tr. 2646.

And is there any system, any prison system under the laws of our Nation that can stop the violence when your weapon is only one thing, your voice?  That is the weapon that the defendant uses.  Tr. 2647.

The evidence in this case shows beyond any reasonable doubt that there is a substantial danger that another witness or a witness's family member will be dead, because the defendant is a danger in prison. As long as he is alive he cannot be stopped from communicating, and that is all he needs.  He does not need a weapon . . . all he needs is a telephone.

\* \* \*

[T]here is no innocent bystander who is safe as long as the defendant can communicate with the outside world.  No prison system can stop him.  Tr. 2647-48.

Given all this focus on future dangerousness by the Government, it is clear they knew the evidence regarding supposed "future dangerousness" was the key to winning a death verdict.  As amply demonstrated by the special findings at the conclusion of the sentencing phase, the jury found the government's future dangerousness arguments – based on the now discredited testimony of Warden Vanyur -- to be extremely persuasive.  On each count the jury unanimously found, beyond a reasonable doubt, that Mr. Johnson "would commit serious acts of violence in the future which would be a continuing and serious threat to society."  Conversely, not a single

11

juror found that that Mr. Johnson "will not be a serious and continuing danger to society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior." Thus, it is abundantly clear that the jury rejected the testimony of Dr. Cunningham, and fully credited the testimony of Warden Vanyur on the issue of the BOP's ability to impose strict conditions of confinement on "dangerous" inmates.

Numerous social science and empirical studies of juror attitudes in capital cases highlight the importance future dangerousness plays in a jury's deliberations and return of a death sentence. *See*, *e.g.*, John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always At Issue*, 86 CORNELL L. REV. 397, 398 (2001) (noting that future dangerousness is on the minds of most jurors in most cases and this is true regardless of whether the prosecutor argues future dangerousness explicitly). Indeed, the more likely that jurors believe that the defendant will be a future danger, the more likely the jury is to impose a death sentence. *See*, *e.g.*, Eisenberg & Wells, Deadly *Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1, 7 (1992). ("[O]ver three-quarters of the jurors believe that the evidence in their case established that the defendant would be dangerous in the future. And the more the jurors agree on this fact, the more likely they are to impose a death sentence."); Constanzo & Constanzo, *Life or Death Decision: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 LAW & HUM. BEHAV. 151, 160 (1992) ("[N]early all [Oregon] jurors also offered the observation that the penalty decision hinged on the issue of whether the defendant will pose a continuing threat to society."); *id*. at 168 ("[F]uture dangerousness plays a prominent, if not central role. . . . Jurors clearly perceived the penalty as hinging on this issue."); John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the*

*Capital Jury Project*, in BEYOND REPAIR? AMERICA'S DEATH PENALTY 144 (2003) (32% of jurors believed that the law required them to impose the death penalty if they believed the defendant would be dangerous in the future); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do jurors think?* 98 COLUM. L. REV. 1538, 1542 (1998) (many jurors wrongly think they must return a death sentence if they find the defendant is especially likely to present a risk of future danger); *id.* at 1559 (noting that future dangerousness evidence is highly aggravating and that 60% of jurors interviewed were more likely to vote for death if they believed that the defendant might be dangerous in the future); Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 BUFF. L. REV. 339, 360 (1996).  ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in the multi-state study of the interview data.").

As stated by this Court in its March 2003 opinion, had Mr. Johnson's trial counsel presented evidence that, in direct contradiction to Warden Vanyur's testimony, other BOP inmates were, in fact, being subject to severe restrictions on communication and contact "the jury might not have rejected Johnson's proposed finding on future dangerousness."  Op. at 3.  In fact, it would have taken only one juror to find that a death sentence was not the only way to keep everyone safe from Mr. Johnson, and vote for a life sentence.  *See United States v. Johnson*, 223 F.3d 666, 670 (7th Cir. 2000) (the threshold for establishing a reasonable probability that the jury would not return a death verdict is lower because "it takes only one juror to nix a death sentence.").

**C. Mr. Johnson was also denied a fair trial when the government presented misleading, inaccurate and prejudicial testimony which was not corrected**

Darryl Johnson was denied due process because the government presented misleading, inaccurate and prejudicial testimony at his capital sentencing hearing. As set out above, the government presented evidence through its expert witness Warden John Vanyur on the issue of "future dangerousness" that created the false impression that no legal authority existed to allow the Bureau of Prisons ("BOP") to limit Mr. Johnson's communications and contacts while in prison in order to curtail his alleged future dangerousness. The government then relied on this evidence throughout its closing argument to convince the jury that unless it sentenced Mr. Johnson to death, "no one is safe," (Tr. 2598), because, argued the government, as long as Mr. Johnson had access to a telephone, correspondence, or visitors while in prison, he would be able to order others to commit acts of violence "simply by uttering the words." Tr. 1772.

However, after the Seventh Circuit Court of Appeals affirmed Mr. Johnson's convictions and death sentences, the government conceded that Warden Vanyur's testimony was "incomplete" and that based on the evidence it heard during the sentencing proceedings, "the jury may have held the mistaken impression that no legal authority existed to limit [defendant's] communications and contacts while in prison in order to curtail his future dangerousness." Gov't. Opp. to Cert. at 21 (attached as Exhibit A to Johnson's Initial Memorandum in support of his §2255 Motion). As explained in more detail below, there is no question that the government presented materially inaccurate testimony that created a false impression on the most critical issue in the jury's sentencing deliberation – namely, whether the only way to prevent Mr. Johnson from committing future violence was to execute him. In light of these facts, Mr. Johnson is entitled to a new sentencing hearing.

14

**1.  Warden Vanyur's Testimony was Substantially Misleading and Created a False Impression Regarding BOP's Ability to Limit Mr. Johnson's Communications and Contacts While Incarcerated**

There is no question that Warden Vanyur's testimony regarding BOP's ability to limit Mr. Johnson's communications and contacts while in prison was substantially misleading and created a false impression.  Contrary to the testimony elicited by the government, the BOP has both the legal ability and prison facilities to house inmates under strict conditions of confinement *for as long as necessary* in order to protect against any reasonable possibility of "future danger." Indeed, even the government has now conceded this point.

In its opposition to Mr. Johnson's Petition for a Writ of Certiorari to the Supreme Court, the government admitted that Warden Vanyur's testimony was "incomplete" with respect to the authority of the BOP to house inmates under strict conditions of confinement, Gov't. Opp. to Cert. at 20, and "that § 3582(d) and the SAMs regulation were relevant, and that without them, 'the jury may have held the mistaken impression that no legal authority existed to limit [defendant's] communications and contacts while in prison in order to curtail his future dangerousness.'"  Gov't. Resp. to § 2255 Motion at 21.  *See also* Govt. Opp. to Cert. at 21 ("As we have acknowledged, there is in fact such authority [to limit petitioner's communications and contacts while in prison in order to curtail his future dangerousness].");  *id.* at 14 ("the jury may have held the mistaken impression that no such legal authority existed.");  *id.* at 28-29 (the prosecutor's closing argument "could have left the impression that, absent the death penalty, there was no legal authority to limit the defendant's communications.").  As set forth in various of Petitioner's pleadings, Warden Vanyur's testimony was substantially misleading in a number of material respects and undoubtedly created a false impression for the jury about the BOP's

15

ability to effectively neutralize any risk of "future dangerousness" posed by Mr. Johnson while incarcerated.

To the extent the government is tempted to argue that Warden Vanyur's testimony was merely "incomplete" and therefore "technically true," such an argument is unavailing. As one circuit court has explained, the government's duty to correct false testimony is not limited to situations where a witness commits perjury, but extends to testimony that is "substantially misleading:"

> We do not believe, however, that the prosecution's duty to disclose false testimony by one of its witnesses is to be narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury. Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is *substantially misleading.* This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross examination. However, when it should be obvious to the government that the witness' answer, although made in good faith, is untrue, the government's obligation to correct that statement is as compelling as it is in a situation when the government knows that the witness is intentionally committing perjury.

*United States v. Harris*, 498 F.2d 1164, 1169 n.14 (3d Cir. 1974). Indeed, there is a long line of Supreme Court cases that deal with due process violations centered on testimony that creates false impressions or that is misleading. *See*, *e.g*., *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Miller v. Pate*, 386 U.S. 1 (1967) (due process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (*Napue* doctrine applies to "misleading evidence important to the prosecution's case in chief" as well as to evidence that is simply false); *Alcorta*

*v. Texas*, 355 U.S. 28, 31 (1957) (finding a due process violation where witness testimony "taken as a whole" gave a "false impression").

Similarly, there is a long line of circuit precedent that establishes that the government violates due process when it presents material testimony which is either misleading or creates a false impression. *See Drake v. Portuondo*, 553 F.3d 230, 243 (2d Cir. 2009) (*Napue* violation found where prosecution's question elicited "literal accuracy while conveying [a] false impression" about witness's qualifications); *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (finding *Napue* violation where prosecution elicited "technically accurate testimony" that was "probably true but surely misleading" and the jury was left with "mistaken impression"); *United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976) (*Napue* violation found where prosecution "allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness."); *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) ("Evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true."); *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) ("under the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications."); *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978) ("The long-settled rule has been that the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial is a denial of due process. A conviction obtained by the use of such evidence cannot be permitted to stand. The same rule applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression.") (internal citations omitted); *United States v.*

*Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) (due process violation does not require finding that witness committed perjury; "It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false."); *United States v. Iverson*, 637 F.2d 799, 805 n.19 (D.C. Cir. 1980) ("[I]t makes no difference whether the testimony is technically perjurious or merely misleading."). *See also Blanton v. Blackburn,* 494 F.Supp. 895, 899 (M.D. La. 1980), *aff'd* 654 F.2d 719 (5th Cir. 1981) ("The fact that the answer given [by the witness] may have been technically correct is not sufficient where the answer is incomplete.").

Warden Vanyur's testimony regarding the BOP's ability to impose strict conditions of confinement to neutralize the alleged risk of "future danger" posed by Mr. Johnson was substantially misleading and presented a false impression to the jury.  Not only did the BOP's own regulations and sections of the United States Code authorize the BOP to impose the very kinds of strict conditions of confinement that Warden Vanyur testified were illegal and unavailable, the BOP routinely imposed such conditions on inmates at the time of Mr. Johnson's sentencing hearing.  Moreover, a former warden and 28-year BOP veteran, Mark A. Bezy, has reviewed Warden Vanyur's testimony on this matter and detailed the manner in which that testimony was substantially misleading and false with respect to BOP practices and procedures. Taken together, this information clearly establishes that Warden Vanyur's testimony was false within the meaning of *Napue* and its progeny.

### 2.  Both the BOP's own regulations and the U.S. Code permitted the BOP to implement strict conditions of confinement.

The government's admission in its Brief in Opposition to Certiorari identifies two sources of authority that existed at the time of Mr. Johnson's sentencing hearing that expressly would have allowed the BOP to implement and administer exactly the kinds of strict conditions of confinement which Warden Vanyur told the jury were impermissible under BOP policy,

18

impossible to maintain for any extended time, and illegal under the law: (1) the Special Administrative Measures ("SAMs") regulation, codified at 28 C.F.R. §501.3, and (2) 18 U.S.C. §3582(d). A plain reading of these two provisions plainly contradicts Warden Vanyur's testimony to the jury about the BOP's ability to neutralize the threat posed by an inmate misusing phone and correspondence privileges to commit future acts of violence.

The SAMs regulation provides in pertinent part:

(a) Upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury. *These procedures may be implemented upon written notification* to the Director, Bureau of Prisons, by the Attorney General or, at the Attorney General's direction, by the head of a federal law enforcement agency, or the head of a member agency of the United States intelligence community, *that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons*, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. *These special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.*

28 C.F.R. § 501.3 (emphasis added). As the above provision makes clear, BOP Warden Vanyur's testimony to the jury that the BOP lacked the authority to prospectively limit an inmate's telephone, visiting and correspondence privileges was false and misleading. The same is true of Warden Vanyur's testimony that the BOP could only limit those privileges if it caught an inmate misusing those lines of communication. The SAMs regulation explicitly provides that the BOP is authorized to implement any procedures that are "reasonably necessary to protect persons against the risk of acts of violence," including "limiting certain privileges" such as "correspondence, visiting, … and use of the telephones," and that the implementation of such

procedures is not contingent on the inmate getting caught misusing these privileges. Rather, such "procedures may be implemented upon written notification" to the BOP by the Justice Department or any other federal law enforcement agency "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons."

Contrary to Warden Vanyur's testimony that the BOP could do nothing to limit an inmate's use of the phones or other correspondence or visiting privileges until after an inmate had already committed an improper act, the BOP's regulations, not surprisingly, do not require it to sit idly by until that time. If the jury had been properly informed about the BOP's regulations, it would have learned that, in fact, the BOP was authorized to use any and all "reasonably necessary" measures to curtail Mr. Johnson's "communications or contacts with persons could [that] result in death or serious bodily injury to persons," and that these measures could be implemented immediately, upon written notification by the appropriate governmental authorities. In other words, under 28 C.F.R. § 501.3, the BOP was authorized to do exactly what Warden Vanyur testified it could not do: eliminate the risk of acts of violence by prospectively limiting Mr. Johnson's ability to communicate with others, whenever and for as long as deemed necessary.

Warden Vanyur's testimony was particularly pernicious because in the course of his testimony, he specifically referenced the Code of Federal Regulations for the purpose of arguing that these regulations *constrained* the BOP's ability to implement strict conditions of confinement prospectively. Specifically, Warden Vanyur cited to 28 C.F.R. § 541 in his testimony that this regulation prohibits the BOP from prospectively assigning an inmate to a control unit based on dangerous behavior the inmate exhibited prior to being incarcerated. See

20

Tr. 2484-85 ("28 CFR Section 541 is very clear that inmates cannot be placed in a control unit solely on the basis of the offenses they committed in the community.")  However, as noted in section 541.41(b)(2), a defendant may be placed in a control unit if he "expressed threats to the life or well-being of other persons," regardless of whether such threats occurred prior to his imprisonment.  Moreover, the BOP itself recognizes that under Section 541,

> This placement is ordinarily recommended only for an inmate already in a federal institution; *however, there may be occasion where an inmate recommended for federal custody requires placement in a control unit.*  In *Bono v. Saxbe*, 620 F.2d 609, at 611 (7th Cir. 1980), the United States Court of Appeals opinion recognized that "Prisoners may be placed in the Marion Control Unit *directly from the federal courts,* from the general population at Marion or from other federal and state prisons."

49 Fed. Reg. 32990 (1984) (emphasis added).  In other words, Warden Vanyur's testimony that the BOP was prohibited from directly assigning Mr. Johnson to a control unit as a means to neutralize the possibility of "future dangerousness" was contrary to what the law actually states on this matter, and undoubtedly created a false impression for the jury in this regard.

The source of authority mentioned in the government's admission is 18 U.S.C. § 3582(d), which authorizes a district court to impose strict conditions of confinement as part of a defendant's sentence.  It provides, in pertinent part:

> The court, in imposing a sentence to a term of imprisonment upon a defendant convicted of a felony set forth in chapter 95 (racketeering) or 96 (racketeer influenced and corrupt organizations) of this title or in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 801 et seq.), or at any time thereafter *upon motion by the Director of the Bureau of Prisons or a United States attorney, may include as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person, other than his attorney, upon a showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise.*

21

18 U.S.C. §3582(d) (emphasis added).  As this provision makes clear, both the BOP and a United States Attorney's Office are authorized to request that the sentencing court impose strict conditions of confinement prospectively to limit an inmate's ability to communicate with others. The government's elicitation of testimony from Warden Vanyur that suggested otherwise was thus grossly misleading and unmistakably created a false impression for the jury about the BOP's authority to limit Mr. Johnson's communications while incarcerated.

> **3.     The BOP had a practice of imposing precisely the kind of strict conditions of confinement that Warden Vanyur testifies were not available or otherwise allowed.**

As has now been extensively documented in Mr. Johnson's Initial Memorandum in support of his § 2255 Motion ("Init. Memo."), and in his Initial Reply in support of his § 2255 Motion ("Init. Rep."), and in the two Affidavits of former BOP Warden Mark Bezy, the BOP routinely imposes strict conditions of confinement on inmates for as long as it deems necessary – and did so at the time of Petitioner's penalty-phase hearing.  Moreover, these measures have been implemented pursuant to BOP regulations and statutory law that were in existence and operative at the time of Mr. Johnson's sentencing hearing.  See Init. Memo. at 17-20, 49; Init. Rep. at 21-23.  See section II(b)(i) above, and the two Bezy Affidavits (Exs. C and D, hereto) for a recitation of individuals held under strict conditions of confinement at the time of Mr. Johnson's trial.

> **4.     The Government Knew of Should Have Known that Warden Vanyur's Testimony was Misleading and Created a False Impression, But Failed to Correct the Testimony.**

In *United States v. Augurs*, 427 U.S. 97, 103 (1976), the Supreme Court held that in cases where the government "knew *or should have known*" of false testimony, a conviction obtained with such testimony is "fundamentally unfair, and must be set aside if there is any reasonable

22

likelihood that the false testimony could have affected the judgment of the jury." *Id*. at 103 (emphasis added, footnotes omitted). *See also United States v. Kaufmann*, 803 F.2d 289, 291 (7th Cir. 1986) (adopting "knew or should have known" standard). That standard is easily met here.

First, the government has already conceded that the SAMs procedures and 18 U.S.C. § 3582(d) were relevant to Mr. Johnson's sentencing hearing. The government's acknowledgment of these regulatory and statutory provisions demonstrates that the government knew or should have known Warden Vanyur's testimony regarding the BOP's inability to impose necessary conditions of confinement to limit Mr. Johnson's communications and contacts while incarcerated was misleading and created a false impression for the jury. Indeed, both the SAMs procedures and § 3582(d) articulate the authority the Justice Department has in pursuing special conditions of confinement against inmates. Under 28 C.F.R. § 501.3(a), the Attorney General is authorized to direct the BOP to implement special administrative procedures, including limiting an inmate's phone, visiting and correspondence privileges, against inmates that it believes pose a "substantial risk" of misusing those privileges to seriously injure or kill others. Under § 3582(d), a United States attorney is authorized to move the sentencing court for an order imposing special conditions of confinement, including specifying the only persons with whom the defendant will be allowed to communicate, outside of counsel, if the United States attorney has "probable cause" to believe that the defendant's communications with a particular person is for the purpose of managing, directing or controlling an illegal activity. Indeed, under § 3582(d), even the BOP can file such a motion with the sentencing court. Given that the government is charged with executing these laws and regulations, it is reasonable to assume that the government is aware of them. The government cannot credibly disclaim knowledge of regulations and statutes that

authorize it to impose exactly the conditions of confinement which it presented to the jury as unavailable or illegal in Mr. Johnson's case.

Second, Warden Vanyur was presented as an expert witness on BOP policies and procedures with respect to conditions of confinement.  Having cited to the Code of Federal Regulations in his own testimony, it strains credulity to believe that Warden Vanyur was not aware of the BOP's regulation codified at 28 C.F.R. § 501.3.  This is particularly so given Warden Vanyur's position at ADX, where many of the inmates were (and are) held under SAMs orders pursuant that very regulation.  Similarly, one would reasonably expect that Warden Vanyur would similarly be aware of § 3582(d), precisely because it specifically mentions the BOP's authority to file a motion in federal court demonstrating probable cause to impose necessary conditions of confinement to prevent an inmate from manipulating communications privileges to direct or manage illegal activities.  Likewise, considering Warden Vanyur's role in making ADX operational – a facility that was, by design, intended to impose the strictest conditions of confinement to neutralize the risk of danger imposed by inmates who are adept at abusing communications privileges – it seems quite unlikely that Warden Vanyur would not know about BOP's regular practice of imposing strict conditions of confinement on dangerous inmates, as detailed by Warden Bezy and as articulated in the specific cases noted above.

Indeed, just prior to testifying at Mr. Johnson's sentencing hearing, Warden Vanyur was called as an expert BOP witness at the capital sentencing hearing in *United States v. Dean Anthony Beckford*, No. 3:96CR66 (E.D. Va.) on July 21, 1997.  At that hearing, Warden Vanyur gave testimony under cross-examination that was at odds with his testimony in Mr. Johnson's case.  For example, Warden Vanyur conceded at the Beckford trial that an individual who has been identified as posing a danger can be sent to the control unit at ADX immediately:

24

Q:      So you don't mean to tell this jury that someone cannot be committed
        there [the "Florence ultra security section"] immediately if the United
        States is of the opinion they are that dangerous.

A:      That's correct.

EX B at 19.

Q:      Is there any rule that prohibits a new inmate who has been classified as
        dangerous from being sent to Ad-Max in Florence?

A:      No, but that's not the Bureau's goal in Ad-Max.

Q:      Okay.  This will got (sic) faster if you answer my question.  Is there any
        rule that says they can't go there?

A:      No.

*Id*. at 31-32.  Warden Vanyur's testimony is directly contrary to the testimony he gave at Mr.
Johnson's trial that "under the law, [it is not] even a possibility to place Darryl Johnson directly
into that 68-bed control unit [at ADX]."  Tr. 2484.  Given that Warden Vanyur was the
government's own expert witness, it knew or should have known that his testimony at Mr.
Johnson's trial was substantially misleading, if not outright false, given that he had just testified
on the very same topic only months before as a government expert.  The prosecutors in this case
were employees of the Department of Justice, and they are imputed with knowledge in the
possession of other employees of that same agency.  *See United States v. Kattar*, 840 F.2d 118,
127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an
entity, the left hand of which is presumed to know what the right hand is doing."); *United States
v. Barkett*, 530 F.2d 189 (8th Cir. 1976) ("[O]ne office within a single federal agency must know
what another office of the same agency is doing. … This is no more than to hold the Government

25

to the same standard of conduct as governs private individuals in transmitting notice from agent to principal.").

Moreover, any knowledge which Warden Vanyur possessed should be imputed to the prosecution. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case."). Indeed, it is a well-settled principle of law that the government is responsible for the knowledge of a government agent who actually testifies as a witness. *See*, *e.g.*, *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977); *Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir.), *cert. denied*, 458 U.S. 1109 (1982); *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973); *Curran v. State of Delaware*, 259 F.2d 707, 712-13 (3d Cir. 1958); *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995); *United States ex rel. Kowal v. Attorney General of Illinois*, 550 F. Supp. 447, 451 (N.D. Ill. 1982); *United States v. Andrews*, 824 F. Supp. 1273, 1289 (N.D. Ill. 1993). *See also United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.").

Finally, under the law, Mr. Johnson need not demonstrate that the prosecutors who tried his case were personally aware of the falsity of Warden Vanyur's testimony. The Supreme Court has held that the presentation of false evidence against a defendant violates due process even if the falsity was unknown to the prosecutor. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). This is because the underlying purpose of *Napue* and *Giglio* is not to punish prosecutor for the misdeeds of a witness, but rather to ensure that jury is not misled by any falsehoods. *See*, *e.g.*, *United States v. Meinster*, 619 F.2d 1041, 1044 (4th Cir. 1980). Nevertheless, in light of the fact

26

that the basis for determining the falsity of Warden Vanyur's testimony was extant regulatory and statutory law within the purview of the United States Attorney's Office, as well as ongoing practices and procedures within the institutional knowledge of the BOP and the Justice Department, it is clear that the government knew or should have known that Warden Vanyur's testimony was substantially misleading and created a false impression for the jury.

### 5. Warden Vanyur's Testimony was Material and Prejudicial.

In order to establish materiality under *Napue*, one must demonstrate "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, (1976).  That standard is easily met here.  The central argument upon which the government relied in arguing to the jury that it should sentence Mr. Johnson to death was his alleged "future dangerousness."  It was the centerpiece of the government's argument in closing at the sentencing phase of the trial, and as reflected in the special findings of the jury, it was an argument that the jury found to be exceedingly persuasive.  The government's ability to make that argument rested almost exclusively on the testimony it elicited from Warden Vanyur. There is simply no question, therefore, that his misleading testimony was highly material and prejudicial.  The arguments set out above in section III(b)(iii) further demonstrates the material and prejudicial nature of Warden Vanyur's testimony.

### III.   Johnson's death sentence violates the 8th Amendment as it is Based upon Materially Incomplete, False and Inaccurate Information

The Eighth Amendment forbids basing a death sentence on materially false or inaccurate information. The Supreme Court has held that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a *special need for reliability* in the determination that death is the appropriate punishment in

27

any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (citations and internal quotations omitted; emphasis added). Accordingly, while there is no "perfect procedure for deciding in which cases governmental authority should be used to impose death," the Court "[has] made it clear that such decisions cannot be predicated [on] factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Id.* (emphasis added).

In *Johnson*, the Court reiterated that one such "constitutionally impermissible" factor is materially false or inaccurate information. *Johnson*, 486 U.S. at 586. In finding the materially inaccurate information required reversal of the death sentence, the Court noted that "the prosecutor repeatedly urged the jury to give [the materially inaccurate information] weight in connection with its assigned task of balancing aggravating and mitigating circumstances 'one against the other.'" *Id.* "Even without that express argument," the Court continued, there would be a possibility that the jury's belief in the inaccurate information "would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* (citing *Gardner v. Florida*, 430 U.S. 349, 359 (1977).

This recognition of prejudice by the *Johnson* Court reflected a principle established in the law at least since *Townsend v. Burke*, 334 U.S. 736 (1948) (due process requires resentencing where "materially untrue" allegations form part of the basis for the defendant's sentence), and which had been forcefully restated on numerous occasions since *Townsend*. *See*, *e.g.*, *United States v. Tucker*, 404 U.S. 443 (1972). *See also*, *e.g.*, *Roussell v. Jeane*, 842 F.2d 1512, 1524 (5th Cir. 1988), citing *Tucker* (where "the sentencing authority relies on incorrect or unsupported assumptions [and] such reliance is manifest in the record due process requires that the defendant be resentenced"); *Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir. 1986) (due process entitles

28

defendant to resentencing if court is "unable to find that the invalid [prior] convictions did not influence" the sentence imposed for a subsequent offense, citing *Tucker*).

Due process is violated, even in a non-capital case, where "the sentence rests on a foundation of confusion, misinformation, and ignorance of facts * * *" *United States v. Espinoza*, 481 F.2d 553,556-557 (5th Cir. 1973), quoting *United States v. Malcolm*, 432 F.2d 809, 816 (2nd Cir. 1970).  "If justice is to be done, [the sentencer] should know all the material facts," because the "[f]air administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion * * *" *Id.* The *Malcolm* court put it succinctly: "[M]aterial false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." *Malcolm*, 432 F.2d at 816, citing *Townsend v. Burke*.

As Mr. Johnson has demonstrated throughout these proceedings and specifically in this memorandum and in his Supplemental Memorandum In Support of His Ineffective Assistance of Counsel claim (filed 12/17/2009), material portions of the testimony of Government witness Warden John Vanyur were inaccurate, incomplete and/or materially misleading.  As set forth above, Warden Vanyur's testimony was the centerpiece of the government's case regarding Mr. Johnson's "future dangerousness" and was forcefully argued to the jury as a primary reason to impose the death penalty.  Johnson's death sentence, because it is based in whole or in part on Vanyur's inaccurate, incomplete, materially misleading, and/or fundamentally unreliable testimony, violates the Eighth Amendment.

### VI.    Conclusion and Prayer for Relief

For all the reasons set out herein as well as in the previously filed motions and pleadings in support of the claims for relief, Mr. Johnson respectfully requests the Court (1) reconsider his

*Brady v. Maryland* claim and grant relief on the same, ordering his sentence vacated and a new jury penalty trial and (2) reconsider his *Johnson v. Mississippi* claim and grant relief on the same. If the Court has any doubt that Mr. Johnson has met his burden in proving any of the claims set out herein, Mr. Johnson respectfully requests an evidentiary hearing be held on the issues. 28 U.S.C. §2255; *Massaro v. United States*, 538 U.S. 500, 504-506 (2003).

Respectfully submitted,


/s/ Terence H. Campbell_____                         /s/ Lorinda M Youngcourt_____

Terence H. Campbell                                              Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.                             Youngcourt Law Office
33 North Dearboen Street, Suite 600                             P.O. Box 206
Chicago, Illinois 60602                                         Huron, Indiana 47437-0206
(312) 263-0345                                                  (866) 274-3218

Counsel for Darryl Lamont Johnson

### Certificate of Service

Terence H. Campbell, an attorney, hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1. Darryl Johnson's Motion for Consideration of His *Brandy v. Maryland* and *Johnson v. Mississippi* claims and to amend his 28 U.S.C. §2255 Motion To Vacate Conviction And Sentence and Supplemental Memorandum of Law in Support

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.


/s/ Terence H. Campbell_____
Terence H. Campbell

30

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-02471-PAB-KMT

_____

VIDEOCONFERENCED DEPOSITION OF JOHN MARTIN VANYUR
February 27, 2009

_____

THOMAS SILVERSTEIN,
Plaintiff,
v.
FEDERAL BUREAU OF PRISONS, et al.,
Defendants.

_____

APPEARANCES

For the Plaintiff:    LAURA ROVNER, ESQ.
                      Nicole Godfrey, Student Attorney
                      Steve Baum, Student Attorney
                      2255 East Evans Avenue
                      Suite 335
                      Denver, Colorado 80208
For the Defendants:   MARCY E. COOK, ESQ.
                      U.S. Attorney's Office
                      1225 17th Street
                      Suite 700
                      Denver, Colorado 80202
Also Present:         Christopher Synsvoll, Esq.
                      Rachel Proctor
                      Katie Stevens

Page 2

Videoconferenced deposition of JOHN MARTIN VANYUR, the Witness herein, called by the Plaintiff in the above-entitled matter on Friday, the 27th day of February, 2009, commencing at the hour of 8:34 a.m., at 901 19th Street, Courtroom 201, Denver, Colorado, before Wendy Evangelista, Registered Professional Reporter and Notary Public within and for the State of Colorado, said videoconferenced deposition being taken pursuant to Notice and the Federal Rules of Civil Procedure.

_____

INDEX
Page Number

Examination by Ms. Godfrey                3

EXHIBITS

Exhibit Letter               Initial Reference

9*  Memorandum to File from Gomez, 6/20/06      70

23* Memorandum to Executive Staff from Nalley,  37
    10/15/04
39  A Summary of Interactions Between Thomas    47
    Silverstein and Staff at USP Leavenworth
    (FY'03)
40  Program Statement 5180.05, Central Inmate   51
    Monitoring System, 12/31/07

*Exhibit marked in a previous deposition; no photocopy substituted

Page 3

PROCEEDINGS

MS. GODFREY:  Hi, Mr. Vanyur.  My name is Nicole Godfrey, and I will be deposing you today.

Marcy, did you show him the protective orders and sign the affirmations already?

MS. COOK:  Yes, we have.

MS. GODFREY:  Okay.  Thank you.

Mr. Vanyur, if you could just state your name for the record.

MS. COOK:  Before we start, could you just identify who all you have with you there?  I've just got Mr. Synsvoll on my left here off camera.

MS. ROVNER:  Hi, Chris.

MR. SYNSVOLL:  Good morning.

MS. GODFREY:  Yes, of course.  It's myself, Nicole Godfrey and my supervising attorney, Laura Rovner; and my other case partners:  Katie Stevens, Rachel Proctor, and Steve Baum; and then the court reporter.

MS. COOK:  Thank you.

JOHN MARTIN VANYUR,
the Witness herein, having been first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

Q   (By Ms. Godfrey)  Mr. Vanyur, could you

Page 4

please state your name for the record.

A   Sure.  My name is John, J-O-H-N, M for Martin, and the last name is Vanyur, V-A-N-Y-U-R.

Q   Thank you.  Because we're taking this deposition via video, it might be a bit awkward.  I'm sure you've noticed there seems to be a little bit of a time delay.  Given that, I'll do my best not to speak over you, and I would ask that you do the same.

You were just sworn in by the court reporter, so you're giving sworn testimony, and you're obligated to give full and complete testimony.  If you could, answer all questions unless you're instructed by Marcy not to.  If you don't understand the question, please tell me; otherwise, I'm going to assume that you do.

I have two preliminary questions:  Are you under the influence of any drugs or medication?

A   No.

Q   And have you consumed alcohol in the last eight hours?

A   No.

Q   Okay.  Thank you.  Do you understand that you are here today to give testimony in a civil case regarding the conditions of confinement of Tom Silverstein?

A   Yes.

Page 5

Q Have you ever given a deposition before?

A Yes.

Q Do you know how often -- how many? I'm sorry.

A I do not know the exact number. I would guess, if you include EEO cases and other administrative cases, probably 12, 14 times.

Q Okay. Thank you. What was the most recent deposition you've given?

A The most recent deposition I gave was in a case in New York. One of the inmate's names was Icbaum (phonetic). And it dealt with detainees.

Q Okay. Thank you. And have you ever testified in court before?

A I have.

Q Do you know how often?

A In two cases.

Q Do you remember the case names?

A Actually, three cases that I can recall. One case was with an individual named Darrell Johnson. And then the other two cases -- I don't know the name of the defendants. One was a death penalty case out of Richmond for multiple defendants. And the other one dealt with Washington, DC, inmates.

Q Okay. Thank you. Who have you spoken to

Page 6

about your testimony today?

A Just to counsel, to Chris and Marcy.

Q Okay. Thank you. And what documents have you reviewed in preparation for your testimony today?

MS. COOK: Objection, foundation.

Q (By Ms. Godfrey) Have you reviewed any documents in preparation for your testimony today?

A I have.

Q And what documents are those?

A A number of documents. I reviewed two depositions, one by Mr. Nalley in this case. The other one -- it was my deposition from a prior case unrelated to this case. I also reviewed an information paper from 2004 and then a number of memorandum from ADX staff and others and a number of Sentry transaction sheets and probably a few other miscellaneous documents.

Q Okay. Thank you. For the -- your deposition in the prior unrelated case, do you know what the issues in that case were?

A Yes. These -- the case involved individuals who were convicted primarily of terrorism offenses prior to 9/11. And it dealt with their conditions of confinement and their transfer to ADX Florence, among other things.

Q Do you know who those inmates were?

Page 7

A There were three, I believe. I want to say it was Nosair and Salameh (sic). But I may be -- the case was being deposed by UD law students, so it's -- you're probably more familiar with it than I am.

Q Okay. Thank you. Can you please describe your educational background since high school?

A Sure. I graduated college in 1973 from the University of Scranton with a Bachelor of Science Degree in psychology and sociology, then received a master's degree in psychology from the University of Maryland in 1980 -- I'm sorry, I graduated from college in 1977. I received my master's degree from the University of Maryland in 1980 and then received my doctorate in psychology from the University of Maryland in 1985.

Q Okay. Thank you. Are you currently employed?

A I am.

Q Where?

A I am employed with a company called Management and Training Corporation, MTC.

Q And what do you do for that company?

A I'm the senior director of federal customer relations.

Q And what are your duties in that position?

A My duties are to help them manage current

Page 8

customers, federal customers, in the private detention business -- they run contract confinement prisons -- and also to help them out with some state contracts they have and to see if I can get them more business in that arena.

Q And how long have you been in this position?

A Just under two years; about 21 months, roughly.

Q And what was your job prior to this?

A Prior to that, I was the assistant director of the Correctional Programs Division for the Federal Bureau of Prisons.

Q And when did you first become the assistant director of the Correctional Programs Division of the BOP?

A In June 2004.

Q Did you have any positions with the BOP prior to that?

A I did.

Q Can you tell me what they were?

A Sure. Prior to that position, I was the deputy assistant director of the Correctional Programs Division. Prior to that, I was the warden of the federal detention center in Philadelphia, Pennsylvania. Prior to that, I was the warden at the low-security

2 (Pages 5 to 8)

Page 9

correctional institution in Butner, North Carolina. Prior to that, I was the deputy assistant -- I'm sorry. Prior to that, I was the associate warden of the administrative maximum facility in Florence, Colorado.

Prior to that, I was the deputy assistant director of human resources for the Bureau. Prior to that, I was the personnel director for the agency. Prior to that, I was the chief of management development. Prior to that, I was the executive assistant to the warden at the federal correctional institution in Terminal Island, California. Prior to that, I was the chief of personnel policy and analysis for the Bureau. Prior to that, I was a science research analyst for the Bureau.

Q   Okay. Thank you. You said that you -- prior to becoming assistant director, you were the deputy assistant director. Do you recall the dates that you were the deputy assistant director?

A   Yes, from January 2001 to when I became the assistant director.

Q   Okay. And you also said you were the associate warden at the ADX at some point. Do you recall the years that you were there?

A   Yes, 1994, which is the year it opened, through 1996.

Page 10

Q   Okay. Thank you. When you were associate warden of the ADX, what were your job duties?

A   I was the associate warden of operations. So I had personnel, financial management, facilities management, safety, food service, and that's probably it; mainly the logistics and services piece of the facility.

Q   Okay. Thank you. During this time when you were associate warden, was there a special housing unit at the ADX?

A   There was.

Q   And at that time was there an area in the special housing unit known as Range 13?

A   Yes.

Q   And how was Range 13 -- was Range 13 different than the rest of the special housing unit?

A   Yes.

Q   How so?

A   It -- the cells on that particular range were -- had their own recreation areas and visiting areas built actually into the cells, which was different from the rest of the institution.

Q   Different from the entirety of the rest of the institution?

A   Yes.

Page 11

Q   Okay. Would you say that an inmate housed on Range 13 is completely isolated from all other prisoners?

A   No.

Q   Why not?

A   Well, there's four adjoining cells on Range 13. So to the degree that there were other inmates on that range, they could converse with each other. They couldn't have physical contact, but they could certainly have verbal contact.

Q   Would they ever see one another?

A   Not normally. If an individual was being moved down the range, they could see each other. But other than that, I would think that their sight would be very limited in terms of seeing other inmates.

Q   Okay. Why was Range 13 built?

A   I don't know. I was not involved in the design of the facility.

Q   Do you know what its purpose was when you were associate warden?

A   We didn't have anybody on that range during the time I was the associate warden.

Q   Okay. Do you know why an inmate would have been confined on that range?

A   Not without knowing a specific inmate, why

Page 12

the decision would be made to put him on that range.

Q   Okay. Do you know, in your time with the BOP, how many inmates have ever been confined on Range 13?

A   There's two that I'm aware of -- three that I'm aware of, but there could have been additional ones, since I didn't work at the facility for those years, between '96 and now.

Q   And of those three, do you know how long they were confined there?

A   I don't.

Q   Okay. What were your job duties as deputy assistant director of the Correctional Programs Division?

A   I had oversight over a number of departments in the division, including correctional services, correctional programs, religious programs, psychology services, inmate systems management.

Q   Okay. And what were your job duties as assistant director of the Correctional Programs Division?

A   Well, I had oversight over those same departments, in addition to privatization management, and community corrections, and detention, were the other departments. And then I had policy control, if you

3 (Pages 9 to 12)

Case: 11-1443     Document: 4-5     Filed: 03/04/2011     Pages: 260

Page 13

will, or policy oversight over any of those different functional areas.

Q   Can you explain to me a little more what you mean by "policy oversight"?

A   Well, my job was to make sure that the policies that were under the span of control of my division were up to date. If they needed to be modified, we were the ones that wrote the modifications. We were the ones who would provide input to the program review division on how our policies should be audited or reviewed out in the field. And some of my staff would negotiate with the union when we made policy changes that were under our span of control.

Q   Okay. Thank you. You had said some of your job duties included correctional services. Can you expand on what that means more, please?

A   Meaning -- is your question: What does correctional services include?

Q   Yes.

A   Okay. Correctional services is basically the same as the security of the Bureau of Prisons. It includes policies related to tool and key control, inmate accountability, special housing operations, inmate transportation and movement, emergency planning, and intelligence gathering, among other things.

Page 14

Q   Okay. And for this intelligence gathering, does this include intelligence about gang-related activities?

A   Yes.

Q   Does the BOP receive intelligence from any other law enforcement agencies regarding gang-related activities within the prison system?

A   Yes.

Q   What other law enforcement agencies?

A   Well, I mean, dozens and dozens. I mean, we get information from other state systems, other state departments of corrections, and from the Federal Bureau of Investigation, Drug Enforcement Authority -- Administration, Alcohol Tobacco & Firearms. We'll take intelligence from basically anyone that will give us information. So as I said, it's dozens and dozens of states and just about every federal law enforcement agency that's out there.

Q   And how does the BOP receive this intelligence from those agencies?

A   Well, it would vary agency by agency. Sometimes we receive, for lack of a better word, bulletins over whether there is a particular gang problem at a state system that may bleed into our system. Sometimes we get specific intelligence about a

Page 15

specific individual. And that can come through different reporting systems; from the FBI and others.

The Bureau has a liaison in the National Gang Intelligence Center at the FBI and also at the National Joint Terrorism Task Force and also has representation on a lot of local task forces throughout the country. So we're constantly liaisoning with other law enforcement agencies to share information.

Q   Okay. You said some of this information comes in the form of bulletins. What happens to those bulletins?

A   They would be received by staff that work for the intelligence office and then they would be analyzed. This is what analysts do. They look at that information, try to determine how credible it is, and then try to determine its relevance to the Bureau of Prisons.

Q   And then after those bulletins are received, are they filed somewhere within the BOP?

A   I'm not sure. You would have to ask the intelligence staff that, as to how actually that piece of paper is handled and managed.

Q   Okay. You had mentioned the National Joint Terrorism Task Force. Is there a law enforcement entity for gangs that would be equivalent to that?

Page 16

A   There are several that are not the same size and scope but have similar functions. The National Gang Intelligence Center, NGIC, in the FBI of fairly recent creation, probably four years old -- three or four years old -- that's becoming more like the JTTF in terms of structure. There's also in many cities what are called Safe Streets Task Forces that deal a lot with gang issues in addition to violent crimes and other things of which the Bureau is involved in. So there's similar structures out there.

Q   Okay. For the National Gang -- I'm sorry. I just wrote down an acronym, NGIC, and I don't recall exactly what you said that stands for. What is the purpose of that entity?

A   The purpose is to try to enhance systems to share intelligence across different agencies and between states, local jurisdictions and federal jurisdiction.

Q   And how would that entity inform intelligence decisions within the BOP?

A   Could you repeat your question, please?

Q   Sure. How would the NGIC inform intelligence decisions within the BOP?

A   Well, they wouldn't inform decisions. They would provide intelligence. And then decisions based on intelligence would be done by the Bureau. The Bureau of

4 (Pages 13 to 16)

Page 17

Prisons has a staff member that's stationed inside the National Gang Intelligence Center as the liaison full time.

Q   Okay.  What other agencies are involved in this entity?

A   There's dozens.  I don't even know them all. I mean, there's dozens of states, and a lot of other federal agencies have staff assigned to the NGIC.  I don't know the complete menu of who is there.

Q   Okay.  Thank you.  Does the BOP ever use intelligence received from entities such as this to make conditions of confinement decisions?

A   We'll use intelligence as part of an assessment of an individual inmate's threat and risk to the safety and security of an institution.  It would be one piece of information that we may use.  And then manager's -- correctional managers would use that threat assessment, that information, to make decisions regarding where the inmate should be housed, how they should be classified and so forth.

Q   Okay.  Can you tell me what types of intelligence would guide these sort of decisions?

MS. COOK:  Objection, vague.

Q   (By Ms. Godfrey)  You can answer.

A   I mean, any type of intelligence, whether

Page 18

it's the person's criminal activity, whether it's who they're communicating with, whether it's who their affiliations and associations are -- I mean, there's dozens and dozens of types of intelligence that could be gathered.

Q   Okay.  Are you familiar with the Aryan Brotherhood?

A   Yes.

Q   What is the Aryan Brotherhood?

A   The Aryan Brotherhood is a security threat group, which is really what the prison terminology is now, rather than "gangs."  You'll hear that term.  These are groups that are a threat to the safety and security of the institution.  The Bureau has a higher level beyond security threat groups for a very small number of groups that are particularly disruptive, and they call them "disruptive groups."

The Aryan Brotherhood is a disruptive group. And in most analyses that you'll see, the Bureau creates a threat index for each security threat group.  The Aryan Brotherhood is consistently at the top of that threat index as the most violent and disruptive group in the federal prison system.

The Aryan Brotherhood started in California. There's multiple Aryan Brotherhoods throughout the

Page 19

country, in Texas and Arizona.  The one in the federal system that we call the Aryan Brotherhood is a California product that originated back -- you probably could trace it back to the late '60s, early '70s.

Q   Okay.  Thank you.  Do you believe that Mr. Silverstein has an association with the Aryan Brotherhood?

A   I believe he has more than an association.

Q   What do you mean by "more than an association"?

A   He's a validated member of the Aryan Brotherhood, so he has gone through an extensive objective validation process and literally been scored to determine whether he is a certified member of the disruptive group.  And he is a certified member of the Aryan Brotherhood.

Q   Okay.  You said something about an objective validation process.  Can you just expand on that a little bit more?  What does that mean?

A   Sure.  Most prison systems now -- and the Bureau is one of the leaders in this -- have devised scoring systems where you look at a number of criteria to determine whether an individual is a validated member of a group so that they're not just a look-alike or a wannabe.  And those criteria are published.

Page 20

They look at things such as affiliations, tattoos, photographs of individuals, and different pieces of intelligence that can be looked at.  And then based on that validation score, the individual is determined to be a member or not a member.

Q   Okay.  Are you aware of any evidence that Mr. Silverstein has had any contact with members of the Aryan Brotherhood in the past 25 years?

A   I have no evidence of that.  I don't -- I only see what the scoring that was produced for him shows.

Q   When was that scoring done for Mr. Silverstein?

A   I don't know.

Q   Okay.  Do you know if it was done before 1990?

A   I do not.

Q   Once an individual is determined to have an affiliation with a group like the Aryan Brotherhood, is that -- are they always -- will they always be determined to have that affiliation?

A   No.  There are inmates that sometimes separate themselves from security threat groups or disruptive groups.

Q   And how do they do that?

5 (Pages 17 to 20)

Page 21

A   There's multiple ways of doing that. Typically, or many times, inmates will what we call debrief, and that is that they will give up large amounts of information about the gang that proves to be credible. They renounce any membership and affiliation with it. But typically the way we do that is to not only listen to what the inmate says, but observe their behavior over a lengthy period of time to make a determination as to whether they should not be a validated member anymore. It's -- the number of people that are invalidated is probably not a large number.

Q   Okay. Has Mr. Silverstein's association with the Aryan Brotherhood factored into the BOP's decision on his conditions of confinement over the past 25 years?

A   Yes. If you are a disruptive group -- a validated disruptive group member, regardless of Silverstein or others, that will impact how you're classified and what security level of institution you're going to be placed at.

Q   Okay. When we were talking about -- you were talking before about how some inmates can invalidate themselves. What would the BOP look for behavior-wise in determining if they are no longer a validated member?

A   Well, I'm not an intelligence expert. But we would closely watch who they communicate with, possibly

Page 22

who they are assaulted by is an indication, unfortunately, who they associate with, whether they're still involved in drugs and other activity inside the prison that's associated with the gang. You know, we're going to watch and see how the person does.

Q   If the inmate doesn't debrief or renounce the organization, can they be invalidated?

A   I'm not sure. That's a question that's really better answered by an intelligence guy who has actually been through the process of devalidating somebody.

Q   And who would that be?

A   Either someone from the central office intelligence or a special investigative agent at a facility.

Q   Would invalidation occur at the institutional level or at the national level?

A   It would be initiated at the local level. But for a disruptive group member, it's going to have to be reviewed at higher levels because it's -- each of these security threat groups is very different in how they're structured and how organized and committed the members are. So if you're in a loosely structured group like a Surreno, it's going to be easier to drop out.

If you're in a group like the Aryan

Page 23

Brotherhood, which is an extremely structured group and one that is punitive to anyone who tries to drop out, then it's going to be -- the bar is going to be significantly higher for that type of group to prove that you're no longer a member. So it's -- but a disruptive group would have to be reviewed at a higher level in the institution.

Q   Okay. Thank you. Earlier when we were talking about your job duties, you also mentioned psychology services as one of your job duties. What exactly does this entail?

A   That entails the provision of mental health services in each of the institutions, with the exception of psychiatry. Psychiatry is done through the medical department of a prison. But the rest of the mental health care -- whether it's treatment, psychological assessments, suicide assessment and prevention, and some group counseling and therapy -- would fit under the mental health care that I had oversight for.

Q   Okay. How much, if any, would this job duty require interaction with inmates?

A   Which job are you speaking about?

Q   When you are providing oversight for psychology services.

A   You mean my job when I was the assistant

Page 24

director?

Q   Yes.

A   Okay. Well, I mean, I was based in the headquarters in Washington, DC, but I visited facilities frequently. And as I walked through facilities, I interacted with staff and inmates.

Q   Would you interact with them specifically about the provision of psychology services?

A   No. I would just interact with them in terms of how things were going in the institution. And if someone raised a concern to me about psychology services, obviously, I would speak to them about that. But I did not seek them out specifically for that issue.

Q   Okay. During the time that you worked for the BOP, did you ever receive any training regarding the psychological effects of incarceration?

A   Yes.

Q   What did that training entail?

A   Well, I mean, we -- I went through the basic correctional officer academy in Glynco, Georgia. And it started there and then carried on every year, going to annual training with the Bureau where we would teach staff to observe inmate behavior and interpret how they were behaving and speaking and interacting to see if an individual was having problems with decompensating, was

6 (Pages 21 to 24)

Page 25

not dealing with stress, was -- looking for depression issues or suicidal issues.

That was drummed into us, to pay attention to that. And then if we became aware that an individual was having difficulties with their confinement, to notify mental health providers specifically. And then in my background as a social psychologist, I also have a fair knowledge of the issues of mental health and conditions of confinement.

Q  Okay. During the time that you worked for the BOP, did you ever receive any training regarding the psychological effects of isolation?

A  No, because there's nobody in the Bureau that's isolated, so it's not really an issue.

Q  Can you define for me what you would determine to be "isolated"?

A  "Isolated," to me, means that there is no human contact, no social interaction at all with people, no communication with the outside world. That would be my definition of "isolation."

Q  Okay. Do you have an understanding of the term "solitary confinement"?

A  I do not.

Q  Okay. Have you ever used the term "solitary confinement"?

Page 26

A  Not that I'm aware of.

Q  Okay. Earlier when we were talking about your job duties, you also mentioned case management. What exactly does that entail?

A  Case management -- the Bureau has a case manager assigned to each inmate. The case manager is the one that initially determines the best housing placement, job assignments and programs that the inmate should be involved in, and then follows up with the inmate periodically to make sure that the programming and the jobs and the assignments are working properly. And then as the inmate gets towards the end of his sentence, the case manager would work with the individual on discharge planning, at least to the community, sort of future steps, if you will.

Q  And what type of oversight would you, in particular, as assistant director of correctional programs, provide with regard to case management?

A  My oversight would be primarily from a policy perspective at the national level.

Q  Are there any inmates for whom you would be more involved with case management?

A  There are inmates that I would be more involved -- there would be a very small number of inmates where I may get involved in their classification

Page 27

and designation.

Q  Why would you be involved?

A  Typically those inmates would be either high profile inmates, inmates that may be in the media frequently, or inmates that present very unique security issues or threats to the safety and security of a facility.

Q  Can you explain to me a little more what you mean by "high profile inmates"?

A  Most high profile inmates are people that are media people. You know, let's say, Martha Stewart; I was involved in her designation. You'll also get cases of former law enforcement people or congressmen who are incarcerated. They present very unique challenges. And then, as I said, you had certain individuals who, because of the nature of their threat assessment or the nature of their crime, present very challenging security and safety issues.

Q  Would Mr. Silverstein have been one of those inmates who, through the nature of his threat assessment or the nature of his crime, you would have been more involved in?

A  Yes.

Q  Can you elaborate on more specifically what you mean by the nature of his particular threat

Page 28

assessment?

A  Well, of course, his threat is fairly well documented as a matter of record. First, he's a validated Aryan Brotherhood member, attempted escape from a federal correctional institution on Terminal Island, California. He's an escape threat. Extensive armed robbery, bank robbery cases. And then most particular, convicted of three murders while incarcerated in the federal prison system, two of which occurred in the control unit at Marion, which at the time was the most secure unit in the entire Bureau of Prisons, one of those murders involving a horrendous murder of a staff member in the control unit.

Q  Okay. So how, in particular to Mr. Silverstein, were you more involved in his case management?

A  Well, I was involved in discussions as to where he should be designated once we were going to move him from Leavenworth, and then I was involved in periodic reviews of him while he was in ADX Florence.

Q  Okay. Thank you. Is there any classification assignment within the BOP that is a no-human-contact assignment?

A  Not that I'm aware of.

MS. GODFREY: Okay. I would like to take a

7 (Pages 25 to 28)

Page 29

five-minute break, if we could.

MS. COOK: That's fine.

MS. GODFREY: Thank you.

(A recess was taken from 9:20 a.m. until 9:32 a.m.)

Q   (By Ms. Godfrey) Okay.  Does the BOP have an executive staff?

A   Yes.

Q   What is the executive staff?

A   It is made up of the director, the assistant directors, the regional directors, and then the senior deputy assistant director of the program review division, and the director of the National Institute of Corrections.

Q   Okay.  Were you ever a member of the executive staff?

A   I was.

Q   When?

A   From June 2004 through May 2007.

Q   Okay.  And does the BOP have an executive panel?

A   Yes.

Q   What is the executive panel?

A   That's a panel to review control unit inmates on a periodic basis.  The panel is the assistant

Page 30

director of the Correctional Programs Division, the regional director of the north central region -- it's really a two-person panel -- and then the warden of the control unit.  I don't know if he's officially a member of the panel or not.  But that's basically it.

Q   Okay.  And as assistant director of correctional programs, you were a member of the executive panel, then?

A   Yes.

Q   Okay.  And then does the BOP have an executive committee?

A   I don't -- I'm not familiar with that term.

Q   Okay.  I want to talk a little bit more about the executive staff.  Does the executive staff ever meet?

A   Yes.

Q   How often do they meet?

A   It varies year to year, but typically three to four times a year.  Then they occasionally have teleconferences at interim times and as needed.

Q   Okay.  What is the purpose of these meetings?

A   Well, the purpose of the meetings is for the director to give an update on what's going on in the Bureau and to have each assistant regional director give an update on what's going on in their -- under their

Page 31

particular span of control.  The exec staff will also review a number of papers that vary on all sorts of topics but could deal with major policy changes or programmatic changes that the agency is considering, and they'll have discussions about that.  The group will also make selections or recommendations to the director for selections of high ranking positions throughout the agency.

Q   Okay.  And then you also said that the executive staff will have teleconferences as needed.  What would require a teleconference?

A   Well, it could be, for lack of a better word, sort of crisis situations -- not particularly crisis, but let's say there's -- the federal budget has come out and there's going to be a lot of major changes that need to happen or we're going to make a major policy change or programmatic change and we don't -- we need to get that implemented before our next scheduled meeting, or the director really feels the need to keep everybody up to date on a particular issue or concern, so he will have a teleconference.

Q   Okay.  Thank you.  And then at the scheduled meetings, is there a general procedure that's followed at those meetings?

A   Yes.  There's an agenda, a structured agenda.

Page 32

Q   And who determines that agenda?

A   It's determined -- the senior deputy assistant director of the program review division is really the coordinator of the meeting.  They put the agenda together.  I would assume at some point they go to the director and he approves the agenda, although I don't know that.  But it's the director's meeting, but it's really logistically run by the program review guy.

Q   Okay.  And are members of the executive staff provided with a copy of the agenda prior to the meeting?

A   Yes.

Q   And will that agenda include all the topics that will be discussed at the meeting?

A   No.  It's a -- the topics that are on the agenda will likely be discussed.  But there are many other topics that come up.  And there's a variety of ways that the topics can come up, either that -- the conversation on one topic, just like anything other thing, leads to another topic.

Each member, at some point, that goes to the meeting, as I mentioned, gets to sort of give an update or tell people what's going on in their area.  At that time, they could raise a particular issue or even bring in a brief memorandum or paper about an issue that they wanted to share.  So the agenda would certainly not be

8 (Pages 29 to 32)

Page 33

all-inclusive.

Q   Okay.  You had said earlier that the executive staff reviews a number of papers that deal with a number of different topics at these meetings. Can you -- would these papers be disseminated to the executive staff before -- prior to the meeting?

A   Most are, but there are some papers that are hand delivered at the meeting.

Q   Is there a reason that a particular paper would be hand delivered at the meeting?

A   There's a variety of reasons, some of which is, the deadline to get the paper submitted is several weeks prior to the meeting.  So it may be that you didn't get your paper in on time or that the particular topic occurred in the interim before the due date.  And then there's some issues that are more sensitive that they may not want to disseminate in advance.  Most regional and assistant directors let their staff review the papers that are sent out in advance to get their feedback on them.  And so there may be papers or issues that you don't want disseminated like that.

Q   Can you give me an example of a topic that you wouldn't want disseminated like that?

A   Yeah.  I mean, I'll give you a perfect example.  We were -- because of budget situations, we're

Page 34

actually going to eliminate hundreds of positions in the Bureau, and it would force people out of their jobs and to take jobs outside of their current assignment.  That is not the kind of paper you want floating around or out in the public domain, if you will, or have other employees be aware of until you've made a decision and communicated it.

Q   Okay.  Are these papers called information papers?

A   They're different types of papers.  There's some papers that are called decision papers, there are some papers called concept papers, there are some that are called information papers, and then sometimes they just come in as memorandum that may not even have that type of title at the top of them.

Q   Is there a reason that a particular paper would be called a decision paper?

A   Yes.  Usually you're talking about a major policy change where there's multiple options that the Bureau is going to look at.  And so the paper will lay out the various options and the cost benefit of each option and then look for a decision as to which option we were going to pursue in that policy area.  So it's very structured.

Q   And how is a concept paper different?

Page 35

A   A concept paper is more of an idea paper. Let me give you a perfect example.  The Bureau, years ago, was looking into creating faith-based units.  And so the initial paper that went in was to sort of lay out what that unit might look like and determine whether there was interest in that concept.  And then if you had an interest in that concept, you would probably come back later, the next meeting or two, with a decision paper that now begins to lay out, We buy into the concept of a faith-based unit.  Where is it going to be? How is it going to be structured?  How is it going to be funded?  How is it going to be operated?  So you sort of move into a decision paper.

Q   Okay.  And how would an information paper differ from those?

A   An information paper usually is what it sounds like.  It's informing someone of the status of a particular project or a particular issue.  It may or may not -- sometimes it doesn't ask for any response back from the executive staff.  It may have a brief recommendation or suggestion at the end of it.  But it wouldn't be as detailed in terms of options and cost benefit analysis as a decision paper.

Q   Okay.  I'm going to introduce -- actually, first, have you ever heard of anything called an

Page 36

executive staff paper?

A   I mean, all the papers I'm talking about would be executive staff papers.

Q   Okay.  So as assistant director of correctional programs, did you ever attend the meetings of the executive staff of the BOP?

A   I did.

Q   And at any of those meetings, did the executive staff discuss the conditions of confinement of Mr. Silverstein?

A   Yes.

Q   Were the conditions of confinement of any other inmates ever discussed at those meetings?

A   Yes.

Q   How many other inmates?

A   Oh, I don't know.  But specifically -- I mean, we had discussions regarding a lot of the inmates and detainees related to terrorism cases.  We had discussions on inmates that were high ranking drug cartel and security threat group members.  I mean, there were discussions on occasion about -- sometimes specific inmates; sometimes, for lack of a better word, sort of groups of inmates.

Q   Okay.  And at those meetings where you would discuss the conditions of confinement of

9 (Pages 33 to 36)

Case: 11-1443       Document: 4-5       Filed: 03/04/2011       Pages: 260

Page 37

Mr. Silverstein, what was the purpose of that discussion?

MS. COOK: Objection, foundation and misstates prior testimony as to "meetings."

Q   (By Ms. Godfrey) You can answer.

A   I don't recall that there were multiple meetings involved in that. I can't recall one meeting. What was the rest of your question?

Q   You had said earlier you discussed the conditions of confinement of Mr. Silverstein at an executive staff meeting. What was the purpose of that discussion?

A   The purpose was to review his current status at the time there that dates far before my placement on the executive staff. There was an annual review of his status. And there was a paper -- an information paper related to that review.

MS. GODFREY: Okay. I'm going to introduce an exhibit. It was previously marked as Plaintiff's Exhibit Number 23. The Bates numbers are US 16364 to US 16366.

Marcy, it was Exhibit I in the e-mail.

MS. COOK: Okay.

MS. GODFREY: Okay. This portion of the deposition should be "Confidential for Attorney's Eyes

Page 38

Only."

I want to introduce a new exhibit. The Bates number is 2402. Marcy, it was marked as Exhibit D in the e-mail I sent to you.

MS. COOK: Okay.

(Exhibit Number 39 was marked for identification.)

Q   (By Ms. Godfrey)  Mr. Vanyur, do you recognize that document?

A   I don't. I've never seen it before yesterday.

Q   Okay. So this document was not used in the executive staff reviews of Mr. Silverstein?

A   I've never seen it.

Q   Okay. Thank you. Have you ever seen a document like it?

A   No.

Q   Okay. Do you know if Mr. Silverstein ever knew that these executive staff reviews were conducted?

A   I don't know.

Q   Do you know if Mr. Silverstein was ever

Page 48

notified of the results of this review?

A   I do not.

Q   At these executive staff reviews -- or at the one that you attended, what role did Director Lappin play?

A   I don't recall him serving in any other role than the rest of the members; to listen to the paper and then concur with the recommendation.

Q   How are decisions made to accept or reject a recommendation by the executive staff?

A   It is usually done through concurrence, not through any type of vote. Depending on how complicated the issue or how contentious the issue is, sometimes the discussions will go on for lengthy periods of time; sometimes they won't. Usually we're looking for concurrence. And if the director believes there is concurrence and he agrees, then the issue moves on.

Q   So would the director be determining if the concurrence was there?

A   Yes. Typically he's trying to get a feel for where the group is headed on a particular issue.

MS. GODFREY: Okay. All right. I would like to take another five-minute break, if we could.

MS. COOK: That's fine.

MS. GODFREY: Thank you.

12 (Pages 45 to 48)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014   (720) 449-0329   FAX (720) 449-0334

Page 49

Q (By Ms. Godfrey) Okay. Mr. Vanyur, have you ever heard of the term "regional director special interest case"?

A Not before yesterday, no.

Q Okay. Do you know if there are particular inmates for which a regional director will, for lack of a better term, take a special interest in?

A Yes. I believe that there are certain inmates that the regional director will want to be notified about if the person is leaving the institution or has a medical emergency or has a significant event.

Q And why would the regional director need to know about those particular inmates?

A Well, I mean, either they're -- similar to the group we talked about before, that they're either high-profile people that are likely to be in the media or they're complicated security cases -- maybe witness security cases -- where the regional director just wants to be sure that he's in the loop of what's going on with that particular inmate.

Q Do you know if Mr. Silverstein would have been one of those inmates?

A I don't know that, other than when I was

Page 50

prepping yesterday for this.

Q Okay. Thank you. Can you tell me what a CIM assignment is?

A It's Central Inmate Monitoring assignment. It is an information tool that allows us to track inmates with special security issues so that when we move them somewhere or we assign them to a facility or we take them out for a medical emergency, we have to clear that person to make sure we don't make a mistake and that we're managing their security properly.

I'll give you an example. You can have seperatees in Central Inmate Monitoring; there are certain inmates that cannot mix with certain other inmates. And so if you were going to transfer that person to another prison, you're going to need to check Central Inmate Monitoring that one of their separatees is not in the facility that you're trying to transfer them to, as an example.

Q Okay. Thank you. Have you heard of the CIM assignment "special supervision"?

A Yes.

Q Can you tell me what is it?

A Special supervision is a category of inmates that require special security needs, complicated security needs, such as an ex-law enforcement officer is

Page 51

maybe someone who is under special supervision. There's probably a number of people. And again, it's an information tool so that before we do anything with that individual, we're going to make sure we know they have some special supervision issues and then make our plans appropriately based on that assignment.

MS. GODFREY: Okay. I'm going to introduce a new exhibit. Marcy, it was Exhibit V in the e-mail I sent to you.

MS. COOK: V, as in Victor?

MS. GODFREY: Yes.

(Exhibit Number 40 was marked for identification.)

MS. COOK: Okay. Just write a number 40 on this.

MS. GODFREY: Marcy, you got that it's Exhibit 40, right?

MS. COOK: Yes.

Q (By Ms. Godfrey) Mr. Vanyur, do you recognize this document?

A Yes. It's the program statement on Central Inmate Monitoring system.

Q Okay. I would like to turn your attention to the fourth page -- I actually think it's the fifth page of the document. It just says page 4 at the top.

Page 52

A Yes.

Q The second paragraph says, "Special supervision." Do you see that?

A Yes.

Q It says, "Inmates who require special management attention."

A Uh-huh.

Q Can you --

A Yes.

Q Okay. Can you tell me what is meant by "special management attention"?

A Well, I mean, it's the correctional management, so it has anything to do with how the inmate is housed and where he's housed, how he's transported, how he's escorted around the institution, how his movement in an emergent -- medical emergency would be done. Anything that deals with how that inmate is housed, transported, and escorted would fit into his correctional management.

Q Okay. Thank you. Once an inmate is designated as "special supervision," how long does that inmate have that designation?

A He has it until the assignment is removed.

Q And how would the assignment be removed?

A Well, I think it's laid out specifically on

13 (Pages 49 to 52)

Case: 11-1443     Document: 4-5     Filed: 03/04/2011     Pages: 260

Page 53

page 6 in the program statement that talks about removal.

Q   Okay. Do you know if Mr. Silverstein had the CIM assignment of "special supervision"?

A   I did as of yesterday, yes.

Q   But you -- did you know that when you were assistant director?

A   I don't know that he had that specific Central Inmate Monitoring assignment. I knew he was a Central Inmate Monitoring case, but what his specific assignments were, I did not know.

Q   Okay. I want to turn back to page 5 of this where it says page 5 at the top.

A   Yes.

Q   Number 3, "Special Supervision," it says, "Placement in this assignment may be made only upon the authorization of a Regional Director or the Assistant Director, Correctional Programs Division." Do you see that?

A   Yes.

Q   So if Mr. Silverstein had received this assignment while you were assistant director, would you have known?

A   Not necessarily because it's an either/or. It's the regional director or the assistant director.

Page 54

Q   Okay. So if the regional director put this assignment onto an inmate, he wouldn't necessarily have to notify the assistant director?

A   That's correct.

Q   Okay. Are you familiar with security threat group assignments?

A   Yes, in broad terms.

Q   Can you tell me how security threat group assignments are determined?

A   As I mentioned earlier when we discussed the validation process, if there is any indication or intelligence that an individual may be a member of a security threat group, then the special investigative supervisor or special investigative agent at a facility will begin to do a validation process on the individual to determine if they're a member; and if they're a member, a member of what particular group.

Q   Okay. Have you heard of the security threat group assignment of "BOP Top 40"?

A   Not prior to yesterday, no.

Q   Okay. When you were assistant director of the Correctional Programs Division, would you have known if there was a security threat group assignment of "BOP Top 40"?

A   I'd never heard the term in my life prior to

Page 55

yesterday.

Q   Right. But would you have known in your position if it existed?

A   I can't speculate whether I would or should have known. One would think I would know, but I can't say that I should have or I would absolutely know.

Q   Okay. Thank you. Mr. Vanyur, I want to talk about Mr. Silverstein's confinement at Leavenworth. Did you ever see the areas where Mr. Silverstein was confined while he was confined at USP Leavenworth?

A   I did not.

Q   Did you ever see those areas of confinement after Mr. Silverstein was transferred from Leavenworth?

A   No.

Q   Okay. I want to talk about Mr. Silverstein's transfer from Leavenworth to ADX. And you had said earlier that you were involved in that decision. How were you involved?

A   I spoke with Mr. Nalley about where the proper place would be to house him.

Q   Okay. So Mr. Nalley was also involved in that decision. Was anyone else involved?

A   No. It was really -- other than, I'm assuming, members of Mr. Nalley's staff and other people under his chain of command -- no, it was really him and

Page 56

I that reviewed the options.

Q   Okay. And when you say "reviewed the options," what were the options?

A   Well, I mean, one option would have been to leave him at Leavenworth, which we felt was inappropriate because Leavenworth was changing missions to a medium-security prison, and their perimeter security was going to decrease significantly. One of the other options would be to retrofit another facility with the type of cell that Mr. Silverstein required. And then the option which we agreed on was to move him to the administrative maximum penitentiary in Florence, Colorado.

Q   Okay. You said "the type of cell that Mr. Silverstein required." What type of cell is that?

A   Structurally it's the type of cell that requires us to have the least amount physical contact between him and staff in terms of movement and escort around the facility.

Q   Okay. And you said you determined that the ADX would be able to meet his security needs. Were there -- are there any other areas of confinement in BOP facilities that would have met those needs?

A   Not really, because the administrative maximum penitentiary is the -- their mission is to

14 (Pages 53 to 56)

Page 57

manage maximum-custody inmates and inmates that are particularly threatening to the safety and security of institutions; so ADX's sole mission is that. And it was really the ideal place to move him to.

Q Okay. When this decision was being made, was it ever contemplated that Mr. Silverstein no longer required these type of security controls?

A I think that's fair. As part of the review in terms of moving him to ADX, did he still require that type of structural cell design that minimized staff physical contact? And our belief at that time was that he still required that type of structural cell design.

Q What was that belief based on?

A That belief was based on his prior pattern of behavior in terms of the murders, particularly the murders that occurred while in the control unit in the most secure unit in the Bureau of Prisons.

Q Was Mr. Silverstein's clear conduct while confined at Leavenworth considered at all?

A Yes, to some degree.

Q In what way?

A Well, he has maintained clear conduct. But as a correctional manager, you can't look at that in the vacuum of a file. You have to also look at that he has not been given the opportunity or we've minimized, to

Page 58

the extent possible under current policies and regulations, to minimize the opportunity for him to assault or murder other people. So one has to look at the clear conduct in the context of how he's being managed and also the historical context of his prior behavior.

Q Okay. If UPS Leavenworth had not changed from a high to a medium security, would Mr. Silverstein still be confined at Leavenworth?

A I don't know that. That's an interesting question. I don't know.

Q Do you know if any inmates have been confined in areas where Mr. Silverstein was confined at Leavenworth since his transfer?

A I don't know.

Q Okay. Who made the decision to house Mr. Silverstein on Range 13 once he was transferred to ADX?

A That decision was made by Mr. Nalley and with my concurrence.

Q Was Director Lappin involved in that decision at all?

A Director Lappin was informed that it was our plan to move Silverstein to ADX Florence and where we would house him. And he raised no objection to that

Page 59

plan, so we moved ahead with it.

Q If he had raised objections to that plan, would the decision have changed?

A I mean, it could have. He's the director of the Bureau of Prisons and we are his subordinates. So certainly at the end of the day, if he disagrees with a decision or raises objections, we're going to have to respond to that.

Q Okay. Was it ever considered that Mr. Silverstein be placed in a general population unit at ADX rather than Range 13?

A I don't recall a specific discussion of that. Mr. Nalley and I spoke about that in more hypothetical terms. And one of the advantages to sending him to ADX Florence is that if he adjusted well in Range 13, that we do have the option at ADX, which we wouldn't have at any other facility, really, to move him into general population. So we -- I think, as part of our decision making, saw that down the road as a potential change.

Q Just so I'm clear, that possibility was contemplated when you were deciding where to transfer Mr. Silverstein from USP Leavenworth?

A I believe so. I believe that we saw down the road that at some point, he may be able to move off of Range 13.

Page 60

Q Okay. What in particular were you looking for to determine that he could be moved off of Range 13?

A The same things we would look at for any inmate; again, how he adjusts to his new environment, whether he continues to be behaved properly, how he interacts with staff. Again, we're going to defer a lot of this to the people who deal with him every day and make a individualized judgment as to whether we may be able to house him somewhere else and give him a little more opportunity to see if he still does present a threat.

MS. GODFREY: Okay. Thank you, Mr. Vanyur. Would you guys be okay with breaking for lunch now?

MS. COOK: How long do you want to take?

MS. GODFREY: Forty-five minutes.

MS. COOK: We can do that.

MS. GODFREY: Okay. Thank you.

(A recess was taken from 10:38 a.m. until 11:26 a.m.)

Q (By Ms. Godfrey) Okay. I want to go back to a few things we discussed before lunch. First, you talked about -- that you had testified in a number of different depositions. And I was wondering if you could remember any of the issues or inmates involved in the cases that were not involving the EEO issues?

15 (Pages 57 to 60)

A    Well, it's the case that I'm sure your familiar with, Nosair -- is it Saleh or Salameh? I always get confused. And Elgabrowny, I guess, is the third. Those guys were convicted of terrorist-type activities prior to 9/11. We moved them to ADX Florence after 9/11, so there was issues there; why they were moved to ADX and so forth.

The other case was on 9/11 detainees. These were not convicted fellows. These were people that were detained mainly for immigration charges after 9/11. And they were detained at some Bureau of Prisons facilities. And there was questions as to how they were detained, why they were detained in a special housing unit, and a bunch of very complicated issues as to whether they were cleared from any concern and being related to terrorist organizations.

Prior to that -- I'm trying to remember prior depositions. The testimony in court cases, two of them were in the penalty phase of death penalty cases where I was an expert witness. The other one was a case involving a haircutting policy imposed on DC inmates housed at a Virginia contract prison. Those are the ones that come to mind. I'm sure if you LexisNexis me, you'll be able to dig up a few cases.

Q    Okay. Thank you. Do you recall if you gave

**Page 62**

depositions when you were the associate warden at the ADX?

A    Not that I recall.

Q    Okay. Thank you. And then I want to talk -- I have one more question about the executive staff review that we talked about of Mr. Silverstein. And could any changes to Mr. Silverstein's conditions of confinement have been made without the executive staff approving?

A    Yes. I mean, the warden has discretion over a lot of different conditions on the day-to-day level. I think it's fair to say that movement to a different type of cell or different unit in the facility would have required certainly the regional director's concurrence.

Q    Okay. So if Mr. Silverstein would have been moved to a different area of confinement, would that have been at the regional director's discretion or at the executive staff's discretion?

A    It's really the regional director's call. You know, he would inform people. He would probably seek my concurrence on it when I was the assistant director, and inform the director. But it's really the regional director who has authority over his confinement.

**Page 63**

Q    Okay. Thank you. And then I just want to clarify: With the transfer to ADX, the decision was made to transfer Mr. Silverstein from Leavenworth to ADX because ADX had Range 13?

A    Well, yeah, because ADX had the physical structure that I was told was similar to Leavenworth in terms of his being able to access recreation, visitation, and other services without requiring the physical escort by staff. And also, ADX is really the appropriate place for a maximum-custody guy like Silverstein. I mean, that's the mission of that facility, is to house the most dangerous inmates inside the Federal Bureau of Prisons. And he certainly fits into that category. So it's both the structural issues in Range 13 and also the mission and security provided by ADX in general.

Q    Okay. Why if the mission -- if Mr. Silverstein's security needs to fit into the mission of ADX, was he not moved prior to 2005?

A    I don't know. Because it's -- that's a good question. I don't know why he -- once we opened ADX, why he would not have been moved there. And I don't have an answer for that.

Q    Okay. And when this decision was being made to transfer Mr. Silverstein from Leavenworth to ADX, you

**Page 64**

had said that you were involved in the decision with Mr. Nalley. When you were making this decision, was this a meeting in person that you had with Mr. Nalley?

A    No. I think most of it was done by -- via telephone.

Q    Okay. And is there -- aside from what we've discussed already, is there anything else that you remember about that conversation with regard to Mr. Silverstein?

A    No.

Q    Did you take any notes during that conversation?

A    Not that I recall.

Q    Okay. Now I want to talk about Mr. Silverstein's reviews at ADX. Did you attend any reviews of Mr. Silverstein at ADX?

A    I did.

Q    How many?

A    I don't know exactly. I would -- if I were to guess, I would say at least two and probably three, that I was actually at ADX. Sometimes we did the reviews for the control unit in general via picture-tel like we're doing now. But I definitely had in-person interactions with him at least twice and possibly three times.

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

Page 65

Q   Okay.  And how often did these reviews of Mr. Silverstein occur?

A   I believe they were every six months.

Q   And was this different than the process for reviewing Mr. Silverstein when he was confined at USP Leavenworth?

A   Yes.  I believe that his in-person reviews were done just by someone from the regional office and other staff and not necessarily by the -- by the regional director and the assistant director of correctional programs.

Q   Do you know why that changed?

A   I don't recall exactly.  It made his reviews more consistent with a control unit level of review.  It also really gave him greater access -- in-person access to higher ranking officials in the BOP, which I think is a positive.  And that's really the primary reasons.

Q   Do you know who decided to change this review process?

A   I think Mr. Nalley proposed that; that when we moved him, we could build into that move this type of review process that, again, is more similar to a control unit type of review.  So I think it was part of that decision-making process.

Q   Okay.  And after Mr. Silverstein was

Page 66

transferred to ADX, did his conditions of confinement continue to be reviewed annually by the executive staff?

A   I don't recall.  I don't specifically remember that paper coming up again, but I could be mistaken.

Q   Okay.  But if it had been reviewed by the executive staff, you would have continued to be a part of that review process also?

A   I would have.  And let me backtrack a little bit.  I don't believe that it -- I don't believe that the -- I believe the reviews stopped by the exec staff at some point.  I don't know what the timing was in relation to his movement to ADX, how soon thereafter we stopped doing the full executive staff reviews.

Q   Do you --

A   But there did come a point when we did not review him at the full exec staff.

Q   Okay.  And do you know why he was no longer reviewed with the full exec staff -- executive staff?

A   We just felt that with the higher level of review, in-person, by two members of the executive staff, there really was no need to involve 16 other people in this discussion who really don't have any direct contact or review with the individual.  So it just made sense to us to manage it, just as we manage

Page 67

other high profile inmates that -- such as those that are in the control unit that would be more consistent.

Q   Okay.  And for the reviews at ADX, what was your role in those reviews of Mr. Silverstein?

A   My role was to sit on a review board with Mr. Nalley and usually the warden of the facility next to us.  We would be briefed by the staff at ADX in terms of Mr. Silverstein's progress and behavior, any psychological issues or any other issues that might be raised.  And then he was brought into the review panel room, given an opportunity to discuss or raise any issues or questions that he had that we would then respond to.  And then we would make a decision after he left the room as to whether we were going to continue his current conditions or make a move to change him significantly.

Q   Okay.  And earlier you said that you stopped working for the Bureau of Prisons in, I believe you said, May 2007; is that correct?

A   That's correct.

Q   And who was your successor as the assistant director of correctional programs?

A   Joyce Conley.

Q   Do you know if she is still in this position?

A   She is.

Page 68

Q   Okay.  And would Ms. Conley have continued to play the same type of role that you did in these reviews?

A   I wouldn't know that, as a matter of fact.  I would assume so.

Q   Okay.  You also said when you were talking about the reviews that the warden of ADX was next to you.  Do you know who this was during that time period?

A   It was definitely Warden Wiley.  I'm trying to remember if he was there the entire time.  That's going back.  But Warden Wiley -- I don't remember, going back.  I can't quite remember, going back to 2004.

Q   And what -- does the warden play any role in these review processes?

A   Yes.  I mean, the warden gives input because he's the most familiar with the inmate.  He basically briefs the regional director and assistant director on issues that the inmate's raised, how those issues have been resolved or not resolved, what's the status of the inmate, what's their current progress.  So he performs a critical role.

Q   Okay.  And then when it comes time to make the decision whether or not for Mr. Silverstein you would change the conditions, did Warden Wiley play a role in that?

17 (Pages 65 to 68)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

Page 69

A   Yes. We would ask for his recommendation.

Q   And then would you follow his recommendation?

A   We would not be bound to follow his recommendation. But when you look across all the inmates in the control unit, I would venture to say we followed his recommendation the majority of the times.

Q   Do you know if you followed his recommendation with regard to Mr. Silverstein?

A   I believe we did.

Q   Okay. Did you take any notes during these reviews of Mr. Silverstein?

A   No, I did not take any notes.

Q   And did you review anything in advance of the reviews of Mr. Silverstein?

A   Yes.

Q   What would you review?

A   For each inmate that was being reviewed, we got a summary document that basically gave their background, their reason for placement at ADX, their progress to that time; you know, in essence a thumbnail sketch and an update of how the inmate was doing.

Q   Okay. Do you know if these reviews of Mr. Silverstein were recorded in any manner?

A   I do not believe there was any type of audio or video recording. There are summary minutes or

Page 70

summary -- a summary of the review and the recommendation of the panel.

Q   Okay. Did Director Lappin ever attend these reviews?

A   Not while I was doing them.

Q   Okay. Do you know of any time that he attended them when you were not doing them?

A   I don't know of any time.

Q   Okay. You had said that these would be done in conjunction with the control unit reviews. Are there any -- aside from the inmates in the control unit and Mr. Silverstein, were there any other inmates that would be given these six-month reviews in front of the executive panel?

A   No, not that I'm aware of.

Q   Why Mr. Silverstein, then?

A   Well, because as I've articulated, he presents very special security needs. He's housed in a unique portion of the institution, certainly, that we just felt that we could review him, we could be more familiar with his case, more familiar with his progress, and give him greater opportunity and access to in-person hearings with top executives in the agency.

MS. GODFREY: Okay. I want to introduce an exhibit. It was previously introduced as Plaintiff's

Page 71

Exhibit Number 9. The Bates number is US02306. Marcy, it was Exhibit G.

Q   (By Ms. Godfrey) Mr. Vanyur, do you recognize this document?

A   Only from seeing it yesterday.

Q   Can you tell me what it is?

A   It appears to be a file or a memo by Thomas Gomez, the unit manager of the control unit.

Q   Okay. If you look at the first paragraph, the last sentence, it says, "John Vanyur, assistant director, was present at the review." Do you recall being present at this review?

A   In general terms, yes.

Q   Okay. I want to direct your attention to the third paragraph where it says, "Inmate Silverstein was assured that he was not transferred to ADX Florence as punishment." Do you see that?

A   Yes.

Q   Do you recall Mr. Silverstein asking you about this?

A   Yes.

Q   Do you recall why Mr. Silverstein thought that he was transferred to ADX Florence as punishment?

A   Yes. He felt that he had more privileges and less restrictions while he was at Leavenworth.

Page 72

Q   Okay. You had said earlier that you -- after Mr. Silverstein was brought into the review and he raised issues, you would then make a decision to change the -- whether or not to change his conditions of confinement. Do you recall that?

A   Yes.

Q   Okay. Do you know what you would consider in making this determination?

A   Well, we would consider the legitimacy of the inmate's issues that he's raising. For example, some inmates will raise issues that -- Hey, I've had a dental problem and the dentist has had me on a waiting list for three months. And we would investigate whether that's the case. And if the inmate needs dental care, we would basically tell the warden to get him some dental care.

So we would look at each individual who comes in and the issues they raise to determine their legitimacy, first of all; and second, determine what the appropriate action needs to be made on that issue that he raised.

Q   Okay. Do you recall during these reviews of Mr. Silverstein if Mr. Silverstein ever raised any issues about his continued confinement on Range 13?

A   Yes.

Q   Do you recall what he said?

18 (Pages 69 to 72)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

Page 73

A   He said in general terms that he believed he didn't require that kind of security anymore, that he'd had clear conduct for a long period of time, and that he had interest in moving out to the general population and through the step-down program.

Q   And do you recall whether or not you considered whether or not to move him into the step-down program at these reviews?

A   We did.  We considered whether he should continue where he was at and -- or whether we should make a move.  And we told Silverstein several times that we are open to looking at where he should be placed in the future and that if he would demonstrate continued compliance with institutional rules and programs, that the panel would be open to looking at changes in his placement in the facility.

Q   How long would Mr. Silverstein need to demonstrate continued compliance with the institutional programs in order for the panel to determine he was ready to be moved?

A   Well, as I mentioned before, there's no fixed time period on that.  We've got to make a judgment, based on our correctional management experience, when the best time is.  It's my understanding that he has since been moved from Range 13.  But that was after my

Page 74

time.

Q   When you stopped working for the Bureau of Prisons in 2007, did you think that Mr. Silverstein would be moved from Range 13 in the near future?

A   I never really thought about it.

Q   Okay.  You had just said that you know that Mr. Silverstein is now in the general population unit -- in a general population unit at ADX.  Do you think that Mr. Silverstein should remain in the general population at ADX indefinitely?

A   Well, I can't make that judgment.  I don't have the information or access to any issues of his progress or how he's doing at ADX.  So it would not be fair for me to answer -- that's a hypothetical question to me since I'm really not involved in his case anymore.

Q   Okay.  Do you know anything about the step-down program at ADX?

A   I do.

Q   What do you know?

A   Well, I know that it's clearly laid out -- or at least it was in the '90s when we first opened the place.  The criteria for inmates who can work their way from general population eventually, hopefully, out to an open-population penitentiary down the road, it's a program based on incentives.  The more the inmate

Page 75

follows the institution rules and programs for periods of time, he can be moved into another unit, stepped down to another unit where he has greater access to privileges, such as recreation, and greater access to communal activities, recreation with small groups of others and so forth.

And then as they move down each step, greater privileges, less restrictions on movement, greater access to communal activities, to see if the inmate is able to adjust to that.  If they violate the institution rules, have other problems at any phase of the step-down, then they can be stepped back up into prior units.

Q   Okay.  If Mr. Silverstein -- if Mr. Silverstein was meeting all of those institutional guidelines, do you know of any reason that he wouldn't be able to move through the step-down program at ADX?

A   Yeah.  There are some inmates -- and I think if you look at the institution supplement, from my recollection, there are some inmates that present such significant security threats that it may be that they end up at some phase of the program that they may not be able to work their way to a lower phase.

Q   And do you think Mr. Silverstein possesses those security threats?

Page 76

A   I think he did at the time I retired from the Bureau.

Q   Do you know of a way that Mr. Silverstein could show that he no longer has those security threats?

A   Again, as I mentioned before, if he complies, if his interactions with staff are positive, if he continues to program, then they'll make decisions of whether he can change into a different unit, as they already have, apparently.  So I would expect that that same process will continue.

MS. GODFREY:  Okay.  I would like to take a five-minute break, please.

MS. COOK:  That's fine.

(A recess was taken from 11:57 a.m. until 12:07 p.m.)

Q   (By Ms. Godfrey)  I just have a couple more questions for you.  Earlier I had asked you about whether or not you took notes of the reviews, and you said that there was a summary created.  Do you know if the exhibit I had you look at, Exhibit 9, is that the summary that's created from those reviews?

A   Now, I seem to recall -- and again, I can't recall specifically for Silverstein -- but for the other guys in the control unit, there was a shorter sort of summary statement made at the end of this profile that I

19 (Pages 73 to 76)

Page 77

sort of laid out before. Remember, I told you we sort of had the picture of the inmate, his background, his current progress. My recollection is they later went in and put a paragraph or two summary in that. But content-wise, it's not going to differ substantially from what this looks like. But I remember a different format.

Q   Okay. Just so I'm clear, you would receive, before the reviews a, like, profile summary of the inmates to be reviewed; and then you think after the reviews, they would put something in about those inmates?

A   That's my recollection, yes.

Q   Okay.

A   Now, I'm speaking in broader terms about control unit reviews.

Q   Right.

A   I don't remember if Silverstein's looked like that or not.

MS. GODFREY:  Okay. Marcy, I think we have the profile for Tommy. I'm not sure if -- for Mr. Silverstein. I'm not sure if we have anything after the review. So if those exist, we would like them.

MS. COOK:  Right. And as Mr. Vanyur has indicated, he doesn't remember if that existed for

Page 78

Mr. Silverstein. We'll look to see if it does. And if it does, we'll produce it.

MS. GODFREY:  Okay. Thank you.

Q   (By Ms. Godfrey)  And then I just have one other question. You were saying that Mr. Silverstein would need to maintain clear conduct and continue programming in order to show that he no longer needs the security controls. What about Mr. Silverstein's complying with the programming would show that he was no longer a security threat?

A   Well, I mean, we -- the programming, his interactions with staff, his clear conduct -- I mean, it's all sort of part of the profile of the picture of the individual and how he's adapting to the institution rules and regulations. So in the programming piece, if his case manager is recommending he needs anger management or whatever other type of programming, we expect him to comply and be active in that program. We expect him to be active in betterment of and keeping himself busy while he's -- not just him, but all these guys -- while they're incarcerated. So we look at that.

MS. GODFREY:  Okay. Thank you, Mr. Vanyur. That's all I have for right now. We would like to reserve the rest of our time, though.

MS. COOK:  For what purpose?

Page 79

MS. GODFREY:  In the event that more documents are produced that we would like to ask him about.

MS. COOK:  Have you asked for any, other than those -- so you mean the limited documents that you just recently identified at the end of the deposition?

MS. ROVNER:  Well, documents continue to trickle in. We just received some yesterday. So to the extent that any of those are relevant to the testimony that Mr. Vanyur has given today or to his knowledge about the events related to this case, we're leaving it open to be able to inquire about those.

MS. COOK:  Right. But you designated those documents you received yesterday as potential exhibits for this deposition. So I'm just asking you to identify what you want to leave the deposition open for, with some specificity.

MS. GODFREY:  Well, Mr. Vanyur referenced, when he was deputy assistant director, seeing other information papers that we have yet to see. So, something like that.

MS. COOK:  All right. That's fine. I would like five minutes to determine if I will ask any follow-up questions.

MS. GODFREY:  Okay.

Page 80

(A recess was taken from 12:12 p.m. until 12:15 p.m.)

MS. COOK:  We're ready if you guys are.

MS. GODFREY:  We are.

MS. COOK:  Okay. I don't have any follow-up questions for Mr. Vanyur.

MS. GODFREY:  Okay. Thank you, Mr. Vanyur.

THE WITNESS:  Okay. Thank you very much.

MS. ROVNER:  Mr. Vanyur, thank you for your assistance with the service of the subpoena. We appreciate your cooperation with that.

THE WITNESS:  Oh, not a problem at all. Thanks. I'm getting to know the server now by name.

MS. ROVNER:  Thanks again.

MS. COOK:  Thank you.

(The videoconferenced deposition was concluded at 12:16 p.m., on Friday, January 27, 2009.)

20 (Pages 77 to 80)

Page 81

I, JOHN MARTIN VANYUR, do hereby certify that I have read the above and foregoing videoconferenced deposition, and that the above and foregoing transcript and accompanying Amendment sheet(s), if any, constitute a true and complete record of my testimony.

Amendment sheet(s) attached [ ]
No changes, therefore no Amendment sheet(s) attached [ ]

_____
JOHN MARTIN VANYUR

Subscribed and sworn to before me this
_____ day of _____, 2009.
My commission expires: _____.

_____
Notary Public

_____

_____

Page 82

VIDEOCONFERENCED DEPOSITION OF
JOHN MARTIN VANYUR

REPORTER'S CERTIFICATE
I, Wendy Evangelista, Registered Professional Reporter and Notary Public in and for the State of Colorado, do hereby certify that prior to the commencement of the examination the Witness was by me first duly sworn to testify the truth; that said videoconferenced deposition was taken in shorthand by me at the time and place hereinabove set forth and was thereafter reduced to typewritten form under my supervision, as per the foregoing transcript; that the same is a full, true, and correct transcription of my shorthand notes then and there taken.
I further certify that I am not related to, employed by, nor counsel for any of the parties or attorneys herein, nor otherwise interested in the event of the within action.
My commission expires August 12, 2012; and I have hereunto set my hand March 11, 2009.

_____
Registered Professional Reporter
and
Notary Public

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014   (720) 449-0329   FAX (720) 449-0334

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION


- - - - - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA,                :

                                         :

                                         :

-vs-                                     : CRIMINAL ACTION
                                         : NO. 3:96CR66
DEAN ANTHONY BECKFORD, et al.,           :
                                         : July 21, 1997
                    Defendants           :
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROBERT E. PAYNE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

DAVID J. NOVAK, Assistant United States Attorney
ANDREW G. McBRIDE, Assistant United States Attorney
STEPHEN W. MILLER, Assistant United States Attorney
Richmond, Virginia

        Counsel on behalf of the United States

GERALD T. ZERKIN, ESQ.
Richmond Virginia

WAGNER & WAGNER, ESQS.
Richmond, Virginia
BY:  ROBERT J. WAGNER, ESQ.

        Counsel on behalf of the Defendant Beckford

JOHN C. JONES, ESQ.
Providence Forge, Virginia

SCOTT BRETTSCHNEIDER, ESQ.
Kew Gardens, New York

        Counsel on behalf of the Defendant Dennis

SANDRA M. BEVERLY, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

REGINALD M. BARLEY, ESQ.
Richmond, Virginia

BOWEN & BOWEN, ESQS.
Richmond, Virginia
BY:  CARY B. BOWEN, ESQ.

       Counsel on behalf of the Defendant Cazaco

MORCHOWER, LUXTON & WHALEY, ESQS.
Richmond, Virginia
BY:  ELIZABETH D. SCHER, ESQ.

DAVID P. BAUGH, ESQ.
Richmond, Virgninia

       Counsel on behalf of the Defendant Thomas

RICE, EVERHART & BABER, ESQS.
Richmond, Virginia
JEFFREY EVERHART, ESQ.

       Counsel on behalf of the Defendant Smith


I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| John Vanyur | 2 | 19 | 36 | 41 |


SANDRA M. BEVERLY, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

(The following is an excerpt from trial day 7-21-97)

MR. McBRIDE: Call Mr. John Vanyur.

JOHN VANYUR, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. McBRIDE:

Q. Good afternoon, sir. State your full name for the record, please.

A. My name is John Martin Vanyur.

Q. How are you presently employed?

A. I'm employed by the Federal Bureau of Prisons.

Q. What is your present duty assignment?

A. I'm the warden of the low security federal prison in Butner, North Carolina.

Q. Mr. Vanyur, how long have you been with the Bureau of Prisons?

A. Over seventeen years.

Q. Could you briefly list the facilities that you have been at for the jury?

A. Prior to my current assignment, which I have been in one year, I was the associate warden of operations for the United States Penitentiary Administrative Maximum in Florence,

Colorado, and I opened that facility and been there for two and a half years.  I have also worked in a medium security federal correctional institution and a number of other posts at headquarters at the Bureau of Prisons.

Q.  Now, you indicated the Ad-Max facility, when did that open?

A.  We took our first inmates in November 1994.

Q.  And prior to joining BOP or during the time at BOP, just summarize, if you would, your educational background for the jury.

A.  I've got a bachelor's degree in psychology and a master's and doctorate degree in social psychology from the University of Maryland.

Q.  And have you also taken the basic officer correctional course for BOP?

A.  I have.

Q.  Let's talk about Ad-Max if we could.  You were the first deputy warden at Ad-Max; is that correct?

A.  That's correct.

Q.  And could you tell the jury how many inmates is Ad-Max capable of housing?

A.  Our capacity was 484.

Q.  How many inmates are there now?

A.  388.

Q.  And do you know, out of that 388.  How many inmates have homicides in their background?

A.   Just over 150.

Q.   Now, Ad-Max is a maximum security facility in BOP; is that correct?

A.   That's correct.  It's the most secure facility in the system.

Q.   Then there are also a number of United States penitentiaries that are labeled high security; is that correct?

A.   That's correct.

Q.   How many of those are there?

A.   There are eight others, in addition to Ad-Max.

Q.   Could you tell us what those are?

A.   I can try.  United States penitentiaries in Lewisburg, Leavenworth, Atlanta, Lompoc, Marion, Terre Haute, Allenwood, I believe, and Beaumont.

Q.   You got it.  At what is the total population that BOP has under its control right now?

A.   Roughly 110,000 inmates.

Q.   Do you know how many of that group have homicide in their background?

A.   Just over 1,200, but that's a slight underestimate because that only includes inmates that are doing time for federal crimes of murder.  If an inmate has state murder charges somewhere in their past, that doesn't show up in that listing; so over 1,200.

Q.   Now, how many inmates are presently at the Ad-Max facility?

A.   388.

Q.   And could you tell us what is the purpose of the Ad-Max facility?

A.   The purpose of the Administrative Maximum is to house inmates that are not functioning properly inside the federal prison system.  Either they have attempted escape or escaped from secured prisons or they have seriously assaulted inmates or staff or they have murdered inmates or staff.  And because they cannot function in a normal, open population environment, we move them for a temporary basis to a more restrictive environment.

Q.   What percentage of inmates at Ad-Max come from other institutions?

A.   Over 91 percent.

Q.   And where do the other 9 percent come from?

A.   The other 9 percent are direct court commitments.  They are very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists, people that would have the potential to have resources enough to garner an outside assisted escape.

Q.   Now, for instance, is John Gotti at Ad-Max?

A.   No, but he's at Marion, which is a similar program.

Q.   Now, is the purpose of Ad-Max for people to go there and remain there?

A.   No, it's not.  Ad-Max is a correctional program.  It's meant

to bring an inmate into a more restrictive environment, and then over several years, three years, four years, depending on the individual, allow them to work their way out of that prison and into an open population penitentiary.

Q.   What is the goal time frame to move them from the highest level of security, Ad-Max, out to another institution?

MR. BAUGH:   Objection to the goal, Your Honor.   That's speculative, has no relevance to this case.

THE COURT:   Overruled.

BY MR. McBRIDE:

Q.   What is the time frame that the Bureau of Prisons has set as its goal?

A.   To move from general population to outside the Ad-Max, three years is our goal.

Q.   And within Ad-Max, there are different levels of security; is that correct?

A.   That's correct.

Q.   And the highest level of security is the controlled area for those who have violated the rules at Ad-Max; is that correct?

A.   The control unit -- or committed murder, serious assault or escape inside BOP facilities.

Q.   If I could have the assistance -- we saw some pictures before, Mr. Vanyur.   The jury has already seen these photographs.   They have been admitted.   Since you have been at Ad-Max, maybe you could describe what we are seeing there.

Could you tell the jury what that is?

A.   That is a typical cell inside Ad-Max.   There are 500 or 602 cells.   Over 400 resemble this type of cell.   You are looking from the back of the cell out towards the front door, out towards the range or hallway.

Q.   Is that, in fact, one of the control area cells for people who have violated the rules within Ad-Max?

A.   It's a similar cell.   A control unit cell would have a 12 inch black and white television.   This cell has a radio.   So it's the administrative detention part of the special housing unit.

Q.   That's for the worst of the worst?

A.   This is the most secure cells, yes.

Q.   And what percentage of the cells at Ad-Max are designed like this?

A.   Over two-thirds.

Q.   What are the other cells like?   How do they differ?

A.   Well, they are just not as self-contained.   They don't have a shower facility inside them, and they are slightly smaller. Other than that, they still have a poured concrete cell.   Some of them just have one steel door, instead of two steel doors, but they are not all that dissimilar.

Q.   Now, let's take the most secured area, the area you have described with the control area.   Even in that area, are inmates allowed to recreate?

Case 1:02-cv-06998  Document 87-3  Filed 12/18/09  Page 10 of 46  PageID 1100
Case: 11-1443  Document: 4-5  Filed: 03/04/2011  Pages: 260

8

A.  Yes.  Every inmate is required to recreate by law.

Q.  And, also, do they have access to a law library?

A.  Yes.  We operate nineteen law libraries inside the institution.  We are required to provide access.

Q.  Now, when the inmates, even in the most secured area, recreate, where do they do that?

A.  In the control unit, they recreate by themselves, and we have both indoor and outdoor recreation yards.  The indoor room is probably about 15 by 20 feet.  And the outdoor room is probably 20 by 15.  It's a triangular shape with two story walls around it.

Q.  In the general population at Ad-Max, how long are the inmates allowed to recreate each day?

A.  Two to two and a half hours a day.

Q.  How do they recreate?

A.  They recreate in small groups of eight to twelve in a larger rec area, probably about the size of this courtroom.

Q.  Entire courtroom?

A.  Yes.

Q.  And what sports are they allowed to play?

A.  They have a basketball and a hand ball.

Q.  How many inmates are allowed out there at one time?

A.  At the most twelve.

Q.  Now, is there a metal detector that's used prior to inmates going out there to recreate?

A.   Yes, there is.   There is a hand-held metal detector.

Q.   Even with that, have you had incidents of shivs, knives, homemade knives being used in the recreation area?

A.   We had an incident where an inmate introduced a wooden shank, which, of course, the metal detector did not pick up, and he assaulted another inmate with that shank.   Unfortunately for him, the individual he assaulted took that shank away from him and then used it on him.

Q.   And have you also had violence occur in that recreation area without weapons involved?

A.   Yes.

Q.   Have you witnessed that yourself, sir?

A.   Yes.   I witnessed a very serious assault where three inmates literally stomped on the head of an inmate for several minutes.

Q.   You mentioned the law library.   Have you had occasion to view homemade knives or instruments that inmates at Ad-Max have manufactured from items in law libraries?

A.   Yes.   I have seen one.   It was a flat piece of steel that came out of the inside of a stapler.   There is a sort of U-shaped piece of steel in a stapler.   The inmate removed it and then got it back to his cell and then flattened it out into a shank.

Q.   What did the inmate do with that?

A.   That particular shank we found in his property before he got to use it.

Q. And was there another shank that was made from a typewriter piece?

A. Yes. After I left, they discovered the steel rod from a typewriter had been taken out, and the inmate did attempt to stab an officer with that weapon.

Q. Now, are you generally familiar with the assignment procedures for BOP, the program statement in the various prisons where people would go?

A. Yes, I am.

Q. Now, if I could put up the program statement. As to assignment to ADX Florence, where you worked, if that comes up on your screen, the criteria for assignment to U.S.P. Marion and ADX Florence -- I don't know if you are going to be able to do that, if it's going to work. I will just hand it to the witness, if I could.

MR. BAUGH: I have no objection to counsel reading it if it would help.

BY MR. McBRIDE:

Q. I will read this and ask you if this is a correct statement of BOP policy. ADX Florence: ADX Florence general population units are used for those inmates who have demonstrated an inability to function in a less restrictive environment, without being a threat to others, or to the secure and orderly operation of the institution. Is that the general criteria for assignment to ADX?

A.   Yes.

Q.   So, essentially, to put it colloquially, you have to mess up, have some kind of incident in some other institution before you'd even get to ADX; is that correct?

A.   That's correct, the vast majority of cases.

Q.   Is that also true of Marion?

A.   That's correct.

Q.   So, for instance, take someone who is convicted of homicide in furtherance of a drug enterprise and has a significant violence -- excuse me, significant background of dealing drugs and firearm violence.  In your opinion, where would that person go to start out their incarceration at BOP?

A.   Probably to an open population United States penitentiary.

Q.   Of which there are how many, you indicate before?

A.   Not including ADX, there would be eight others.

Q.   Now, let's talk about those high security facilities.  Do they have recreation where they recreate with other inmates?

A.   Oh, yes.  They would have open access to large recreation yards, similar to what you would see on television, and a full recreation program.

Q.   Would they have double bunking?

A.   Probably.

Q.   Two inmates to a cell?

A.   Yes, probably.

Q.   And would feeding be done in a dormitory fashion at a high

security facility?

A.   They would eat in a dining hall, similar to a military style dining hall.

Q.   So there would be access to utensils then?

A.   That's correct.

Q.   Would they also have an opportunity to work in uniform?

A.   Yes.   They would be required to work at some job.

Q.   So there would be access to tools as well?

A.   That's correct.

Q.   Now, even at Ad-Max, once you have advanced in the program, you do receive certain liberties; is that correct?

A.   That's correct.

Q.   And so are there inmates at Ad-Max who are allowed to eat in a dormitory type fashion with other inmates?

A.   Yes, and there are also inmates that work in a factory setting.

Q.   So even during the three year program at Ad-Max, the liberties increase over time; is that correct?

A.   That's correct.

Q.   Now, let me ask you, have you had a look at the statistics on the rates of violence in the high security facilities at BOP?

A.   I have.

Q.   If I could put up the first chart.   If you would look at your screen, is that the BOP statistics for high security facilities for the period from May '95 to May '97, a two year

period?

A.   Yes, it is.

Q.   Now, does that population include Ad-Max?

A.   Yes, it would.

Q.   And it includes Marion as well?

A.   That's correct.

Q.   And then the other less restrictive high security facilities, correct?

A.   Yes.

Q.   What was the average daily population in those high security facilities for that two year period?

A.   I cannot read it, 9,981.

Q.   Almost 10,000 inmates; is that correct?

A.   That's correct.

Q.   And how many total assaults occurred in that two year period?

A.   I did some tallying.  If I could pull my --

Q.   Sure.  How many total assaults out of almost 10,000 inmates?

A.   1,462.

Q.   So assuming that no inmate committed more than one assault, what percentage of inmates committed assaults in the high security facilities?

A.   Roughly 14 percent.

Q.   And of those assaults, those 1,500 assaults, how many involved a weapon of some kind?

A.   384.

Q.   What percentage is that of the total assaults?

A.   26 percent.

Q.   And how many of those assaults were on staff?

A.   800, both with and without weapon.

Q.   And that was one two-year period in the high security facilities; is that correct?

A.   That's correct.

Q.   If we could go to the next one.  If we could go back to that one.  How many homicides were there in high security facilities for that two year period?

A.   Nine.

Q.   How many of those involved staff?

A.   One.

Q.   If we could go to the next one then.  Now, this is for the period 1993 through 1995, same statistics.  How are those statistics generated by the Bureau of Prisons?

A.   Any time an incident occurs within a facility, we generate something similar to a police report, whether there was an assault or any kind of serious misconduct.  So those are automated, and then they are fed into a computer system and tallied.

Q.   For this period 1993 through 1995, for most of that period, or some of that period, Ad-Max was not operating; is that correct?

A.   That's correct.

Q.   So this would include Marion and then the other high security prisons?

A.   Except for Beaumont, which is also brand new.

Q.   Except Beaumont?

A.   That's correct.

Q.   What was the average daily population of inmates during this two year period?

A.   7,912.

Q.   And how many total assaults occurred among that group?

A.   1,572.

Q.   And, again, assuming that no inmate was charged with more than one assault, what percentage of inmates committed assaults in the BOP high security prisons?

A.   19 percent.

Q.   And how many of those assaults were with a weapon?

A.   420.

Q.   What percent of that is of the total assaults?

A.   26 percent again.

Q.   How many assaults were committed on staff members in that two year period?

A.   921.

Q.   Now, how many murders were committed in that two year period in your high security facilities?

A.   Sixteen.

Q. And how many of those homicides involved corrections officers?

A. One.

Q. If we could go to the last statistics. Have you also reviewed the statistics for the years 1991 through 1993 for high security facilities?

A. Yes, I have.

Q. And that would not include Ad-Max at all; is that correct?

A. That's correct.

Q. It was not even open at that point. What was the average daily population of the Bureau of Prisons high security level institutions for that two year period.

A. 7,274.

Q. And, again, how many total assaults occurred in that population?

A. 586.

Q. Assuming that only one assault per inmate, what percentage of inmates committed some kind of assault?

A. 8 percent of them.

Q. And what percentage of those assaults involved a weapon of some kind?

A. Over one third.

Q. And how many deaths, homicidal deaths, occurred in BOP high security facilities in that period of time?

A. Ten.

Q.  Did you also keep statistics regarding drug use in high security federal prisons?

A.  Yes, we do.

Q.  In your experience, sir, is the distribution and use of drugs in federal prisons associated with violence in those prisons?

A.  Yes, it is.

Q.  Could you tell the jury why that is?

A.  Well, you sort of have the direct effect of the inmate who is using drugs, if he's using amphetamines or another drug that would get him hyped up, you've got to deal with that individual in a confined setting.  So you have the immediate violence.

But probably more important to that is the secondary violence that you get.  You have turf wars with gangs over who is going to distribute the drugs inside the institution, just as you would have on the street.  And then people sometimes don't pay their debts for drugs they bought or they made promises they couldn't keep.  So there is retribution based on that failure to pay debts or failure to follow through on distribution promises.

Q.  Now, let me ask you to look, if you could, at the 1993 to 1995 statistics on your drug testing program and how many -- what was the average daily population in that period?

A.  Again, 7,912.

Q.  And how many total positive tests did you have?

A.  1,980.

Q.   Now, a lot of those are repeat offenders; is that correct?

A.   That's correct.

Q.   So what percentage of positive tests for controlled substances did you have in random testing of this population?

A.   About 3 percent of the random tests were positive.

Q.   So 3 percent of the people in your high security prisons test positive for drugs?

A.   Randomly, yes.

          MR. McBRIDE:   If I could have Exhibit DAB-11, that's been admitted into evidence.

BY MR. McBRIDE:

Q.   Mr. Vanyur, take a look at that item.   In your experience, in your seventeen years with the Bureau of Prisons, have you ever seen an item like that before?

A.   Similar.

Q.   Many times, in fact?

A.   Yes, usually with a tooth brush handle is the most common.

Q.   In other words, the razor welded onto the toothbrush?

A.   Yes.   A toothbrush handle is typically longer, and you get more leverage with it.

Q.   How do people shave at Ad-Max?

A.   With a disposal razor.

Q.   Similar to that one right there?

A.   Yes.

          MR. McBRIDE:   Thank you.   I have nothing further.

CROSS EXAMINATION BY MR. BAUGH:

Q. Mr. Vanyur, all the statistics you gave us have to do with all of the inmates in the maximum security prison; am I correct?

A. High security prisons.

Q. High security. How many homicides have there been in your Florence ultra security section?

A. None so far.

Q. None so far. Are you expecting any?

A. With the type of population we have, one never knows.

Q. Also, you told this jury that usually people are sent there after they misbehave in another facility; am I correct?

A. That's correct.

Q. Do you mean to tell me that if the Bureau of Prisons decides that someone is so dangerous that they should either be executed or sentenced to a cell, you people wouldn't stick him in there immediately?

A. As I said, about 9 percent of the inmates are direct court commitments.

Q. So you don't mean to tell this jury that someone cannot be committed there immediately if the United States is of the opinion they are that dangerous?

A. That's correct.

Q. Now, concerning inmate violence at Ad-Max, am I correct, sir, that not in your open population -- well, strike that. In

your high security jails, Beaumont, Marion and all those, they have a section that's just open, like on television, a yard, right?

A. That's correct.

Q. And people can mingle?

A. That's correct.

Q. And they can have visitors?

A. Contact visiting.

Q. Contact visiting. They can actually meet with loved ones and friends in a room and pass things back and forth sometimes?

A. That's a fact.

Q. Now, when someone is in Ad-Max security, that doesn't happen, does it?

A. No. The visiting is noncontact.

Q. In fact, not only is it noncontact, but you people, meaning BOP people, had the kind of glass you can't even break through with a hammer hitting on it for two hours.

A. That's a fact.

Q. They must speak over the telephone?

A. Correct.

Q. And the cells at Ad-Max, am I correct, they are approximately, what, 6 feet 6 inches by 9 feet 6 inches?

A. The controlled units are 90 square feet. The general population area is 85 square feet.

Q. And in that 90 square feet, you got your bunk?

A. Correct.

Q. Your toilet?

A. Yes.

Q. And your shower?

A. Correct.

Q. You have one window, 5 inches by 24 inches, looking outside?

A. That would be about right.

Q. Then you got a set of bars?

A. Correct.

Q. And then you got a solid metal door with another small window about the same size?

A. Yes, with a small vestibule in between the bars and the solid door.

Q. And am I correct that the vestibule is there so that the inmate can be fed in their cell?

A. That's correct. The staff steps into the vestibule.

Q. So the staff can't even -- I mean, there is a row of bars between the staff when they feed them.

A. That's a fact.

Q. In fact, because of the lessons that were learned at other facilities, when Ad-Max was designed, you can even change the light bulb without going inside the cell through a little --

A. Through a pipe chase.

Q. So it is possible that if someone is particularly dangerous, it is possible that that person could live, breathe, shower, eat

and never have direct contact with another human being in the Bureau of Prisons.

A. That's not possible.

Q. Well, am I correct that the only time you take them out would be for recreation, right?

A. For recreation, medical examinations, visiting.

Q. Well, am I correct that if someone doesn't play by the rules, they lose visitation rights?

A. That's a fact.

Q. And if it's a medical necessity, the doctors can go to them, right?

A. For very limited care. If they need an x-ray or dental care, obviously, they have to come out.

Q. If someone had appendicitis, you might want to move them. I mean, if someone has complaints, to determine if the complaint is valid, the doctor can actually go look at them, right?

A. They have to go into an open area to see the inmate.

Q. And, further, when Ad-Max was designed, wasn't it originally designed that there wouldn't even be bar soap? Didn't they originally decide to use powder soap?

A. That's correct.

Q. Do you all still do that?

A. Yes, we do.

Q. There is not even a little roller for the toilet paper to go on; is that correct?

A.   That's correct.

Q.   Because that might turn into a weapon?

A.   That's correct.

Q.   And, further, if someone -- you get fifteen minutes on the phone per month?

A.   That's correct.

Q.   And if you don't play by the rules, that can be cut back too, can't it?

A.   That's correct.

Q.   All your mail is opened?

A.   Correct.

Q.   Any pictures that you might receive from loved ones that are viewed to be suggestive or racy are confiscated?

A.   That's true bureau-wide.

Q.   All mail has to be read, coming in and going, except for legal mail?

A.   That's a fact.

Q.   Even a letter from a lawyer though has to be opened in the presence of the inmate?

A.   Correct.

Q.   By a guard.  The officer opens it, makes sure there is nothing in it and then hands it to them?

A.   That's bureau-wide also.

Q.   So all these statistics you were talking about with homicides and stuff, those include those facilities that have a

yard where people mingle and have contact with others and all that?

A.   That's correct.

Q.   Now, of the 9,000 -- I'm sorry, 10,000 inmates who are in high security, how many of them are in segregation?

A.   I don't know that.  It would vary from day to day.  I would say a safe estimate would probably be 10 percent.

Q.   About a thousand.  And of the thousand, about 400 of them are at Florence?

A.   That would be in addition.  Florence is not segregation.

Q.   When I say segregation, for instance, at Marion there was a bank of cells that are very small and people aren't let out of very often; am I correct?

A.   If it's disciplinary segregation, they are let out one hour five days a week.

Q.   And in Florence, how often are the inmates let out of the Ad-Max security area?  How long are they let out?

A.   It depends on the unit.  In the control unit, the most secure unit, one hour a day, seven days a week.

Q.   And if they are good, they get to go to the outside room. If they are not so good, they go to the inside room?

A.   No.  They rotate.

Q.   When the cell is opened to let them go to the recreation room and they are in maximum security, they recreate by themselves, don't they?

A. That's correct.

Q. And when the cell door is opened, they are shackled, right?

A. That is correct.

Q. And for people who don't know what shackling is, it's like handcuffs on the ankles, right, with a long chain?

A. In the control unit, they have leg irons and they are cuffed from behind.

Q. And they are cuffed from behind.  Is there a belly chain?

A. No, not on recreation escort.

Q. When they get to the recreation room, they are put inside the door.  And then the little doors open up, and they put their hands through the locked door, and they are uncuffed from the outside of the locked door?

A. That's correct.

Q. And then they are allowed to sit there in that room.  And then when it comes time for them to remove, they come back, put their hands back through the hole in the door and are handcuffed before the doors is ever opened.

A. That's correct.

Q. And then somebody escorts them back to their cell?

A. Correct.

Q. And, further, only one of those metal doors at a time is opened as the inmates are let out, am I correct, to go to the recreation area?

A. Only one inmate would go out to recreation, be escorted at a

time.

Q. Plus, the inmates at Florence in the high security area, they are kind of shuffled periodically, am I correct, so that they can't communicate possibly with people next door to them?

A. We have mandatory cell rotation.

Q. How often do you rotate?

A. Fourteen days typically.

Q. So every two weeks everybody gets moved?

A. Right, but on the same range, they just rotate the cells in that range.

THE COURT: Mr. Baugh, didn't we cover most of this with Doctor Cunningham? It seems to me like I have heard a good deal of this before recently.

MR. BAUGH: Forgive me.

BY MR. BAUGH:

Q. Am I correct, sir, that the cell walls at Florence are 5,000 test concrete, reinforcing bar every 6 inches?

A. Class A wall, what the prisons defines as a Class A wall, precast concrete, 8 inch rebar.

Q. So that nobody can get through them.

A. Well, we've only been open two years. So we don't know all the possibilities that can happen over the course of history.

Q. The doors, not the bar door, but the metal door, that's electronic, isn't it?

A. That's correct.

Q.   And in the time that it has been open, has anyone gotten out?

A.   No.

Q.   If an inmate does not abide by the rules, other than cutting off his visits or limiting his visits, can they also limit his telephone time?

A.   Yes, if the offense is related to misuse of the telephone.

Q.   And what is the -- can you cut off the telephone completely to him?

A.   Probably for a year, if the misuse was significant.

Q.   What would be a misuse on the telephone?

A.   Conducting business on the telephone, discussing escape plots or introduction of contraband.

Q.   Telephone calls are monitored?

A.   That's correct.

Q.   In the language of the person speaking?

A.   Generally.  You mean if it's a foreign language?

Q.   Yes.

A.   We try to have people on the monitors that can speak foreign languages.

Q.   Am I correct that if inmates want to use the telephone, he must file a written request identifying the person to whom he's going to speak?

A.   That's correct.

Q.   So that everyone knows ahead of time when it's going to

happen so it can be approved?

A.   Yes.

Q.   And the reason for Florence is not only to protect officers but, am I correct, also to protect inmates from each other?

A.   Yes.

Q.   Because inmates have been known to hurt each other?

A.   That's a fact.

Q.   Would you say that, in the world, based upon your knowledge, that there is a safer facility for an inmate than Florence?

A.   There are similar facilities, about twenty-seven states operate super maximum facilities that are similar.  So we are on par, I think, with where technology is heading.

Q.   Would you say that those are the safest institutions there can be?

A.   As far as I can tell.

Q.   And Beaumont is how old?

A.   Brand new.

Q.   Beaumont, Texas?

A.   Yes, within the last couple months.

Q.   And does it have a segregation unit, like we are talking about here, where single cells exist?

A.   Yes.  Every penitentiary -- my prison, current prison, will have a segregation unit.

Q.   So we are building more of these?

A.   We are not building Florences.

Q. But Florence has a capacity of 484. So you have empty bunks in Florence.

THE COURT: Segregation is different than maximum.

BY MR. BAUGH:

Q. They call them different things in different facilities. So there is still room in Florence. There are empty bunks.

A. Yes. We only use Florence for people that require that level. We don't just fill it up to fill it up.

Q. Now, you say there are 150 people at Florence with homicides in their background. Are they there for murder or are they there for other crimes and they have committed murders in the past?

A. They are there primarily for what they have done inside the prison system. Some of them have committed murder once they have entered the prison system.

Q. And others --

A. Others, it's just part of their history. They are there for other reasons, whether they tried to riot or --

Q. What percentage of the inmates at Florence are in Florence because they committed a homicide while a prisoner?

A. I don't know that number.

Q. Could you estimate it less than ten?

A. No. I would say it's higher than that. I would say it's probably thirty or forty.

Q. Of those thirty or forty, some of them come from high

security facilities, right?

A.   That's correct.

Q.   Others come from medium security or low security facilities?

A.   If they were involved in types of behavior that would place them in Florence, they could come from any other facility.

Q.   So, hypothetically, if someone were sentenced to prison in a minimum security facility for some significant felony, but nothing involving violence, and they defended themselves and hurt someone, they could get sent to Florence?

A.   They defended myself --

Q.   If they defended themselves from assault from other inmates.

A.   Then they would not have been charged with assault, and they would not end up in Florence.

Q.   They wouldn't be charged with assault?

A.   Not if we can prove that they were -- or they can prove that they were defending themselves.

Q.   Oh, I'm sorry, if they can prove that they were the victims, they don't get sent, right?

A.   Right.

Q.   But if they were the victims and they can't prove it, they go, right?

A.   Well, you are twisting my words.  What I'm saying is that if the individual is found guilty of a serious assault, then he is punished like anyone else would be punished when they are

involved in that type of behavior.

Q.   Would spitting on an officer be an assault?

A.   To be put in Florence?

Q.   Is it classified as a serious assault and be in that stat you just read?

A.   On occasion.

Q.   Yes.  Would pushing an officer out of the way, would that be considered an assault?

A.   Yes.

Q.   Would that be considered in your statistics?

A.   Yes.

Q.   So any misdemeanor touching would be classified as an assault and would fit in those statistics you just went over with Mr. McBride, right?

A.   Any physical use of force against an individual would be considered an assault.

Q.   Would you consider spitting at someone use of force?

A.   I consider it an assault, yes.

Q.   Okay.  So that could get you -- you could get on that statistical pool that Mr. McBride just read from?

A.   Right.

Q.   Is there any rule that prohibits a new inmate who has been classified as dangerous from being sent to Ad-Max in Florence?

A.   No, but that's not the Bureau's goal in Ad-Max.

Q.   Okay.  This will got faster if you answer my question.  Is

there any rule that says they can't go there?

A.   No.

MR. BAUGH:   Thank you.   Pass the witness.

CROSS EXAMINATION BY MR. ZERKIN:

Q.   Good afternoon.   When you talk about turf wars against gangs, the gangs you are talking about in the federal prison system are things like the Hells Angels, Pagans, Arian Nation; am I correct?

A.   Not necessarily.   The broader group is actually what we call disruptive groups, and sometimes they are street gangs as you mentioned.   Other times they are just loosely geographic gangs. African American inmates from Washington, D.C., if they are in one facility, may get together to run turf issues.

Q.   And you have the ability in your classification system to determine who might align themselves with other inmates; is that correct?

A.   We attempt to.

Q.   And you attempt to disassociate people who were involved in crime on the outside from being with each other on the inside; is that right?

A.   That's correct.

Q.   In fact, that would be one of your clear criteria you would rely upon when you are making assignments?

A.   Yes, codefendants.   We usually try to separate codefendants.

Q.   And what information -- when you determine what level of security is necessary for an inmate coming into the system, what sources of information do you have?

A.   We have the presentence investigation report.   We rely heavily on that.

Q.   That's done by a probation officer and the court; is that correct?

A.   That's correct.

Q.   What else do you have?

A.   Their instant offense.   Those are the primary sources.

Q.   Do you do a psychological assessment?

A.   We do a screening.   And if that screening indicates that the individual may have some issues, then we do further assessment.

Q.   When you say screening, what are you talking about?

A.   It's both a written tool, and then we do a brief diagnostic with a psychologist, a brief interview.

Q.   And that's a psychological profile to determine whether the person would be at high risk for committing violence in the institution; is that correct?

A.   That would be putting it too strongly.   Mainly, we're looking at tendencies toward suicide and then whether the individual has some severe mental functioning.   That's about it at that point.

Q.   If the gentlemen to my right, the United States Attorneys in

this case, thought that a particular defendant posed a high risk of danger in the prison system, do they have a means of communicating that to the prison system for classification purposes?

A.   Yes, they do.

Q.   I assume that you would willingly accept such information from them; is that correct?

A.   We'll accept the information, yes.

Q.   Is there, in fact, a form for that purpose?

A.   I'm unsure, but given that it's the Government, I would believe there probably is a form.

Q.   Touche.  These programs, like Florence, and which I guess is in similar form at Marion; is that correct?

A.   We took all the inmates out of Marion, most of them, and moved them to Florence.  So Marion's program is very different than it was several years ago.

Q.   But the basic concept existed at Marion before Florence?

A.   That's correct.

Q.   And that program, in fact, with this goal of thirty-six months being able to release them back to the population, has been quite successful, hasn't it?

A.   It has been very successful.

Q.   In fact, you only have a return rate, once they are released, of about 15 percent?

A.   That's correct.

Q.   Isn't it also true that most murderers in the system are not classified as -- when I say murderers in the system, I mean people convicted of murder, serving terms for murder -- are not classified as appropriate for settings such as Ad-Max and Florence or at Marion; is that correct?

A.   That's correct.  The vast majority of them are in open population facilities.

Q.   In fact, if I got your numbers -- do you know what the percentage would be?

A.   Well, there is roughly just over 1,250 inmates in our system that have a current offense of murder, and only 158 of those are in ADX.

Q.   So it comes out to about 12 and a half percent; does that look about right?

A.   Yes.

Q.   Mr. Baugh asked you about the definition of assault.  What's the definition of weapon in those statistics you showed us?

A.   It would require some piece of hardware that's actually used on an individual.

Q.   I mean, anything other than your fist; is that right?

A.   That's correct.

          MR. ZERKIN:  That's all I have, Judge.

          THE COURT:  Any other questions?

REDIRECT EXAMINATION BY MR. McBRIDE:

Q.   Now, Mr. Vanyur, you mentioned that you HAD taken soap, hard soap away at Ad-Max, and you have taken the rollers for the toilet paper out of the cells; is that correct?

A.   That's correct.

Q.   Do you think you've thought of all the things that an inmate could make a weapon out of?

A.   Not at all.

Q.   Now, by law, these inmates have to go to the law library; is that correct?

A.   That's correct.

Q.   And by law, they have to recreate?

A.   That's correct.

Q.   Now, Mr. Baugh indicated that in the high security part of Ad-Max, people are cuffed behind their back, and they have these leg irons on; is that correct?

A.   That's correct.

Q.   But there are inmates at Ad-Max who are not moved around in that fashion; is that correct?

A.   That's correct.

Q.   In fact, at the latter stages of the program, they are allowed to move about freely to some extent; is that correct?

A.   Yes.   They move about unrestrained.

Q.   And receive cable television and other privileges at that

point; is that correct?

A.   Well, they see that in even the most secure units.

Q.   Cable television?

A.   That's correct.

Q.   Now, let me ask you this.   There was a lot of questioning about Ad-Max and Marion and high security.   Based upon the crime of homicide, is there any limit as to how low an inmate could work himself in the BOP system over the years if they were incarcerated for a long period of time?

A.   If it's just homicide?

Q.   Just homicide.

A.   I have nine in my low security facility.   So I would assume a low security facility would probably be as low as they could go.

Q.   And you're at a low security facility?

A.   That's correct.

Q.   How many inmates in total are at your facility?

A.   1,160.

Q.   And nine of them --

A.   Have homicide in their background.

Q.   How about someone who is sentenced to prison for life without parole, what is the lowest they could work themselves in the system?

A.   They could work themselves down to a medium security facility.

Q.   Then by rule they could go no further; is that correct?

A.   That's correct.

Q.   What is the difference between a medium security facility and a high security like the U.S.P.

A.   More the level of control of movement and the perimeter security.  But in terms of open movement to recreation areas, access to education programs, access to open feeding, they are going to be very similar.

Q.   Now, BOP has to house international terrorists and leaders of drug cartels from South America; is that correct?

A.   That's correct.

Q.   And those people pose a threat from the outside as well as the inside; is that correct?

A.   That's correct.

Q.   Now, these four defendants here who have been convicted of serious crimes, drug murder and participation in a continuing criminal enterprise, in your opinion, with your seventeen years experience in BOP, where are they going to be sent if they are sentenced?

MR. BAUGH:  Objection, Your Honor, irrelevant.

MR. ZERKIN:  It's way beyond -- I think way beyond the cross.

MR. McBRIDE:  I don't think it is at all, Your Honor.

MR. ZERKIN:  It's certainly beyond mine.

MR. BAUGH:  It's speculative, Your Honor, in that Mr.

Vanyur --

THE COURT: Come up here.

BENCH CONFERENCE:

MR. ZERKIN: I just think it was beyond cross, that's all, Judge.

MR. BAUGH: Mine is, Your Honor, that Mr. Vanyur has indicated that the criteria for the determination of that placement, all of which involved, he mentioned input from the United States Attorney's Office, presentence report, all those things, without that information, that is a pure guess he's been asked to give.

THE COURT: Also, I haven't heard anything about them being involved in the decisional process. Maybe I missed it. Is there anything in his background that had him involved in placement?

MR. McBRIDE: Well, he's familiar with the regulations. Those are what he quoted about Ad-Max and Florence. And I think Mr. Baugh certainly suggested that all these guys are going to Florence, based upon a number of criteria. Mr. Zerkin's cross suggested that the U.S. Attorney's Office would have some influence on that. I think I'm entitled to ask him, as a BOP professional, where do you think these guys are going to go.

MR. BAUGH:  If I might, Your Honor, the purpose of my questioning was not to show that they would go there, but the purpose of my questioning was to show, if the Bureau of Prisons deemed them dangerous enough, they could.  That is all.  I don't think anyone can say they are going there.

THE COURT:  I don't think direct assignment is appropriate.  So I will sustain the objection.  You are not going to argue anything beyond what you just said.

MR. BAUGH:  Yes, sir.

END BENCH CONFERENCE

BY MR. McBRIDE:

Q.  Out of your total population of 110,000, how many inmates have homicide in their background?

A.  Roughly 1,250.

Q.  And the vast majority of those are in high security facilities?

A.  579 are at the highest.

Q.  And where are the rest of them?

A.  They are spread out in the system.  As I said, I have nine in my low security.  We have eighty-five facilities.  So I'm sure they are spread out, medium, low and high.

Q.  Now, that razor item that I showed you earlier, would you classify that as a weapon?

A.   Definitely.

Q.   Have you ever seen anyone do arts and crafts with an item like that?

THE COURT:  All right, let's go.

MR. McBRIDE:  I have no further questions.

MR. BAUGH:  I have very few, Your Honor, if I may.

RECROSS CROSS EXAMINATION BY MR. BAUGH:

Q.   Just so people in the audience don't misunderstand, when you say cable television, am I correct that at Florence each inmate gets a 12 inch black and white television and religious services and education channels and some entertainment are broadcast over those?

A.   That's correct.

Q.   They are not getting HBO or CSPAN or anything like that?

A.   Well, they have ESPN and several other channels similar to that.

Q.   In black and white?

A.   In black and white.

THE COURT:  ESPN?

THE WITNESS:  Yes, sir.

MR. BAUGH:  That's what he said.

By MR. BAUGH:

Q.   Is one thing, can you cut off their television?

A.   Yes.   We have had some destroy their televisions.

MR. BAUGH:   Thank you, sir.

THE COURT:   All right.

MR. JONES:   Your Honor, a couple questions if I might.

RECROSS EXAMINATION BY MR. JONES:

Q.   Mr. Vanyur, you indicate that you have nine prisoners who have been charged with murder, or is that in their history or is that a federal charge of murder?

A.   That's in their history.

THE COURT:   Are you talking about in his facility?

BY MR. JONES:

Q.   At your facility.

A.   It's somewhere along their criminal --

Q.   Okay.   So they are not in the federal system for murder?

A.   Not necessarily, no.

Q.   And do you know individually how long they have been in the system before they got to the security level that you are at?

A.   No.   They have to have generally less than seventeen years left to serve to get down to a low security.

Q.   Do you know the average age of the individuals that -- these nine individuals that are in your facility?

A.   I do not.   The average age of my total inmate population is around thirty-seven or thirty-eight.

Q.  Okay.  But your total inmate population -- Butner has a special treatment program; is that correct?

A.  That is the facility next door to mine.  There are two facilities at Butner.

Q.  Okay.  But we don't consider that program as part of your inmates?

A.  No, I do not.

MR. BAUGH:  In light of that, may I?

RECROSS EXAMINATION BY MR. BAUGH:

Q.  Sir, when you talk about these gangs, does the occurrence of gang violence drop off --

THE COURT:  He didn't talk about gangs.  Mr. Jones didn't ask --

BY MR. BAUGH:

Q.  Sir, do you find older inmates involved in gang activity, like fifties and sixties?

A.  Yes.  Most of the gang leaders typically are older.  It takes them a few years to work their way up.

MR. BAUGH:  Thank you, sir.

THE COURT:  Can he be excused?

MR. McBRIDE:  Yes, Your Honor.

THE COURT:  Thank you for being with us and giving us your evidence.  You are excused from your subpoena.

(The witness was excused from the witness stand.)

I, Sandra M. Beverly, certify that the foregoing transcript is a correct record of the proceedings taken and transcribed by me to the best of my ability.

_____     _____
SANDRA M. BEVERLY, RPR          Date

# EXHIBIT C

STATE OF ARIZONA        )
                        ) ss
COUNTY OF PINAL         )

## AFFIDAVIT OF MARK A. BEZY

MARK BEZY, after being duly sworn, deposes and states under oath as follows:

1.      I am over the age of 18, and I am competent to testify to the matters stated herein. I make the statements in this affidavit based upon my personal knowledge.

2.      I worked for the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006, starting my career as a Correctional Officer and working my way up.  During that time, I held a number of positions, including:  (a) Warden of the Federal Correctional Complex at Terre Haute, Indiana from August, 2004 through October, 2006; (b) Warden of the Federal Correctional Institution in Elkton, Ohio from December, 2002 through August 2004; (c) Associate Warden at the United States Penitentiary in Leavenworth, Kansas, a high security facility, from July, 1999 through November, 2002; (d) Correctional Services Administrator of the North Central Regional Office of the BOP in Kansas City, Kansas from May, 1995 through July, 1999; and (e) Captain at the maximum security U.S. Penitentiary in Marion, Illinois ("USP Marion") from February, 1992 through May, 1995.

3.      I received a number of awards during my service with the Bureau of Prisons, including being named a Member of the Senior Executive Services; being named Associate Warden of the Year for the North Central Region; and receiving a Director's Award in 1997.

4.      While I was Warden at Terre Haute, I was responsible for the operation of, among others, the high security penitentiary and the Federal Death Row which is located at the FCC in Terre Haute.  As Warden at Terre Haute, I oversaw 1,500 adult male high security offenders, as well as 37 inmates who were under death sentences.  I managed several emergency situations that

occurred while I was Warden at Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.

5. As Correctional Services Administrator for the North Central Regional Office of the BOP, my duties included providing consultation, advice and on-site assistance to 18 federal correctional institutions within the North Central region of the United States, which included at the time the states of Illinois, Wisconsin, Minnesota, Missouri, South Dakota, Kansas, and Colorado. I also oversaw the regional disciplinary transfer program for the North Central Region, and the Control Unit Hearing Program for the entire BOP.

6. When I worked at USP Marion, that facility was the highest security prison in the United States. USP Marion housed the "worst of the worst" of federal prisoners in its general population, and did so under highly secure and restrictive conditions of confinement, including, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort. While the hope of the BOP was that inmates sent to the general population at USP Marion would modify their behavior and return to a mainstream maximum security facility after two to three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened. In addition, there were some inmates who were assigned directly to USP Marion from the sentencing court. For example, John Gotti was an inmate sent directly to USP Marion from the sentencing court.

7. While I worked there, USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of

-2-

confinement than those imposed on USP Marion's general population.  These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness.  For example, USP Marion had a Control Unit within the prison where the most violent offenders, including particularly those who were deemed to pose a future danger of violence and/or criminal activity, were housed prior to the opening of the Super-Max ADX facility in Florence, Colorado.  Typically, inmates could be assigned to the Control Unit at USP Marion for a specific amount of time, up to five years, based on their offense.  The specific amount of time that an inmate was committed to the Control Unit was determined by the BOP.  Moreover, if an inmate engaged in additional criminal or violent activity, they could be re-committed to the Control Unit for additional time beyond the five years.  Inmates assigned to the Control Unit were housed in that Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

8.      The Super-Max ADX facility in Florence, Colorado opened in approximately 1994.  I know that a number of inmates who, due to security and/or "future dangerousness" concerns, had been housed at Marion under very strict conditions of confinement for years prior to the opening of the ADX facility in Colorado, were then transferred to the ADX facility where they continued to be held under very strict conditions of confinement due to the same long-standing security and/or future danger concerns.  Inmates who fit this description that I can recall at this time include Barry Mills, and T.D. Bingham, high ranking members of the Aryan Brotherhood gang, as well as leaders of other gangs and disruptive groups.  In addition, shortly after ADX was opened, a number of other

-3-

violent inmates, including gang members, domestic terrorists, and organized crime figures, were also were transferred directly from USP Marion to the ADX facility.  At ADX, both before and after 1998, these types of inmates were housed in conditions that were even more restrictive than the conditions had been at USP Marion in terms of their ability to interact or communicate with staff, other inmates, or persons outside the facility.

9.      USP Marion also had what was called the "K-Unit" from at least the mid-1980's through the mid-1990's in which inmates who were a security risk were housed under extremely strict conditions of confinement.  Inmates housed in the K-Unit due to security and/or future dangerousness concerns that I can recall included John Walker, a convicted spy, Ed Wilson, a former CIA operative, Jonathan Pollard, a convicted spy, and Christopher Boyce, a former CIA operative.  These inmates were held in K-Unit because of security and/or future danger concerns, and were held there for as long as the BOP deemed it necessary to ensure security and that these individuals did not constitute a future danger.  Inmates housed in K-Unit were housed in single cells and had no physical interaction with other inmates.  All their mail was screened by BOP officers, all telephone calls had to be arranged through BOP officers who would bring the phone to the inmate in his cell.  Those calls could only be made to people who were on an approved phone list, and all such calls were recorded and monitored by the BOP.  All visitors to any inmates on K-Unit had to go through a somewhat intensive background screening process, and had to be pre-approved by the BOP before they could visit.

10.      Also at the USP Marion, there is an inmate housing unit above the hospital called the "I-Up Unit".  Similar to the K-Unit, in the I-Up Unit, all inmate mail was screened and/or copied, and all telephone calls were recorded and monitored.  I know, for example, that gang leader David

Sahakian, whose crimes included ordering the murders of others, was held in the I-Up Unit during his pre-trial detention in order to protect others and ensure that he did not commit, order or direct any additional criminal activity.  I believe this was after 1998, but inmate Sahakian was held under conditions of confinement that were available to the BOP at USP Marion in and prior to 1998.

11.    The Super-Max facility in Florence, Colorado, was designed to hold the most dangerous inmates under extremely strict conditions of confinement, including with strict limitations on any communications with people outside the prison, whether by phone, mail, or visits, whenever deemed necessary by the BOP.  It is my understanding that inmates were in 1998 and prior thereto (and have been from 1998 through the present) held at the ADX facility under strict conditions of confinement, including severe restrictions on their communications, whether by mail, phone or visitation, whenever that was deemed necessary by the BOP or the ADX Warden, and for as long as necessary to deal with the security or future danger concern raised by a particular inmate.  I also know that some inmates have been assigned to the ADX facility directly from the sentencing court, when the circumstances warranted.  The ADX facility also has areas within the prison that are referred to as "side pockets" or "special cells," which are used to hold prisoners who are deemed to be exceptionally dangerous.  For example, inmate Luis Felipe was assigned to ADX directly from the sentencing court and inmate Felipe was held in one of these "side pockets" after being sentenced in 1997 due to concerns about security and/or his future dangerousness as set forth by the sentencing court.  It is my belief that other inmates, too, were housed in these "side pockets" in order to address concerns about security and/or future dangerousness in and before 1998.

12.    I know of some other examples of inmates who, in 1998 and prior, were housed under strict conditions of confinement specifically in order to reduce or eliminate their potential future

dangerousness.  For example, Federal inmate Rodney Hamrick, a convicted bomber, was housed at USP Marion when I worked there.  All of Hamrick's mail, including his legal mail, was specially monitored by the BOP in order to reduce or eliminate his future dangerousness.  Inmate Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the assessed risk that he posed to be a future danger by ordering crimes or violence while incarcerated.  Other inmates that I can recall who, in 1998 and prior, were housed under very strict conditions of confinement due to security concerns include Thomas Silverstein and Clayton Fountain.  Again, these strict conditions of confinement were (and are, to my knowledge) imposed on high security inmates by the Bureau of Prisons for as long as the BOP deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).  In the years after 1998, there have been a great many more federal inmates housed under such strict conditions of confinement in order to address security and/or future dangerousness concerns.

13.     All maximum security BOP facilities also have what is called a Special Housing Unit ("SHU") within the facility.  SHU's are, in essence, a prison within a prison where security and conditions of confinement are more strict than those imposed on the general population within the maximum security facility generally.  Both before and after 1998, inmates could be and were housed in a SHU for a variety of reasons, including because of concerns about security and/or an inmate's "future dangerousness."

14.     Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the

-6-

most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's "future dangerousness." This included, but was not limited to, housing inmates in conditions of confinement where they did not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or mail. The BOP could, and did, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deemed it necessary to do so for the security of either prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" and not "rights," so they could be taken away whenever it was deemed necessary. Moreover, these strict conditions of confinement could be, and were, imposed for as long as the BOP deemed it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

15.     When strict conditions of confinement, such as being sent to the Control Unit or a SHU, or having mail, visiting and/or phone privileges taken away, were imposed on federal inmates for security reasons or concerns about violence, documentation of that action would normally be created and maintained in one or more places within the BOP. Information about both the restrictive conditions imposed and the reason(s) for imposing those conditions could be contained in one or more of the following: (a) in the DHO (Disciplinary Hearing Officer) record which is kept at the individual BOP facilities; (b) in the SIS (Special Investigation Supervisor) Files, which are kept at all high and maximum security BOP facilities; and (c) when the Warden imposed such conditions, s/he would write a memo which should be contained both in the inmate's file and the files of the BOP facility where the conditions were imposed. In order to ascertain all the inmates on whom these types of restrictive conditions were imposed based on security and/or "future dangerousness"

-7-

concerns, at a minimum, one would need to review the above files at each of the high and maximum security BOP facilities.

16. While restrictive conditions of confinement, including taking away communication privileges such as mail, phone and correspondence, could be imposed for a variety of reasons, I know that, in 1998 and prior thereto, those conditions were imposed on a number of inmates specifically in order to address security and violence/future danger concerns, and that those strict conditions of confinement were maintained for as long as the BOP deemed necessary to address the security of violence concerns regarding the particular inmate. I do not know the names of all the inmates who had strict conditions of confinement imposed on them in order to address security and/or future dangerousness concerns, but believe that, in 1998 and prior, there were a number more such inmates beyond those that I have recalled and described in this affidavit.

Further, Affiant sayeth not.



Mark A. Bezy

Subscribed and sworn to
before me this 21st day
of November, 2008.

Notary Public

AARON HALLSTROM
Notary Public - Arizona
MARICOPA COUNTY
My Comm. Exp. 04-30-2011

-8-

# EXHIBIT D

STATE OF ARIZONA    )
                    ) ss
COUNTY OF PINAL     )

## SUPPLEMENTAL AFFIDAVIT OF MARK A. BEZY

MARK A. BEZY, after being duly sworn deposes and states under oath as follows:

1.      I am over the age of eighteen, and I am competent to testify to the matters stated herein. The statements in this affidavit are based upon my personal knowledge.

2.      I am the principal/owner of Mark A. Bezy and Associates, LLC, a consulting firm specializing in corrections management; conditions of confinement; correctional facility activation, operation, and management; inmate transportation; correctional work programs; prison gangs and security threat groups; and institutional disturbances and crisis management. Additionally, I worked as a consultant to Creative Corrections, LLC, a company charged with inspecting state and local correctional facilities housing detainees under the auspices of the federal Department of Homeland Security and Bureau of Immigration and Customs Enforcement.

3.      Prior to these positions, I was employed by the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006. I began my BOP career as a correctional officer at the Federal Correctional Institution in Oxford, Wisconsin. Three years later, I was promoted to the rank of lieutenant and served in that capacity at the Federal Prison Camp in Duluth, Minnesota and the Federal Correctional Institution in Phoenix, Arizona. In 1988, I was promoted to the rank of captain and served in that capacity at the Federal Correctional Institution in Ray Brook, New York, the Federal Medical Center in Lexington, Kentucky, and the United States Penitentiary in Marion, Illinois ("USP-Marion").

1

4.      At the time I served as a captain at USP-Marion, that facility was the highest-security federal correctional facility in the country and housed many of what were considered the most incorrigible and difficult inmates in the BOP, and did so under highly secure and restrictive conditions of confinement.   This included, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.   At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through the facility's step-down process.

5.      While the hope of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and cycle out of USP-Marion to a mainstream maximum-security facility after two to three years, there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program.   The BOP recognized that a small percentage of individuals would most likely require such restrictive security measures during the entire term of their incarceration because of the potential future dangerousness posed by those inmates.   These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX" or "SuperMax") when that facility opened in 1994, and they remain housed at ADX today.   Although many inmates came to USP-Marion as a result of a demonstrated inability to function properly in other, less-restrictive environments, a number, such as John Gotti, were assigned directly to USP-Marion from the sentencing court.

6.      From 1995 to 1999, I served as correctional services administrator for the BOP North Central Regional Office in Kansas City, Kansas.   In that management position, I provided

2

on-site advice and consultation to 18 BOP facilities in that region. I also created and implemented the tactical inmate movement plan for "Flo-Max II," the final movement of high-security offenders from USP-Marion to ADX. In this position, I administered the disciplinary transfer program and was responsible for evaluating and classifying all disciplinary transfers and close supervision and protective custody cases – some 4,000 cases in all.

7. In 1999, I was named associate warden at the United States Penitentiary in Leavenworth, Kansas, an institution housing up to 2,500 inmates. At USP-Leavenworth, I directed the "KC Model Program" which effectively managed disruptive and violent inmates within the general population through identification, classification, and housing changes. The KC Model Program has since been successfully implemented in other penitentiaries.

8. In 2002, I was named the chief executive officer (warden) of the Federal Correctional Institution in Elkton. There, I managed the safe and secure operation of this low-security facility and was responsible for providing programs and services to 2,300 adult male offenders. I supervised a staff of 300 and managed an annual budget of $42 million.

9. In August 2004, I became chief executive officer (Warden) of the Federal Correctional Complex at Terre Haute, Indiana ("FCC-Terre Haute"). At FCC-Terre Haute, I managed programs and services provided to 1,500 adult male high-security offenders at the U.S. Penitentiary ("USP-Terre Haute"), 1,200 adult male medium-security offenders at the Federal Correctional Institution, 450 minimum-security adult male offenders at the Federal Prison Camp and 37 adult offenders under death sentences, including Darryl Lamont Johnson. I oversaw 675 personnel and managed an annual budget of $64 million. At FCC–Terre Haute, I implemented a number of security enhancements that have now been adopted throughout the BOP. Moreover, I

3

managed several emergency situations that occurred while I was warden at FCC-Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.  As warden, I received top-secret clearance in order to review classified documents relating to particular inmates.  I retired from the BOP in October 2006.

10.   I received a number of awards during my service with the BOP, including being selected for the Senior Executive Services, a merit-based special compensation program; being named Associate Warden of the Year for the North Central Region in 2001; and receiving the Director's Award in 1997 for my contributions to security technology.   As that honor demonstrates, I am very familiar with the security capacity of BOP facilities and have in fact pioneered the use of some of the security protocols and equipment that the BOP employs to this day.

11.   For example, when I activated the current USP-Terre Haute in March 2005, that facility was the first in the nation to deploy a wireless microwave camera system.  That system was part of my changes in the deployment and accessibility of emergency response equipment which were designed to allow the facility to deal better with serious disturbances.  Subsequently, other BOP facilities adopted the use of wireless microwave camera systems.   In fact, the equipment at USP-Terre Haute was transferred to and installed at ADX after I retired from BOP.

12.   After my retirement from the BOP in 2006, I served as the warden of Central Arizona Correctional Facility, a private prison for sex offenders in Florence, Arizona.

13.   I previously have been certified as an expert in BOP policies and procedures by the United States District Court for the Eastern District of Missouri and as an expert in prison

4

adjustment by the United States District Courts for the Central District of California and the Eastern District of Pennsylvania.

14. In the instant case, I have been retained by counsel for Darryl Lamont Johnson and have been asked to provide my opinion and evaluation, based on my thirty-year history in corrections, regarding the following matter:

A. The ability of the Bureau of Prisons to neutralize inmates deemed to be a threat to institutional security and/or to alleviate the threat to the safety and well-being of other individuals, whether inside or outside prison walls, at the time of Mr. Johnson's 1997 trial (*i.e.* future dangerousness).

15. In the course of my evaluation, I have reviewed the following materials:

a. Portions of the trial record, including the opening and closing statements of the government and the defense and the testimony of John Vanyur, Ph.D. and Mark Cunningham, Ph.D.;

b. July 21, 1997 Testimony of John Vanyur, Ph.D. in United States v. Dean Beckford et al, Case No. 3:96CR66 (E.D. Va.);

c. The direct appeal opinion affirming Mr. Johnson's convictions and sentences;

d. The Affidavit of BOP Case Manager B. English, filed in Mr. Johnson's current case;

e. Various BOP regulations and Program Statements.

16. The BOP's primary mission is to safely and securely house individuals accused and/or convicted of federal criminal offenses, ranging from nonviolent drug and fraud-related offenses to more serious offenses, such as treason, acts of terrorism, racketeering, and murder.

5

The 200,000 inmates in federal custody are classified according to their criminal history; history and circumstances of incarceration; the circumstances of the current offense(s); affiliations with gangs, militant organizations, or other security threat groups; medical and mental health needs; and length of sentence(s) for the current offenses. The stated purpose of the BOP's classification system is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." Program Statement 5100.08, p. 1.

17.     As Dr. Vanyur correctly noted during his testimony in Mr. Johnson's case, prior convictions and prison behavior are part of the BOP's classification calculus. Johnson Trial Transcript at 2470-2471 (hereinafter "Johnson T. at ___"). As it did during my entire tenure, the BOP retains a great deal of discretion to fashion conditions of confinement and classify inmates to meet its penological objectives and mission, including to ensure the safety and security of BOP facilities and people both inside and outside such facilities. The BOP's discretion is not absolute – it must comply with the United States Constitution as well as those mandates handed down by Congress, the courts, and the Department of Justice. In keeping with these principles, the BOP has many tools in its arsenal that it may use to deal with inmates presenting both commonplace and extraordinary threats to the security of prison staff, other inmates, and those in society at large.

18.     Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and imposed, there is no doubt that the BOP had, at all times, the authority and ability to house inmates in severely restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future

6

dangerousness. This includes, but is not limited to, housing inmates in conditions of confinement where they do not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or by mail. The BOP can, does, and did at the time of Mr. Johnson's trial in 1997, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" – not "rights" – so they can, and could at the time of Mr. Johnson's trial in 1997, be taken away whenever it is deemed necessary by the BOP. Moreover, these strict conditions of confinement can be, and were at the time of Mr. Johnson's trial in 1997, imposed for as long as the BOP deems it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

## I.  Inmate Classification and Placement and Facilities

19.  One way in which the BOP can deal with the dangers posed by prisoners at the outset is through the initial classification process. At the time of Mr. Johnson's trial in 1997 (the same is true today), inmates convicted of federal offenses could, generally speaking, be sent to four types of federal institutions (in increasing order of security):  (1) Federal Prison Camps (minimum security); (2) Federal Correctional Institutions (low/medium security); and (3) United States Penitentiaries (high security); and (4) ADX (high security/control unit).[1] Due to the circumstances of Mr. Johnson's offenses, he would not have been eligible for placement anywhere besides a United States Penitentiary (high security) or ADX (the SuperMax facility),

---

[1] There are a number of other specialty prisons, such as medical and reception centers, but the vast majority of federal inmates have no contact with these specialty institutions.

7

despite Mr. Vanyur's suggestion that an individual with Mr. Johnson's history could be sent to a medium- or low-security facility. Johnson T. at 2471-2473. As described further below, in my professional opinion, ADX is a facility that maintains security protocols capable of neutralizing the threats of future danger that the Government alleged warranted Mr. Johnson's death sentence, and placement at that facility could have effectively limited or eliminated his contact with any individual, both within and outside the confines of the prison, absent consent from the BOP (*i.e.* for mail, telephone or correspondence privileges with particular individuals). Indeed, given the circumstances of his current convictions, his history and his status as a high-ranking gang leader, Darryl Johnson was one of those "very special cases" (a phrase used by Dr. Vanyur in his Beckford testimony) eligible for direct ADX placement if deemed necessary and appropriate by the BOP.

20.     Although direct court commitments to ADX are not the norm, they are neither prohibited nor unheard of. The vast majority of ADX inmates come directly from other institutions. However, at the time of Mr. Johnson's trial, approximately ten percent of ADX inmates were direct commitments from the sentencing courts. In a capital trial that occurred a few months before Mr. Johnson's (United States v. Dean Beckford, et al.), former ADX Associate Warden Vanyur testified that some nine percent of ADX's 388 inmates were direct court commitments. According to Dr. Vanyur, that nine percent was composed of "very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists." Beckford T. at 5. Dr. Vanyur's testimony on this point in Beckford was accurate and consistent with my knowledge and experience. Similarly, his affirmative response to the question, "So you don't mean to tell this jury that someone cannot be committed [to ADX]

8

immediately if the United States is of the opinion that they're dangerous?" was also accurate and consistent with my knowledge and experience. Beckford T. at 19. Accordingly, the suggestion that Mr. Johnson was not eligible for placement at ADX immediately after sentencing, if deemed necessary and appropriate, is false and is belied by ADX's history. Similarly, the notion that the BOP is somehow powerless to prohibit specific inmates from committing serious crimes while incarcerated is also false.

21. In the <u>Beckford</u> case, Dr. Vanyur correctly testified that ADX is "the most secure facility" in the federal prison system. Beckford T. at 4. All the cells at that facility – whether they are in the general-population area of the prison or in the control unit – hold a single inmate. Generally speaking, in 1997, inmates in general population had the opportunity to recreate with other inmates, but there was no requirement that they be allowed to do so and, as discussed below, there are a multitude of examples where inmates are prohibited from congregating or having any contact whatsoever with other inmates. Indeed, now, inmates in the general population at ADX do <u>not</u> have the privilege of recreating with other inmates; rather, they recreate individually. Moreover, those in the control unit have no opportunity to recreate or otherwise have any contact whatsoever with other inmates and have no interactive human contact with anyone except guards during cell extractions or staff rounds. Given the nature of Mr. Johnson's convictions, and if the BOP determined it was warranted based on his behavioral history and perceived "future dangerousness," he could have been placed in the control unit at ADX.

22. Regardless of whether Mr. Johnson was eligible for direct placement in ADX's general-population unit or its control unit, the BOP had both the authority and the ability to craft

conditions of confinement that would alleviate any risk presented by Mr. Johnson that he would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public. Indeed, the BOP individualizes conditions of confinement on a regular basis. The either/or proposition that an inmate receives a great deal of freedom if not incarcerated at ADX advanced in Mr. Johnson's trial by Dr. Vanyur (see Johnson T. at 2475 (general population means that an inmate would have "open and frequent contact unrestrained with staff and inmates"); Johnson T. at 2472 (inmates have "virtually unlimited access to telephones and a great deal of open visiting contact"); Johnson T. at 2477 (an inmate at high-security facilities has "a great deal of open contact visiting," "virtually unlimited phone access," and "unlimited correspondence privileges"); Johnson T. at 2485 (even in a control unit, inmates have "virtually unlimited correspondence with the outside world"); Johnson T. at 2504 (dangerous inmates cannot be separated at high-security institutions)) are at best serious misstatements and are at worst gross distortions and mischaracterizations of the BOP's role, function, authorities, and abilities, at the time of Mr. Johnson's trial and presently, to house prisoners under secure and restrictive conditions of confinement for as long as deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

23. For many years, the BOP has maintained and set aside facilities, units, and cells for difficult and dangerous inmates. For example, ADX and numerous other prisons have cells that are termed "side pockets." These side pockets, which operate separate from the general population housing, provide for the holding of inmates under highly-secure control-unit type conditions. For example, Luis Felipe – considered by the BOP to be exceptionally dangerous

10

and sent to ADX directly by the sentencing court – was held in a side pocket at ADX immediately upon his arrival there.  In the side pocket, Felipe was kept in total isolation from other inmates and all of his communications were both severely restricted and strictly monitored.  Similarly, ADX has a wing known as "bombers' row" where those inmates (such as Theodore Kaczynski) convicted of using bombs and other explosive devices to commit their crimes are held under strict, individualized conditions.

24.    These strict conditions are not solely the province of ADX and are nothing unusual or novel in the BOP.  Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons, including, as discussed further below, imposing restrictions on contact with people on the outside by telephone and mail.

25.    For example, USP-Marion had what it termed the "K-Unit" from at least the mid-1980s through the mid-1990s.  The K-Unit held inmates who posed a high security risk and housed them under extremely strict conditions of confinement.  These inmates were held in single cells, recreated by themselves, and had no contact with other inmates.  There was one officer assigned for every six inmates (a very low guard-to-inmate ratio).  Additionally, K-Unit inmates conducted their work (electronic cable assembly) in their cells instead of reporting to a workshop within the prison.  Inmates housed in the K-Unit due to security and/or future-dangerousness concerns included convicted spies John Walker and Jonathan Pollard and former CIA operatives Ed Wilson and Christopher Boyce.  These inmates were held in the K-Unit 1for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the

11

public.

26.     Furthermore, USP-Marion maintained an inmate housing unit called the "I-Up Unit." David Sahakian, an inmate affiliated with Aryan Brotherhood, who was accused of serious crimes, including ordering the murders of others, was held in the I-Up Unit during his pretrial detention in the mid-2000s in order to protect others and ensure that he did not commit, order, or direct any additional criminal activity.   Sahakian and another Aryan Brotherhood member were separated from the rest of the prison population (they were held on the top floor of the prison hospital) and were continuously monitored by an officer.   The conditions of confinement created by the BOP for Sahakian were certainly available at the time of Mr. Johnson's trial in 1997.

27.     Thus, Dr. Vanyur's assertion that it would be "extremely difficult, at best" for officials at a BOP facility such as USP-Marion to separate Mr. Johnson from other Gangster Disciples is simply false.   At USP-Marion, we frequently and successfully separated inmates like Sahakian, Pollard, Walker, and others from the rest of the prison population.

28.     The BOP has likewise used other facilities within the system to hold pretrial defendants with special security needs.   For example, Timothy McVeigh and Terry Nichols were held at the Federal Correctional Institution at Englewood, Colorado prior to their trials on charges stemming from the 1995 bombing of the federal building in Oklahoma City, Oklahoma. An entire wing of the facility was cleared out to accommodate the two defendants.

29.     There are numerous other examples of individuals who have been subject to special security measures due to the special challenges that they present.   Rodney Hamrick, a convicted bomber, was housed at the USP-Marion when I worked there.   I recall that all of

12

Hamrick's mail was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Former Panamanian leader Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the risk that he would order crimes or violence while incarcerated. Other inmates that have been, or continue to be, housed under very strict conditions of confinement due to security concerns include T.D. Bingham, Terry Mills, Thomas Silverstein, Clayton Fountain, Eric Rudolph, Ramzi Yousef, Anthony Ayeni Jones, Terry Nichols, and Theodore Kaczynski. Silverstein has been held in conditions at various prisons – including USP-Atlanta, USP-Leavenworth, USP-Marion, and ADX – where he has had virtually no human contact since the 1980's. Unlike Mr. Johnson, many of these individuals have shown an inability to positively adjust to incarceration in the federal prison system. However, to my knowledge, the strict conditions of confinement detailed above have very successfully alleviated the risk that these inmates might pose a future danger to individuals inside or outside the prisons in which they are housed.

30. Additionally, the BOP maintains specialty units at various prisons that are designed to deal with problematic inmates. The Special Management Unit at the United States Penitentiary in Lewisburg, Pennsylvania has controls similar to those found at ADX and is designed to house inmates who have had difficulty abiding by the rules and regulations of other institutions.

31. USP-Terre Haute's Communications Management Unit ("CMU") isolates inmates away from the general population and is designed to monitor any and all inmate communication. That prison also maintains a Special Confinement Unit ("SCU"). Although the SCU is home to the federal government's death row, the BOP may also place non-condemned

13

inmates with disciplinary problems in that unit if deemed necessary and appropriate given the facts. Indeed, as FCC-Terre Haute warden, I housed individuals in the SCU who had previously been involved in an incident at another prison. For example, Hakeem Shaheed and Tyrone Davis were involved in a major disturbance at USP-Marion in 2005 and were immediately transferred to USP-Terre Haute, where I was warden at the time. My superiors at the BOP instructed me to put Shaheed and Davis into the SCU indefinitely so that they could be closely monitored. I followed these instructions, and these two men were not involved in any incidents, violent or otherwise, while they were in the SCU.

32. Moreover, most maximum-security federal prisons contain a Special Housing Unit ("SHU") where inmates can be placed when they have violated (or are suspected of violating) prison rules. A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the maximum-security facility generally. Each BOP warden has the authority to place any inmate into a SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, with the only limitation being that facility administrators must periodically review placement to determine continued appropriateness.

33. Special Administrative Measures ("SAM's") also allow the BOP to construct individualized conditions of confinement as are "reasonably necessary to protect persons against the risk of acts of violence or terrorism." See 28 CFR §501.3(a). Each SAM's order is totally unique and is nearly limitless in terms of the conditions of confinement available to be imposed

14

by BOP personnel (subject to the constraints of the United States Constitution, of course). Although SAM's orders are required to be periodically reviewed, they may be extended for as long as conditions persist (*i.e.*, indefinitely). A number of inmates have been held under SAM orders for more than a dozen years. SAM's orders were available to the BOP and the Department of Justice at the time of Mr. Johnson's trial in 1997 had officials been concerned that Mr. Johnson presented a risk of violence while incarcerated.

34.     Again, contrary to Dr. Vanyur's assertions at Mr. Johnson's trial, these strict conditions of confinement were (and are, to my knowledge) routinely imposed on high-risk inmates by the BOP for as long as it deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

## II.     Telephone, Visitation, and Correspondence Restrictions

35.     Generally speaking, federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these privileges consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused or are deemed to constitute a threat to the security of the institution or the safety of individuals, whether inside or outside the prison. As Dr. Vanyur correctly stated in Beckford, inmates can have their phone privileges revoked for up to a year at a time in the case of significant misuse. Beckford T. at 27. There is no limit on the number of consecutive year-long revocations that can be imposed on a prisoner if it is deemed to be warranted.

15

36.     Misuse of telephone, mail, and visitation privileges are of particular concern to BOP personnel because of the possibility that a federal inmate will facilitate the commission of a crime through communications with other inmates or associates in society at large.   The BOP retains a large amount of flexibility in dealing with this potential threat, as well.   As the Justice Department's Inspector General found in a 1999 report:

> According to the BOP's program statement "Telephone Regulations for Inmates," conditions and limitations may be imposed on an inmate's telephone use to ensure that it is consistent with the BOP's correctional management responsibilities. Additionally, *inmate telephone use is subject to any limitations that individual wardens determine are necessary to ensure the security or good order of the institution or to protect the public*. Restrictions on inmate telephone use may also be imposed as a disciplinary sanction.
>
> BOP regulations direct wardens to refer incidents of unlawful inmate telephone use to law enforcement authorities. According to BOP regulations, telephone "misuse" refers to such things as using the telephone to intimidate a potential witness or for other criminal purposes. Using another inmate's phone access code (PAC) or providing a PAC to another inmate is considered "misuse" and is subject to discipline. *Inmates who violate the telephone rules may have their privileges restricted or revoked*.
>
> Each warden is required by BOP's program statement to establish procedures to enable monitoring of inmate telephone conversations on any telephone located within the institution.   The term "monitoring" is not defined in the BOP program statement, so it is not clear whether this means recording of calls or live-monitoring by the BOP staff.  According to the BOP's program statement, the purpose of monitoring is to preserve the security and orderly management of the institution and to protect the public.
>
> In all BOP facilities, a notice is placed on inmate telephones advising the user that all conversations are subject to monitoring. Use of the telephones by inmates, therefore, constitutes their consent to this monitoring.   Inmate calls to attorneys are an exception to this rule and will not be monitored by BOP staff if the

16

inmate follows proper procedures, established by the warden at each institution, to arrange and place attorney calls.

BOP Headquarters has not issued any policy detailing how much "live monitoring" or review of recorded calls staff at each institution should conduct. Rather, determinations about the amount and methods of monitoring are left to individual wardens. Some institutions have remote monitoring locations. At these locations, officers randomly listen to some calls as they are occurring. This monitoring is in addition to their regular duties. Most of these institutions require the officers to monitor a minimum number – usually five – telephone calls during their shift. The officers are required to fill out a form describing the content of each monitored call and submit these reports to the institution's SIS office. The SIS offices are supposed to review the reports and decide if any further action is required.

Most institutions without remote monitoring locations have established a fixed listening post where a staff member assigned as the telephone monitor listens to inmate calls in addition to other duties, such as reviewing inmate mail. This telephone monitor normally works only during the day shift. However, wardens at several institutions have assigned a telephone monitor to the evening shift as well.

In its "Special Investigative Supervisors Manual" (SIS Manual), the BOP encourages a proactive approach to deterring criminal conduct by inmates. The SIS Manual directs SIS staff to use threat analysis, risk assessment, analysis of connections between inmates, and intelligence sources to prevent illegal conduct by inmates while still in the planning stage. The manual also states that the SIS should determine which inmates are engaged in activities that pose a threat to the welfare of the community. The SIS Manual provides examples of how the current version of ITS can assist staff in this task.

In August 1997, the Intelligence Section at BOP Headquarters issued an Inmate Telephone Monitoring field guide for wardens and SIS staff. The guide states that one of the BOP's primary concerns is to ensure that inmates who were convicted for playing leadership roles in major drug trafficking organizations do not continue their criminal operations using prison telephones. The guide stresses that

17

inmates should not be permitted to talk on the telephone when they should be at their job or educational assignments. The guide notes that some inmates may require reassignment from orderly jobs or similar positions that provide them a great deal of flexibility and autonomy so that their time is more fully engaged. The guide also cautions against permitting a small number of inmates to dominate the telephones.

In addition, the guide suggests that "population profiling" should be a major component of an institution's monitoring operations. For example, the guide acknowledges that it is not possible for staff to consistently listen to 100 percent of inmate calls. For this reason, the guide states that any inmate telephone monitoring should place the highest priority on identifying and tracking inmates with the greatest likelihood of using their telephone privileges to engage in criminal or illicit activity. Inmates identified as having a high likelihood of engaging in crime while incarcerated, such as drug dealing and escape plots, should be targeted and their telephone conversations subject to intense review.

See USDOJ/OIG Special Report: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges, August, 1999 (Found online at: http://justice.gov/oig/special/9908/) (emphasis added).

37.   As a captain, associate warden, and warden at numerous federal correctional facilities, I recall numerous instances where prison management (myself included) completely suspended or otherwise severely restricted telephone privileges because of concern that an inmate was abusing the privilege. While no system is 100 percent foolproof, we were successful in curbing inmate abuse of telephones in the overwhelming majority of cases where the issue arose through the use of targeted and contemporaneous monitoring and severe restrictions on numbers of calls and to whom inmate calls could be made.

38.   The same can be said for inmate abuse of correspondence and visitation privileges. In his testimony in the Beckford case, Dr. Vanyur correctly noted that mail, phone,

18

and visitation privileges can be severely restricted.  Beckford T. at 22-24. He did not testify similarly in Mr. Johnson's case.  Indeed, as a senior manager or head of numerous correctional facilities, I was involved in countless decisions to closely monitor visitation of, and correspondence to and from, specific individuals where there was a concern about institutional or individual safety.  Actions taken to deter or detect unlawful conduct included, among other things, real-time monitoring and recording of visitation, review of correspondence, and the interception and translation of letters written in foreign languages or code.  For example, at USP-Marion, Yu Kikumura, a member of the Japanese Red Army, a terrorist organization, had all incoming and outgoing mail inspected and translated.  It was not uncommon for prison officials to inspect every piece of incoming and outgoing mail pertaining to a targeted inmate.  Gotti and Felipe are additional examples of inmates who received this sort of treatment.

39.    Given facts underlying Mr. Johnson's convictions, including the use of telephones to commit crimes, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, were clearly available to the BOP in 1997 (and are today) – no matter where his placement.

40.    Notably, it is my knowledge and understanding that during the term of his federal incarceration (more than 13 years at this point) the BOP has not deemed it necessary or appropriate to house Darryl Johnson under the strict conditions of confinement available to it as described above (e.g., intensive restriction and/or supervision of communications by mail, phone, or in-person visitation; or segregation from staff and other inmates) whether based on any perceived "future dangerousness" or otherwise.  In addition, the information available to me clearly suggests that Mr. Johnson has been housed by the BOP under conditions that have, in

19

fact, negated any potential "future dangerousness," and he has demonstrated that he is a well-adjusted inmate, as evidenced, for example, by the affidavit of BOP Case Manager B. English previously submitted to the Court in this case which states, "I consider [Darryl] Johnson to be a well-adjusted inmate without any out of the ordinary management concerns. ...   Overall, Johnson is a quiet and civil individual." (BOP Case Manager B. English Affidavit 8/25/08).

Further affiant sayeth naught.

Mark A. Bezy

Subscribed and sworn to before me this _14_ day of December, 2009.

Notary Public

OFFICIAL SEAL
TERESA SEVERSON
NOTARY PUBLIC · State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 2, 2011

20

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee – Respondent, | ) | |
| | ) | No. 02 C 6998 |
| vs. | ) | |
| | ) | Hon. William J. Hibbler |
| DARRYL JOHNSON | ) | |
| | ) | Death Sentence Imposed |
| Defendant – Appellant – Petitioner. | ) | |

**DARRYL JOHNSON'S MOTION FOR CONSIDERATION OF HIS**
*BRADY v. MARYLAND* **AND** *JOHNSON v. MISSISSIPPI* **CLAIMS**
**and**
**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT**

Defendant Darryl Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe & Streicker, and Lorinda Meier Youngcourt, moves the Court for consideration of his *Brady v. Maryland*[1] and *Johnson v. Mississippi*[2] claims. In support thereof, Mr. Johnson presents the following supplemental memorandum of law.

**I.      Motion requesting the court to reconsider the *Brady* and *Johnson* claims.**

In its Memorandum Opinion and Order (Doc 71 filed 5/15/2009) ruling on Mr. Johnson's renewed and amended motion for discovery, the Court stated that the reason it was denying the discovery request with respect to Mr. Johnson's *Brady* claims was because "he has not formally moved the Court to reconsider the decision regarding the *Brady* claim and that claim is not

---

[1] This argument was originally set out at pages 47-53 of his §2255 motion timely filed on September 30, 2002.

[2] This claim was originally set out at pages 54-56 of his §2255 motion.

1

currently pending." Op. at 2. Pursuant to the Court's Order. Mr. Johnson formally requests that the Court reopen and reconsider the *Brady* claim.

Both the legal and factual landscape of this case have changed markedly since Judge Conlon issued her March 11, 2003 Memorandum Opinion and Order denying Mr. Johnson's *Brady* claim, stating

> The materiality standard under *Brady* is the same as the prejudice standard for an ineffective assistance of counsel claim under *Strickland*. *See Id.* at 694 (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of prejudice in *Strickland v. Washington*, 466 U.S. 688, 694 (1984). For the same reasons Johnson failed to establish prejudice for his ineffective assistance of counsel claim, he fails to establish materiality for his *Brady* claim.

Op. at 13-14 (Doc 20).

The legal landscape changed when the United States Supreme Court issued its opinion in *Massaro v. U.S.*, 538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), holding that a federal criminal defendant may properly bring an ineffective assistance claim for the first time in a §2255 motion. "In most cases a motion brought under §2255 is preferable to direct appeal for deciding claims of ineffective-assistance" because "[w]ithout additional factual development . . . an appellate court may not be able to ascertain whether the alleged error was prejudicial." *Id.* at 504-505, 123 S.Ct. at 1694, 155 L.Ed.2d at 720-721.

Since the reopening of the ineffective-assistance claims, Mr. Johnson has established new facts regarding information that was in the possession of the government at the time of his trial -- information the government did not disclose to the defense, and information which would have significantly impeached, if not outright refuted, Warden Vanyur's testimony. *See, e.g.,* Supplemental Brief in Support on Ineffective Assistance Claim (filed 12/17/2009). As this Court remarked in its May 15, 2009 ruling on discovery:

2

> The affidavit of the BOP Warden [Mark A. Bezy] provides a factual foundation for Johnson's claim that the government expert's testimony misled the jury regarding the BOP's ability to confine him immediately and indefinitely while at the same time minimizing the risk that Johnson would continue to be a danger to society. Moreover, the government has produced some information regarding other inmates held in strict conditions of confinement, also which seems to contradict the testimony of the government's expert and which could lend credibility to the testimony Johnson's expert might provide.

Op. at 7 (Doc 71). These new facts warrant reconsideration of the *Brady* claim because they substantially undermine the two arguments that the March 2003 opinion relied upon in denying the claim: (1) that the government did not suppress evidence, and (2) that the evidence was not material.

Mr. Johnson has demonstrated that the government *was* in possession of significant impeachment evidence that it failed to turn over to the defense. This includes the information which the government has belatedly disclosed regarding other inmates held in strict conditions of confinement, as well as all the extensive information contained in Warden Bezy's two affidavits regarding the policies and procedures in place at the time of Mr. Johnson's trial that were routinely used to neutralize the risk of future dangerousness posed by certain inmates, and a large and growing number of inmates who were, at the time of Mr. Johnson's trial, being held under those conditions. EX C and EX D. It is indisputable that the government failed to disclose this information to trial counsel. Additionally, as this Court recognized, this information would have constituted relevant impeachment evidence with respect to Warden Vanyur's testimony. As such, it was material to a central issue in the case – namely, the "future dangerousness" aggravating factor, and more specifically, the credibility of Warden Vanyur's testimony regarding the BOP's inability to impose strict conditions of confinement as long as was necessary to alleviate a risk of future danger posed by an inmate.

The government would not be unduly prejudiced by Mr. Johnson's request to reopen the *Brady* claim. As this Court acknowledged in its May 15, 2009 order on the discovery motion, the IAC claim and the Brady claim are "intertwined," Op. at 2, and in light of the significant factual overlap with respect to these claims, reopening the *Brady* claim would not burden the government's ability to litigate its interests in this §2255 proceeding. Indeed, the legal analysis with respect to the materiality of the *Brady* claim is essentially identical to the prejudice analysis of the ineffective assistance of counsel claim. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (opinion of Blackmun, J.) (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of "prejudice" in *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Given the significant similarity in both the underlying facts and the applicable legal test dispositive of these two claims, Petitioner respectfully requests that the Court reopen and reconsider the *Brady* claim.

For the same reasons as those articulated above, we also respectfully request that the Court reopen and reconsider Johnson's claim under *Johnson v. Mississippi*, 486 U.S. 578 (1988). *See* Initial Memorandum in Support of §2255 Motion, 54-56 (Doc 4, filed 9/30/02). As with the IAC and *Brady* claims, this issue relies on the same operative facts regarding Warden Vanyur's false and misleading testimony. Moreover, resolution of this claim will necessarily rely on similar legal analysis to that involved in determining *Strickland* prejudice – namely, whether there is a reasonable probability that the incorrect and misleading testimony provided by Warden Vanyur affected the outcome of the sentencing proceedings.

Finally, it should be noted that despite the March 2003 ruling on the *Brady* and *Johnson* claims, a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure was never entered in Mr. Johnson's case. In other words, the judgment technically need not be "reopened"

4

because it was never final to begin with.  This Court has maintained jurisdiction over all the claims in this proceeding since inception, and it maintains the inherent authority to reconsider any and all rulings in this matter until a final judgment is entered.  *See Ruehman v. Village of Palos Park*, 842 F. Supp. 1043, 1062-63 (N.D. Ill. 1994); Rule 54(b), Federal Rules of Civil Procedure ("any order or other decision, however designated, that adjudicates fewer than all the claims or rights and liabilities . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

## II.     The Government Violated *Brady* by failing to turn over evidence concerning inmates housed under special conditions of confinement

### A.     Applicable Law

Due process requires that the prosecution disclose any evidence favorable to the accused where the evidence is "material either to guilt *or to punishment"*. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, 218 (1963) (emphasis added).   The *Brady* disclosure requirement extends to evidence that impeaches the credibility of prosecution witnesses. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

In short, a defendant is entitled to relief under *Brady* when he establishes that "1) the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and 3) that the evidence was material to an issue at trial." *United States v. Earnest*, 129 F.3d 906, 910 (7th Cir. 1997).

### B.     Mr. Johnson was established the government violated *Brady v. Maryland*

The government, whether through its prosecutors or the Department of Justice, suppressed evidence.  The record clearly shows that at the time of Mr. Johnson's penalty phase

trial, a number of inmates were housed by the BOP under conditions that virtually eliminated any contact with other inmates, prison staff, and particularly the outside world.

In the mid-1980's through the mid-1990's, USP-Marion had what it termed the "K-Unit" where inmates who posed a high security risk were housed under extremely strict conditions of confinement. They were single celled, recreated alone, and had no contact with other inmates. EX D at 13.

Eight months prior to Mr. Johnson's sentencing hearing, the defendant in *United States v. Luis Felipe*, (Case No. S16-94CR395 (S.D.N.Y.)) was sentenced in a conspiracy case involving murders and drug trafficking similar to that alleged in Mr. Johnson's case. At the sentencing hearing, the district court noted that based on the record developed at trial, it found that there was a great danger that the defendant might attempt to order additional murders of others unless necessary conditions of confinement were imposed to limit his contact and communication with other individuals. For that reason, the district court issued a special direction to the BOP that the defendant be confined so that:(1) he could not have any contact with other prisoners; (2) he could only correspond with and have visits from family members that were approved by the district court; (3) any and all correspondence and visits, other than with counsel, were to be monitored and copies of each piece of correspondence were to be sent to the United States Attorney's Office for the Southern District of New York; and (4) the defendant was not permitted to have telephone contact with anyone. Luis Felipe was sent directly to ADX by the sentencing court and housed in a side pocket cell in total isolation from other inmates. EX D at 12.

In *United States v. Anthony Jones*, (Case Nos. WMN-96-0458 and WMN-97-0355 (D. Md.)), the district court, pursuant to 18 U.S.C. § 3582(d), imposed special conditions of confinement on the defendant at his sentencing. These conditions included: (1) no contact with

other inmates; (2) no telephone privileges other than with counsel, and only at times and under conditions to be set by the BOP; (3) no visiting privileges other than legal visits with counsel, and supervised visits with his mother to the extent approved by the BOP, and only at times and under conditions to be set by the BOP; (4) all ingoing and ongoing mail is to be reviewed by the BOP.

In *United States v. Peter Rollack*, (Case No. 97CR1293 (S.D.N.Y.)), the court entered a sentencing order pursuant to a plea agreement that included the following conditions of confinement: (1) no communication with any co-defendants or any member of the racketeering enterprise (i.e., gang) charged in the indictment; (2) outside of counsel, no correspondence or visits with anyone other than family members and significant others approved by the court and the BOP, and that any such correspondence and visits will be subject to monitoring; (3) the prosecution will be given notice of any family members or significant others the defendant seeks to place on his visiting list and will have the right to file objections with the court as to those visitors being approved.  Rollack was also sent directly to a "special housing unit" (i.e., a control unit) from his sentencing for a minimum of 18 months, after which his housing designation could be reviewed by BOP.

In *United States v. Ramzi Yousef*, (Case No. S12-93 CR 180 (S.D.N.Y.)), the district court stated that there was an identifiable risk that the defendant might try to order additional acts of violence from prison, and therefore imposed special conditions of confinement to neutralize that risk.  Those conditions included: (1) that the defendant be incarcerated in an administrative detention facility (i.e., control unit); and (2) outside of counsel, the defendant was only allowed to visit with family members that could positively proof they were related to the defendant.

For more than 20 years, Thomas Silverstein was incarcerated at USP-Leavenworth in solitary confinement under a "no human contact" order.  EX D at 15.  He was housed in a cell underground, where his cell lights were kept on 24 hours of the day, and was constantly monitored by correctional officers.  In 2005, when USP-Leavenworth was downgraded to a medium-security facility, Silverstein was transferred to ADX Florence, where he continues to be housed – indefinitely -- under the strictest conditions of confinement in an area of the facility known as "Range 13." *See* Deposition of John Vanyur, *Silverstein v. Federal Bureau of Prisons*, Case No. 07-CV-2471 (D.Colo. February 27, 2009) at 58 (Attached as Exhibit A).  Indeed, even Warden Vanyur admits that Silverstein, one of the most notorious inmates in the federal prison system, has had a clean conduct record due to controls placed on him by the BOP.  *Id.* at 57-58.

In addition to the aforementioned individuals, there are other BOP inmates who have been incarcerated under strict conditions of confinement for indefinite periods of time, in excess of 12 to 15 years, including Clayton Fountain, Barry Mills, Norman Matthews, Adolph Reynoso, and T.D. Bingham.  Contrary to Warden Vanyur's testimony, it is not only legal for the BOP to impose such conditions on inmates indefinitely, it is – and was at the time of Johnson's trial -- a well-established practice.  Notably, these conditions – such as no telephone use and severely limited visitation and correspondence privileges – are precisely the measures which Warden Vanyur testified would be illegal and unavailable to the BOP in the imposition of Mr. Johnson's sentence.

The conditions of confinement created for Aryan Brotherhood inmate David Sahakian were available at the time of Mr. Johnson's trial.  During his pre-trial detention, Sahakian was held in the USP-Marion I-Up Unit where he was separated from the rest of the prison population and continuously monitored by an officer.  EX D at 13-14.

8

Whether it come as an order of the sentencing court or is constructed by the BOP under Special Administrative Measures ("SAM's"), federal inmates were being held at the time of Mr. Johnson's trial and continue to be held today under conditions which either severely or totally restrict their communication with other inmates and the outside world.  EX D.

As set out in the March 2003 Order and Opinion, the government has never contested that evidence relating to BOP practices was favorable to the defense.  Op. at 13.

The materiality standard under *Brady* is the same as the prejudice standard for an ineffective assistance of counsel claim under *Strickland*.  *See United States. v. Bagley*, 473 U.S. 667, 693(1984) (Evidence is material under *Brady* if there is a reasonable probability that the result of the proceedings would have different had the evidence been disclosed).

While there were a number of aggravating and mitigating circumstances raised by the parties, the most powerful penalty phase evidence was devoted to Mr. Johnson's potential for future dangerousness and whether a sentence less than death could prevent that potential danger. In the government's opening statement to the penalty phase, the prosecutor argued to the jury that Mr. Johnson had to be executed in order to keep others safe:

> You will hear that simply by uttering the words, the defendant will have ended the lives of three people.  You've already heard how he can order brutal beatings, in addition to these murders, simply by saying so.  Tr. 1772.
>
> [T]hese threats and orders did not stop once the defendant was jailed on this charge.  Tr. 1774.
>
> Richie Wash told [Delano Finch] that the [Mr. Johnson] wants you to find someone to knock off somebody in Roger Stewart's family so that they know that we're serious, and he wants to you have somebody knock off Lance Cleaton because he saw who killed Blunt and he saw who killed Jello. Tr. 1775.
>
> That, ladies and gentlemen, will be the evidence regarding the defendant's future dangerousness. Tr. 1776.

During the defense penalty case, Mr. Johnson presented the testimony of Dr. Mark Cunningham to testify that Mr. Johnson could be housed by the BOP in such a manner as to virtually eliminate the potential for future acts of violence.  Tr. 2248-2332.  Anticipating this evidence, the government had Warden Vanyur present in the courtroom to hear Dr. Cunningham's testimony.  *E.g.*, Tr 2467, 2468, 2475, 2482.  The next day, Vanyur testified as an expert rebuttal witness for the prosecution.  Tr. 2462-2509.  As set out in detail in Johnson's Reply in Support of his His §2255 Motion (Doc 19, filed 3/6/2003), Vanyur testified:  that the BOP could not hold any prisoner indefinitely without telephone and correspondence privileges, Tr. 2482-83; that even inmates at ADX Florence had " a lot of contact with inmates", "frequent and constant contact with staff unrestrained", TR 2489-90, and "one fifteen-minute phone call per month" as well as "five visits per month" and "virtually unlimited correspondence with the outside world" Tr. 2485; that even the most dangerous inmate would eventually end up in general population with "in excess of twelve visits a month", "as many phone calls as he could pay for or get someone to accept as collect charges", and "unlimited correspondence privileges", Tr, 2472, 2477.

In its closing, the government painted a terrifying future in the event the jurors returned a verdict for anything other than the death penalty.

> [L]adies and gentlemen, as long as the defendant has the ability to convey his orders to his followers, either on the street or in prison with him, nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe. It doesn't matter where he is locked up.
>
> * * *
>
> [I]nmates with no out-dates, those inmates that are facing life, like the defendant, they are the most dangerous, they have nothing to lose.  And that's why people like Mr. Johnson poses {sic} this threat.  Tr. 2593
>
> Now, couple that with his background that you've heard about of all the other orders he gave, he truly poses a future dangerousness. . . . There is no way to completely shut somebody off in the prison with communicating with somebody

10

on the outside.  And as you heard, there is very ingenious ways that they even communicate among one another in prison.  That is why Mr. Johnson, no matter where he is, no matter when he is, is a future danger, he poses it to society as a whole, because through his own actions, his own words, and use your common sense, that no one is safe from the defendant.  Tr. 2594.

[A]fter he is locked up when we as a society should feel safe, he is out there ordering more people killed.  That is the type of evidence that is here.  And that is why no one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live.  Tr. 2598.

In its rebuttal closing argument, the government continued to bang the drum and openly stated that in order to insure everyone's safety, Mr. Johnson had to be executed.

[T]he federal regulations do not allow somebody to go directly to the control unit. That's what they're describing. That's what those pictures were.  The control unit at ADX Florence, you know he will not be going there.  Tr. 2646.

And is there any system, any prison system under the laws of our Nation that can stop the violence when your weapon is only one thing, your voice?  That is the weapon that the defendant uses.  Tr. 2647.

The evidence in this case shows beyond any reasonable doubt that there is a substantial danger that another witness or a witness's family member will be dead, because the defendant is a danger in prison. As long as he is alive he cannot be stopped from communicating, and that is all he needs.  He does not need a weapon . . . all he needs is a telephone.

\* \* \*

[T]here is no innocent bystander who is safe as long as the defendant can communicate with the outside world.  No prison system can stop him.  Tr. 2647-48.

Given all this focus on future dangerousness by the Government, it is clear they knew the evidence regarding supposed "future dangerousness" was the key to winning a death verdict.  As amply demonstrated by the special findings at the conclusion of the sentencing phase, the jury found the government's future dangerousness arguments – based on the now discredited testimony of Warden Vanyur -- to be extremely persuasive.  On each count the jury unanimously found, beyond a reasonable doubt, that Mr. Johnson "would commit serious acts of violence in the future which would be a continuing and serious threat to society."  Conversely, not a single

11

juror found that that Mr. Johnson "will not be a serious and continuing danger to society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior." Thus, it is abundantly clear that the jury rejected the testimony of Dr. Cunningham, and fully credited the testimony of Warden Vanyur on the issue of the BOP's ability to impose strict conditions of confinement on "dangerous" inmates.

Numerous social science and empirical studies of juror attitudes in capital cases highlight the importance future dangerousness plays in a jury's deliberations and return of a death sentence. *See*, *e.g.*, John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always At Issue*, 86 CORNELL L. REV. 397, 398 (2001) (noting that future dangerousness is on the minds of most jurors in most cases and this is true regardless of whether the prosecutor argues future dangerousness explicitly). Indeed, the more likely that jurors believe that the defendant will be a future danger, the more likely the jury is to impose a death sentence. *See*, *e.g.*, Eisenberg & Wells, Deadly *Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1, 7 (1992). ("[O]ver three-quarters of the jurors believe that the evidence in their case established that the defendant would be dangerous in the future. And the more the jurors agree on this fact, the more likely they are to impose a death sentence."); Constanzo & Constanzo, *Life or Death Decision: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 LAW & HUM. BEHAV. 151, 160 (1992) ("[N]early all [Oregon] jurors also offered the observation that the penalty decision hinged on the issue of whether the defendant will pose a continuing threat to society."); *id*. at 168 ("[F]uture dangerousness plays a prominent, if not central role. . . . Jurors clearly perceived the penalty as hinging on this issue."); John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the*

*Capital Jury Project*, in BEYOND REPAIR? AMERICA'S DEATH PENALTY 144 (2003) (32% of jurors believed that the law required them to impose the death penalty if they believed the defendant would be dangerous in the future); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do jurors think?* 98 COLUM. L. REV. 1538, 1542 (1998) (many jurors wrongly think they must return a death sentence if they find the defendant is especially likely to present a risk of future danger); *id.* at 1559 (noting that future dangerousness evidence is highly aggravating and that 60% of jurors interviewed were more likely to vote for death if they believed that the defendant might be dangerous in the future); Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 BUFF. L. REV. 339, 360 (1996). ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in the multi-state study of the interview data.").

As stated by this Court in its March 2003 opinion, had Mr. Johnson's trial counsel presented evidence that, in direct contradiction to Warden Vanyur's testimony, other BOP inmates were, in fact, being subject to severe restrictions on communication and contact "the jury might not have rejected Johnson's proposed finding on future dangerousness." Op. at 3. In fact, it would have taken only one juror to find that a death sentence was not the only way to keep everyone safe from Mr. Johnson, and vote for a life sentence. *See United States v. Johnson*, 223 F.3d 666, 670 (7th Cir. 2000) (the threshold for establishing a reasonable probability that the jury would not return a death verdict is lower because "it takes only one juror to nix a death sentence.").

**C. Mr. Johnson was also denied a fair trial when the government presented misleading, inaccurate and prejudicial testimony which was not corrected**

Darryl Johnson was denied due process because the government presented misleading, inaccurate and prejudicial testimony at his capital sentencing hearing.  As set out above, the government presented evidence through its expert witness Warden John Vanyur on the issue of "future dangerousness" that created the false impression that no legal authority existed to allow the Bureau of Prisons ("BOP") to limit Mr. Johnson's communications and contacts while in prison in order to curtail his alleged future dangerousness.  The government then relied on this evidence throughout its closing argument to convince the jury that unless it sentenced Mr. Johnson to death, "no one is safe," (Tr. 2598), because, argued the government, as long as Mr. Johnson had access to a telephone, correspondence, or visitors while in prison, he would be able to order others to commit acts of violence "simply by uttering the words."  Tr. 1772.

However, after the Seventh Circuit Court of Appeals affirmed Mr. Johnson's convictions and death sentences, the government conceded that Warden Vanyur's testimony was "incomplete" and that based on the evidence it heard during the sentencing proceedings, "the jury may have held the mistaken impression that no legal authority existed to limit [defendant's] communications and contacts while in prison in order to curtail his future dangerousness." Gov't. Opp. to Cert. at 21 (attached as Exhibit A to Johnson's Initial Memorandum in support of his §2255 Motion).  As explained in more detail below, there is no question that the government presented materially inaccurate testimony that created a false impression on the most critical issue in the jury's sentencing deliberation – namely, whether the only way to prevent Mr. Johnson from committing future violence was to execute him.  In light of these facts, Mr. Johnson is entitled to a new sentencing hearing.

**1.  Warden Vanyur's Testimony was Substantially Misleading and Created a False Impression Regarding BOP's Ability to Limit Mr. Johnson's Communications and Contacts While Incarcerated**

There is no question that Warden Vanyur's testimony regarding BOP's ability to limit Mr. Johnson's communications and contacts while in prison was substantially misleading and created a false impression.  Contrary to the testimony elicited by the government, the BOP has both the legal ability and prison facilities to house inmates under strict conditions of confinement *for as long as necessary* in order to protect against any reasonable possibility of "future danger." Indeed, even the government has now conceded this point.

In its opposition to Mr. Johnson's Petition for a Writ of Certiorari to the Supreme Court, the government admitted that Warden Vanyur's testimony was "incomplete" with respect to the authority of the BOP to house inmates under strict conditions of confinement, Gov't. Opp. to Cert. at 20, and "that § 3582(d) and the SAMs regulation were relevant, and that without them, 'the jury may have held the mistaken impression that no legal authority existed to limit [defendant's] communications and contacts while in prison in order to curtail his future dangerousness.'"  Gov't. Resp. to § 2255 Motion at 21.  *See also* Govt. Opp. to Cert. at 21 ("As we have acknowledged, there is in fact such authority [to limit petitioner's communications and contacts while in prison in order to curtail his future dangerousness].");  *id.* at 14 ("the jury may have held the mistaken impression that no such legal authority existed.");  *id.* at 28-29 (the prosecutor's closing argument "could have left the impression that, absent the death penalty, there was no legal authority to limit the defendant's communications.").  As set forth in various of Petitioner's pleadings, Warden Vanyur's testimony was substantially misleading in a number of material respects and undoubtedly created a false impression for the jury about the BOP's

15

ability to effectively neutralize any risk of "future dangerousness" posed by Mr. Johnson while incarcerated.

To the extent the government is tempted to argue that Warden Vanyur's testimony was merely "incomplete" and therefore "technically true," such an argument is unavailing. As one circuit court has explained, the government's duty to correct false testimony is not limited to situations where a witness commits perjury, but extends to testimony that is "substantially misleading:"

> We do not believe, however, that the prosecution's duty to disclose false testimony by one of its witnesses is to be narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury. Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is *substantially misleading.* This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross examination. However, when it should be obvious to the government that the witness' answer, although made in good faith, is untrue, the government's obligation to correct that statement is as compelling as it is in a situation when the government knows that the witness is intentionally committing perjury.

*United States v. Harris*, 498 F.2d 1164, 1169 n.14 (3d Cir. 1974). Indeed, there is a long line of Supreme Court cases that deal with due process violations centered on testimony that creates false impressions or that is misleading. *See*, *e.g*., *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Miller v. Pate*, 386 U.S. 1 (1967) (due process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (*Napue* doctrine applies to "misleading evidence important to the prosecution's case in chief" as well as to evidence that is simply false); *Alcorta*

16

*v. Texas*, 355 U.S. 28, 31 (1957) (finding a due process violation where witness testimony "taken as a whole" gave a "false impression").

Similarly, there is a long line of circuit precedent that establishes that the government violates due process when it presents material testimony which is either misleading or creates a false impression. *See Drake v. Portuondo*, 553 F.3d 230, 243 (2d Cir. 2009) (*Napue* violation found where prosecution's question elicited "literal accuracy while conveying [a] false impression" about witness's qualifications); *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (finding *Napue* violation where prosecution elicited "technically accurate testimony" that was "probably true but surely misleading" and the jury was left with "mistaken impression"); *United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976) (*Napue* violation found where prosecution "allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness."); *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) ("Evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true."); *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) ("under the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications."); *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978) ("The long-settled rule has been that the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial is a denial of due process. A conviction obtained by the use of such evidence cannot be permitted to stand. The same rule applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression.") (internal citations omitted); *United States v.*

17

*Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) (due process violation does not require finding that witness committed perjury; "It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false."); *United States v. Iverson*, 637 F.2d 799, 805 n.19 (D.C. Cir. 1980) ("[I]t makes no difference whether the testimony is technically perjurious or merely misleading."). *See also Blanton v. Blackburn,* 494 F.Supp. 895, 899 (M.D. La. 1980), *aff'd* 654 F.2d 719 (5th Cir. 1981) ("The fact that the answer given [by the witness] may have been technically correct is not sufficient where the answer is incomplete.").

Warden Vanyur's testimony regarding the BOP's ability to impose strict conditions of confinement to neutralize the alleged risk of "future danger" posed by Mr. Johnson was substantially misleading and presented a false impression to the jury. Not only did the BOP's own regulations and sections of the United States Code authorize the BOP to impose the very kinds of strict conditions of confinement that Warden Vanyur testified were illegal and unavailable, the BOP routinely imposed such conditions on inmates at the time of Mr. Johnson's sentencing hearing. Moreover, a former warden and 28-year BOP veteran, Mark A. Bezy, has reviewed Warden Vanyur's testimony on this matter and detailed the manner in which that testimony was substantially misleading and false with respect to BOP practices and procedures. Taken together, this information clearly establishes that Warden Vanyur's testimony was false within the meaning of *Napue* and its progeny.

### 2.  Both the BOP's own regulations and the U.S. Code permitted the BOP to implement strict conditions of confinement.

The government's admission in its Brief in Opposition to Certiorari identifies two sources of authority that existed at the time of Mr. Johnson's sentencing hearing that expressly would have allowed the BOP to implement and administer exactly the kinds of strict conditions of confinement which Warden Vanyur told the jury were impermissible under BOP policy,

18

impossible to maintain for any extended time, and illegal under the law: (1) the Special

Administrative Measures ("SAMs") regulation, codified at 28 C.F.R. §501.3, and (2) 18 U.S.C.

§3582(d).   A plain reading of these two provisions plainly contradicts Warden Vanyur's

testimony to the jury about the BOP's ability to neutralize the threat posed by an inmate

misusing phone and correspondence privileges to commit future acts of violence.

The SAMs regulation provides in pertinent part:

(a) Upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury. *These procedures may be implemented upon written notification* to the Director, Bureau of Prisons, by the Attorney General or, at the Attorney General's direction, by the head of a federal law enforcement agency, or the head of a member agency of the United States intelligence community, *that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons*, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. *These special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.*

28 C.F.R. § 501.3 (emphasis added).   As the above provision makes clear, BOP Warden

Vanyur's testimony to the jury that the BOP lacked the authority to prospectively limit an

inmate's telephone, visiting and correspondence privileges was false and misleading.  The same

is true of Warden Vanyur's testimony that the BOP could only limit those privileges if it caught

an inmate misusing those lines of communication.  The SAMs regulation explicitly provides that

the BOP is authorized to implement any procedures that are "reasonably necessary to protect

persons against the risk of acts of violence," including "limiting certain privileges" such as

"correspondence, visiting, … and use of the telephones," and that the implementation of such

19

procedures is not contingent on the inmate getting caught misusing these privileges.  Rather, such "procedures may be implemented upon written notification" to the BOP by the Justice Department or any other federal law enforcement agency "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons."

Contrary to Warden Vanyur's testimony that the BOP could do nothing to limit an inmate's use of the phones or other correspondence or visiting privileges until after an inmate had already committed an improper act, the BOP's regulations, not surprisingly, do not require it to sit idly by until that time.  If the jury had been properly informed about the BOP's regulations, it would have learned that, in fact, the BOP was authorized to use any and all "reasonably necessary" measures to curtail Mr. Johnson's "communications or contacts with persons could [that] result in death or serious bodily injury to persons," and that these measures could be implemented immediately, upon written notification by the appropriate governmental authorities. In other words, under 28 C.F.R. § 501.3, the BOP was authorized to do exactly what Warden Vanyur testified it could not do: eliminate the risk of acts of violence by prospectively limiting Mr. Johnson's ability to communicate with others, whenever and for as long as deemed necessary.

Warden Vanyur's testimony was particularly pernicious because in the course of his testimony, he specifically referenced the Code of Federal Regulations for the purpose of arguing that these regulations *constrained* the BOP's ability to implement strict conditions of confinement prospectively.  Specifically, Warden Vanyur cited to 28 C.F.R. § 541 in his testimony that this regulation prohibits the BOP from prospectively assigning an inmate to a control unit based on dangerous behavior the inmate exhibited prior to being incarcerated.  See

Tr. 2484-85 ("28 CFR Section 541 is very clear that inmates cannot be placed in a control unit solely on the basis of the offenses they committed in the community.")  However, as noted in section 541.41(b)(2), a defendant may be placed in a control unit if he "expressed threats to the life or well-being of other persons," regardless of whether such threats occurred prior to his imprisonment.  Moreover, the BOP itself recognizes that under Section 541,

> This placement is ordinarily recommended only for an inmate already in a federal institution; *however, there may be occasion where an inmate recommended for federal custody requires placement in a control unit.*  In *Bono v. Saxbe*, 620 F.2d 609, at 611 (7th Cir. 1980), the United States Court of Appeals opinion recognized that "Prisoners may be placed in the Marion Control Unit *directly from the federal courts,* from the general population at Marion or from other federal and state prisons."

49 Fed. Reg. 32990 (1984) (emphasis added).  In other words, Warden Vanyur's testimony that the BOP was prohibited from directly assigning Mr. Johnson to a control unit as a means to neutralize the possibility of "future dangerousness" was contrary to what the law actually states on this matter, and undoubtedly created a false impression for the jury in this regard.

The source of authority mentioned in the government's admission is 18 U.S.C. § 3582(d), which authorizes a district court to impose strict conditions of confinement as part of a defendant's sentence.  It provides, in pertinent part:

> The court, in imposing a sentence to a term of imprisonment upon a defendant convicted of a felony set forth in chapter 95 (racketeering) or 96 (racketeer influenced and corrupt organizations) of this title or in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 801 et seq.), or at any time thereafter *upon motion by the Director of the Bureau of Prisons or a United States attorney, may include as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person, other than his attorney, upon a showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise.*

21

18 U.S.C. §3582(d) (emphasis added).  As this provision makes clear, both the BOP and a

United States Attorney's Office are authorized to request that the sentencing court impose strict

conditions of confinement prospectively to limit an inmate's ability to communicate with others.

The government's elicitation of testimony from Warden Vanyur that suggested otherwise was

thus grossly misleading and unmistakably created a false impression for the jury about the BOP's

authority to limit Mr. Johnson's communications while incarcerated.

> **3.     The BOP had a practice of imposing precisely the kind of strict
> conditions of confinement that Warden Vanyur testifies were not available or
> otherwise allowed.**

As has now been extensively documented in Mr. Johnson's Initial Memorandum in

support of his § 2255 Motion ("Init. Memo."), and in his Initial Reply in support of his § 2255

Motion ("Init. Rep."), and in the two Affidavits of former BOP Warden Mark Bezy, the BOP

routinely imposes strict conditions of confinement on inmates for as long as it deems necessary –

and did so at the time of Petitioner's penalty-phase hearing.  Moreover, these measures have

been implemented pursuant to BOP regulations and statutory law that were in existence and

operative at the time of Mr. Johnson's sentencing hearing.  See Init. Memo. at 17-20, 49; Init.

Rep. at 21-23.  See section II(b)(i) above, and the two Bezy Affidavits (Exs. C and D, hereto) for

a recitation of individuals held under strict conditions of confinement at the time of Mr.

Johnson's trial.

> **4.     The Government Knew of Should Have Known that Warden
> Vanyur's Testimony was Misleading and Created a False Impression, But
> Failed to Correct the Testimony.**

In *United States v. Augurs*, 427 U.S. 97, 103 (1976), the Supreme Court held that in cases

where the government "knew *or should have known*" of false testimony, a conviction obtained

with such testimony is "fundamentally unfair, and must be set aside if there is any reasonable

22

likelihood that the false testimony could have affected the judgment of the jury." *Id*. at 103 (emphasis added, footnotes omitted). *See also United States v. Kaufmann*, 803 F.2d 289, 291 (7th Cir. 1986) (adopting "knew or should have known" standard). That standard is easily met here.

First, the government has already conceded that the SAMs procedures and 18 U.S.C. § 3582(d) were relevant to Mr. Johnson's sentencing hearing. The government's acknowledgment of these regulatory and statutory provisions demonstrates that the government knew or should have known Warden Vanyur's testimony regarding the BOP's inability to impose necessary conditions of confinement to limit Mr. Johnson's communications and contacts while incarcerated was misleading and created a false impression for the jury. Indeed, both the SAMs procedures and § 3582(d) articulate the authority the Justice Department has in pursuing special conditions of confinement against inmates. Under 28 C.F.R. § 501.3(a), the Attorney General is authorized to direct the BOP to implement special administrative procedures, including limiting an inmate's phone, visiting and correspondence privileges, against inmates that it believes pose a "substantial risk" of misusing those privileges to seriously injure or kill others. Under § 3582(d), a United States attorney is authorized to move the sentencing court for an order imposing special conditions of confinement, including specifying the only persons with whom the defendant will be allowed to communicate, outside of counsel, if the United States attorney has "probable cause" to believe that the defendant's communications with a particular person is for the purpose of managing, directing or controlling an illegal activity. Indeed, under § 3582(d), even the BOP can file such a motion with the sentencing court. Given that the government is charged with executing these laws and regulations, it is reasonable to assume that the government is aware of them. The government cannot credibly disclaim knowledge of regulations and statutes that

authorize it to impose exactly the conditions of confinement which it presented to the jury as unavailable or illegal in Mr. Johnson's case.

Second, Warden Vanyur was presented as an expert witness on BOP policies and procedures with respect to conditions of confinement. Having cited to the Code of Federal Regulations in his own testimony, it strains credulity to believe that Warden Vanyur was not aware of the BOP's regulation codified at 28 C.F.R. § 501.3. This is particularly so given Warden Vanyur's position at ADX, where many of the inmates were (and are) held under SAMs orders pursuant that very regulation. Similarly, one would reasonably expect that Warden Vanyur would similarly be aware of § 3582(d), precisely because it specifically mentions the BOP's authority to file a motion in federal court demonstrating probable cause to impose necessary conditions of confinement to prevent an inmate from manipulating communications privileges to direct or manage illegal activities. Likewise, considering Warden Vanyur's role in making ADX operational – a facility that was, by design, intended to impose the strictest conditions of confinement to neutralize the risk of danger imposed by inmates who are adept at abusing communications privileges – it seems quite unlikely that Warden Vanyur would not know about BOP's regular practice of imposing strict conditions of confinement on dangerous inmates, as detailed by Warden Bezy and as articulated in the specific cases noted above.

Indeed, just prior to testifying at Mr. Johnson's sentencing hearing, Warden Vanyur was called as an expert BOP witness at the capital sentencing hearing in *United States v. Dean Anthony Beckford*, No. 3:96CR66 (E.D. Va.) on July 21, 1997. At that hearing, Warden Vanyur gave testimony under cross-examination that was at odds with his testimony in Mr. Johnson's case. For example, Warden Vanyur conceded at the Beckford trial that an individual who has been identified as posing a danger can be sent to the control unit at ADX immediately:

24

Q:      So you don't mean to tell this jury that someone cannot be committed there [the "Florence ultra security section"] immediately if the United States is of the opinion they are that dangerous.

A:      That's correct.

EX B at 19.

Q:      Is there any rule that prohibits a new inmate who has been classified as dangerous from being sent to Ad-Max in Florence?

A:      No, but that's not the Bureau's goal in Ad-Max.

Q:      Okay.  This will got (sic) faster if you answer my question.  Is there any rule that says they can't go there?

A:      No.

*Id*. at 31-32.  Warden Vanyur's testimony is directly contrary to the testimony he gave at Mr. Johnson's trial that "under the law, [it is not] even a possibility to place Darryl Johnson directly into that 68-bed control unit [at ADX]."  Tr. 2484.  Given that Warden Vanyur was the government's own expert witness, it knew or should have known that his testimony at Mr. Johnson's trial was substantially misleading, if not outright false, given that he had just testified on the very same topic only months before as a government expert.  The prosecutors in this case were employees of the Department of Justice, and they are imputed with knowledge in the possession of other employees of that same agency.  *See United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *United States v. Barkett*, 530 F.2d 189 (8th Cir. 1976) ("[O]ne office within a single federal agency must know what another office of the same agency is doing. … This is no more than to hold the Government

to the same standard of conduct as governs private individuals in transmitting notice from agent to principal.").

Moreover, any knowledge which Warden Vanyur possessed should be imputed to the prosecution. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case."). Indeed, it is a well-settled principle of law that the government is responsible for the knowledge of a government agent who actually testifies as a witness. *See*, *e.g.*, *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977); *Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir.), *cert. denied*, 458 U.S. 1109 (1982); *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973); *Curran v. State of Delaware*, 259 F.2d 707, 712-13 (3d Cir. 1958); *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995); *United States ex rel. Kowal v. Attorney General of Illinois*, 550 F. Supp. 447, 451 (N.D. Ill. 1982); *United States v. Andrews*, 824 F. Supp. 1273, 1289 (N.D. Ill. 1993). *See also United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.").

Finally, under the law, Mr. Johnson need not demonstrate that the prosecutors who tried his case were personally aware of the falsity of Warden Vanyur's testimony. The Supreme Court has held that the presentation of false evidence against a defendant violates due process even if the falsity was unknown to the prosecutor. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). This is because the underlying purpose of *Napue* and *Giglio* is not to punish prosecutor for the misdeeds of a witness, but rather to ensure that jury is not misled by any falsehoods. *See*, *e.g.*, *United States v. Meinster*, 619 F.2d 1041, 1044 (4th Cir. 1980). Nevertheless, in light of the fact

26

that the basis for determining the falsity of Warden Vanyur's testimony was extant regulatory and statutory law within the purview of the United States Attorney's Office, as well as ongoing practices and procedures within the institutional knowledge of the BOP and the Justice Department, it is clear that the government knew or should have known that Warden Vanyur's testimony was substantially misleading and created a false impression for the jury.

### 5. Warden Vanyur's Testimony was Material and Prejudicial.

In order to establish materiality under *Napue*, one must demonstrate "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, (1976). That standard is easily met here. The central argument upon which the government relied in arguing to the jury that it should sentence Mr. Johnson to death was his alleged "future dangerousness." It was the centerpiece of the government's argument in closing at the sentencing phase of the trial, and as reflected in the special findings of the jury, it was an argument that the jury found to be exceedingly persuasive. The government's ability to make that argument rested almost exclusively on the testimony it elicited from Warden Vanyur. There is simply no question, therefore, that his misleading testimony was highly material and prejudicial. The arguments set out above in section III(b)(iii) further demonstrates the material and prejudicial nature of Warden Vanyur's testimony.

### III. Johnson's death sentence violates the 8th Amendment as it is Based upon Materially Incomplete, False and Inaccurate Information

The Eighth Amendment forbids basing a death sentence on materially false or inaccurate information. The Supreme Court has held that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a *special need for reliability* in the determination that death is the appropriate punishment in

any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (citations and internal quotations omitted; emphasis added). Accordingly, while there is no "perfect procedure for deciding in which cases governmental authority should be used to impose death," the Court "[has] made it clear that such decisions cannot be predicated [on] factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Id.* (emphasis added).

In *Johnson*, the Court reiterated that one such "constitutionally impermissible" factor is materially false or inaccurate information. *Johnson*, 486 U.S. at 586. In finding the materially inaccurate information required reversal of the death sentence, the Court noted that "the prosecutor repeatedly urged the jury to give [the materially inaccurate information] weight in connection with its assigned task of balancing aggravating and mitigating circumstances 'one against the other.'" *Id.* "Even without that express argument," the Court continued, there would be a possibility that the jury's belief in the inaccurate information "would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* (citing *Gardner v. Florida*, 430 U.S. 349, 359 (1977).

This recognition of prejudice by the *Johnson* Court reflected a principle established in the law at least since *Townsend v. Burke*, 334 U.S. 736 (1948) (due process requires resentencing where "materially untrue" allegations form part of the basis for the defendant's sentence), and which had been forcefully restated on numerous occasions since *Townsend*. *See*, *e.g.*, *United States v. Tucker*, 404 U.S. 443 (1972). *See also*, *e.g.*, *Roussell v. Jeane*, 842 F.2d 1512, 1524 (5th Cir. 1988), citing *Tucker* (where "the sentencing authority relies on incorrect or unsupported assumptions [and] such reliance is manifest in the record due process requires that the defendant be resentenced"); *Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir. 1986) (due process entitles

28

defendant to resentencing if court is "unable to find that the invalid [prior] convictions did not influence" the sentence imposed for a subsequent offense, citing *Tucker*).

Due process is violated, even in a non-capital case, where "the sentence rests on a foundation of confusion, misinformation, and ignorance of facts * * *" *United States v. Espinoza*, 481 F.2d 553,556-557 (5th Cir. 1973), quoting *United States v. Malcolm*, 432 F.2d 809, 816 (2nd Cir. 1970).  "If justice is to be done, [the sentencer] should know all the material facts," because the "[f]air administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion * * *" *Id.* The *Malcolm* court put it succinctly: "[M]aterial false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." *Malcolm*, 432 F.2d at 816, citing *Townsend v. Burke*.

As Mr. Johnson has demonstrated throughout these proceedings and specifically in this memorandum and in his Supplemental Memorandum In Support of His Ineffective Assistance of Counsel claim (filed 12/17/2009), material portions of the testimony of Government witness Warden John Vanyur were inaccurate, incomplete and/or materially misleading.  As set forth above, Warden Vanyur's testimony was the centerpiece of the government's case regarding Mr. Johnson's "future dangerousness" and was forcefully argued to the jury as a primary reason to impose the death penalty.  Johnson's death sentence, because it is based in whole or in part on Vanyur's inaccurate, incomplete, materially misleading, and/or fundamentally unreliable testimony, violates the Eighth Amendment.

## VI.    Conclusion and Prayer for Relief

For all the reasons set out herein as well as in the previously filed motions and pleadings in support of the claims for relief, Mr. Johnson respectfully requests the Court (1) reconsider his

29

*Brady v. Maryland* claim and grant relief on the same, ordering his sentence vacated and a new jury penalty trial and (2) reconsider his *Johnson v. Mississippi* claim and grant relief on the same. If the Court has any doubt that Mr. Johnson has met his burden in proving any of the claims set out herein, Mr. Johnson respectfully requests an evidentiary hearing be held on the issues.  28 U.S.C. §2255; *Massaro v. United States*, 538 U.S. 500, 504-506 (2003).

Respectfully submitted,


/s/ Terence H. Campbell_____ _____          /s/ Lorinda M Youngcourt_____

Terence H. Campbell                       Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.        Youngcourt Law Office
33 North Dearboen Street, Suite 600        P.O. Box 206
Chicago, Illinois 60602                    Huron, Indiana 47437-0206
(312) 263-0345                             (866) 274-3218

Counsel for Darryl Lamont Johnson

### Certificate of Service

Terence H. Campbell, an attorney, hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1. Darryl Johnson's Motion for Consideration of His *Brandy v. Maryland* and *Johnson v. Mississippi* claims and to amend his 28 U.S.C. §2255 Motion To Vacate Conviction And Sentence and Supplemental Memorandum of Law in Support

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.


/s/ Terence H. Campbell_____
Terence H. Campbell

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-02471-PAB-KMT

_____

VIDEOCONFERENCED DEPOSITION OF JOHN MARTIN VANYUR
February 27, 2009

_____

THOMAS SILVERSTEIN,
Plaintiff,
v.
FEDERAL BUREAU OF PRISONS, et al.,
Defendants.

_____

APPEARANCES

For the Plaintiff:   LAURA ROVNER, ESQ.
          Nicole Godfrey, Student Attorney
          Steve Baum, Student Attorney
          2255 East Evans Avenue
          Suite 335
          Denver, Colorado 80208
For the Defendants:   MARCY E. COOK, ESQ.
          U.S. Attorney's Office
          1225 17th Street
          Suite 700
          Denver, Colorado 80202
Also Present:     Christopher Synsvoll, Esq.
          Rachel Proctor
          Katie Stevens

Page 2

Videoconferenced deposition of JOHN MARTIN VANYUR, the Witness herein, called by the Plaintiff in the above-entitled matter on Friday, the 27th day of February, 2009, commencing at the hour of 8:34 a.m., at 901 19th Street, Courtroom 201, Denver, Colorado, before Wendy Evangelista, Registered Professional Reporter and Notary Public within and for the State of Colorado, said videoconferenced deposition being taken pursuant to Notice and the Federal Rules of Civil Procedure.

_____

INDEX

Page Number

Examination by Ms. Godfrey          3

EXHIBITS

Exhibit Letter          Initial Reference

9* Memorandum to File from Gomez, 6/20/06     70

23* Memorandum to Executive Staff from Nalley,     37
    10/15/04
39  A Summary of Interactions Between Thomas     47
    Silverstein and Staff at USP Leavenworth
    (FY'03)
40  Program Statement 5180.05, Central Inmate     51
    Monitoring System, 12/31/07

*Exhibit marked in a previous deposition; no photocopy substituted

Page 3

PROCEEDINGS

MS. GODFREY: Hi, Mr. Vanyur. My name is Nicole Godfrey, and I will be deposing you today.

Marcy, did you show him the protective orders and sign the affirmations already?

MS. COOK: Yes, we have.

MS. GODFREY: Okay. Thank you.

Mr. Vanyur, if you could just state your name for the record.

MS. COOK: Before we start, could you just identify who all you have with you there? I've just got Mr. Synsvoll on my left here off camera.

MS. ROVNER: Hi, Chris.

MR. SYNSVOLL: Good morning.

MS. GODFREY: Yes, of course. It's myself, Nicole Godfrey and my supervising attorney, Laura Rovner; and my other case partners: Katie Stevens, Rachel Proctor, and Steve Baum; and then the court reporter.

MS. COOK: Thank you.

JOHN MARTIN VANYUR, the Witness herein, having been first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

Q  (By Ms. Godfrey)  Mr. Vanyur, could you

Page 4

please state your name for the record.

A  Sure. My name is John, J-O-H-N, M for Martin, and the last name is Vanyur, V-A-N-Y-U-R.

Q  Thank you. Because we're taking this deposition via video, it might be a bit awkward. I'm sure you've noticed there seems to be a little bit of a time delay. Given that, I'll do my best not to speak over you, and I would ask that you do the same.

You were just sworn in by the court reporter, so you're giving sworn testimony, and you're obligated to give full and complete testimony. If you could, answer all questions unless you're instructed by Marcy not to. If you don't understand the question, please tell me; otherwise, I'm going to assume that you do.

I have two preliminary questions: Are you under the influence of any drugs or medication?

A  No.

Q  And have you consumed alcohol in the last eight hours?

A  No.

Q  Okay. Thank you. Do you understand that you are here today to give testimony in a civil case regarding the conditions of confinement of Tom Silverstein?

A  Yes.

1 (Pages 1 to 4)

Page 5

Q   Have you ever given a deposition before?

A   Yes.

Q   Do you know how often -- how many?  I'm sorry.

A   I do not know the exact number.  I would guess, if you include EEO cases and other administrative cases, probably 12, 14 times.

Q   Okay.  Thank you.  What was the most recent deposition you've given?

A   The most recent deposition I gave was in a case in New York.  One of the inmate's names was Icbaum (phonetic).  And it dealt with detainees.

Q   Okay.  Thank you.  And have you ever testified in court before?

A   I have.

Q   Do you know how often?

A   In two cases.

Q   Do you remember the case names?

A   Actually, three cases that I can recall.  One case was with an individual named Darrell Johnson.  And then the other two cases -- I don't know the name of the defendants.  One was a death penalty case out of Richmond for multiple defendants.  And the other one dealt with Washington, DC, inmates.

Q   Okay.  Thank you.  Who have you spoken to

Page 6

about your testimony today?

A   Just to counsel, to Chris and Marcy.

Q   Okay.  Thank you.  And what documents have you reviewed in preparation for your testimony today?

MS. COOK:  Objection, foundation.

Q   (By Ms. Godfrey)  Have you reviewed any documents in preparation for your testimony today?

A   I have.

Q   And what documents are those?

A   A number of documents.  I reviewed two depositions, one by Mr. Nalley in this case.  The other one -- it was my deposition from a prior case unrelated to this case.  I also reviewed an information paper from 2004 and then a number of memorandum from ADX staff and others and a number of Sentry transaction sheets and probably a few other miscellaneous documents.

Q   Okay.  Thank you.  For the -- your deposition in the prior unrelated case, do you know what the issues in that case were?

A   Yes.  These -- the case involved individuals who were convicted primarily of terrorism offenses prior to 9/11.  And it dealt with their conditions of confinement and their transfer to ADX Florence, among other things.

Q   Do you know who those inmates were?

Page 7

A   There were three, I believe.  I want to say it was Nosair and Salameh (sic).  But I may be -- the case was being deposed by UD law students, so it's -- you're probably more familiar with it than I am.

Q   Okay.  Thank you.  Can you please describe your educational background since high school?

A   Sure.  I graduated college in 1973 from the University of Scranton with a Bachelor of Science Degree in psychology and sociology, then received a master's degree in psychology from the University of Maryland in 1980 -- I'm sorry, I graduated from college in 1977.  I received my master's degree from the University of Maryland in 1980 and then received my doctorate in psychology from the University of Maryland in 1985.

Q   Okay.  Thank you.  Are you currently employed?

A   I am.

Q   Where?

A   I am employed with a company called Management and Training Corporation, MTC.

Q   And what do you do for that company?

A   I'm the senior director of federal customer relations.

Q   And what are your duties in that position?

A   My duties are to help them manage current

Page 8

customers, federal customers, in the private detention business -- they run contract confinement prisons -- and also to help them out with some state contracts they have and to see if I can get them more business in that arena.

Q   And how long have you been in this position?

A   Just under two years; about 21 months, roughly.

Q   And what was your job prior to this?

A   Prior to that, I was the assistant director of the Correctional Programs Division for the Federal Bureau of Prisons.

Q   And when did you first become the assistant director of the Correctional Programs Division of the BOP?

A   In June 2004.

Q   Did you have any positions with the BOP prior to that?

A   I did.

Q   Can you tell me what they were?

A   Sure.  Prior to that position, I was the deputy assistant director of the Correctional Programs Division.  Prior to that, I was the warden of the federal detention center in Philadelphia, Pennsylvania.  Prior to that, I was the warden at the low-security

2 (Pages 5 to 8)

Page 9

correctional institution in Butner, North Carolina. Prior to that, I was the deputy assistant -- I'm sorry. Prior to that, I was the associate warden of the administrative maximum facility in Florence, Colorado.

Prior to that, I was the deputy assistant director of human resources for the Bureau. Prior to that, I was the personnel director for the agency. Prior to that, I was the chief of management development. Prior to that, I was the executive assistant to the warden at the federal correctional institution in Terminal Island, California. Prior to that, I was the chief of personnel policy and analysis for the Bureau. Prior to that, I was a science research analyst for the Bureau.

Q   Okay. Thank you. You said that you -- prior to becoming assistant director, you were the deputy assistant director. Do you recall the dates that you were the deputy assistant director?

A   Yes, from January 2001 to when I became the assistant director.

Q   Okay. And you also said you were the associate warden at the ADX at some point. Do you recall the years that you were there?

A   Yes, 1994, which is the year it opened, through 1996.

Page 10

Q   Okay. Thank you. When you were associate warden of the ADX, what were your job duties?

A   I was the associate warden of operations. So I had personnel, financial management, facilities management, safety, food service, and that's probably it; mainly the logistics and services piece of the facility.

Q   Okay. Thank you. During this time when you were associate warden, was there a special housing unit at the ADX?

A   There was.

Q   And at that time was there an area in the special housing unit known as Range 13?

A   Yes.

Q   And how was Range 13 -- was Range 13 different than the rest of the special housing unit?

A   Yes.

Q   How so?

A   It -- the cells on that particular range were -- had their own recreation areas and visiting areas built actually into the cells, which was different from the rest of the institution.

Q   Different from the entirety of the rest of the institution?

A   Yes.

Page 11

Q   Okay. Would you say that an inmate housed on Range 13 is completely isolated from all other prisoners?

A   No.

Q   Why not?

A   Well, there's four adjoining cells on Range 13. So to the degree that there were other inmates on that range, they could converse with each other. They couldn't have physical contact, but they could certainly have verbal contact.

Q   Would they ever see one another?

A   Not normally. If an individual was being moved down the range, they could see each other. But other than that, I would think that their sight would be very limited in terms of seeing other inmates.

Q   Okay. Why was Range 13 built?

A   I don't know. I was not involved in the design of the facility.

Q   Do you know what its purpose was when you were associate warden?

A   We didn't have anybody on that range during the time I was the associate warden.

Q   Okay. Do you know why an inmate would have been confined on that range?

A   Not without knowing a specific inmate, why

Page 12

the decision would be made to put him on that range.

Q   Okay. Do you know, in your time with the BOP, how many inmates have ever been confined on Range 13?

A   There's two that I'm aware of -- three that I'm aware of, but there could have been additional ones, since I didn't work at the facility for those years, between '96 and now.

Q   And of those three, do you know how long they were confined there?

A   I don't.

Q   Okay. What were your job duties as deputy assistant director of the Correctional Programs Division?

A   I had oversight over a number of departments in the division, including correctional services, correctional programs, religious programs, psychology services, inmate systems management.

Q   Okay. And what were your job duties as assistant director of the Correctional Programs Division?

A   Well, I had oversight over those same departments, in addition to privatization management, and community corrections, and detention, were the other departments. And then I had policy control, if you

3 (Pages 9 to 12)

Page 13

will, or policy oversight over any of those different functional areas.

Q   Can you explain to me a little more what you mean by "policy oversight"?

A   Well, my job was to make sure that the policies that were under the span of control of my division were up to date. If they needed to be modified, we were the ones that wrote the modifications. We were the ones who would provide input to the program review division on how our policies should be audited or reviewed out in the field. And some of my staff would negotiate with the union when we made policy changes that were under our span of control.

Q   Okay. Thank you. You had said some of your job duties included correctional services. Can you expand on what that means more, please?

A   Meaning -- is your question: What does correctional services include?

Q   Yes.

A   Okay. Correctional services is basically the same as the security of the Bureau of Prisons. It includes policies related to tool and key control, inmate accountability, special housing operations, inmate transportation and movement, emergency planning, and intelligence gathering, among other things.

Page 14

Q   Okay. And for this intelligence gathering, does this include intelligence about gang-related activities?

A   Yes.

Q   Does the BOP receive intelligence from any other law enforcement agencies regarding gang-related activities within the prison system?

A   Yes.

Q   What other law enforcement agencies?

A   Well, I mean, dozens and dozens. I mean, we get information from other state systems, other state departments of corrections, and from the Federal Bureau of Investigation, Drug Enforcement Authority -- Administration, Alcohol Tobacco & Firearms. We'll take intelligence from basically anyone that will give us information. So as I said, it's dozens and dozens of states and just about every federal law enforcement agency that's out there.

Q   And how does the BOP receive this intelligence from those agencies?

A   Well, it would vary agency by agency. Sometimes we receive, for lack of a better word, bulletins over whether there is a particular gang problem at a state system that may bleed into our system. Sometimes we get specific intelligence about a

Page 15

specific individual. And that can come through different reporting systems; from the FBI and others.

The Bureau has a liaison in the National Gang Intelligence Center at the FBI and also at the National Joint Terrorism Task Force and also has representation on a lot of local task forces throughout the country. So we're constantly liaisoning with other law enforcement agencies to share information.

Q   Okay. You said some of this information comes in the form of bulletins. What happens to those bulletins?

A   They would be received by staff that work for the intelligence office and then they would be analyzed. This is what analysts do. They look at that information, try to determine how credible it is, and then try to determine its relevance to the Bureau of Prisons.

Q   And then after those bulletins are received, are they filed somewhere within the BOP?

A   I'm not sure. You would have to ask the intelligence staff that, as to how actually that piece of paper is handled and managed.

Q   Okay. You had mentioned the National Joint Terrorism Task Force. Is there a law enforcement entity for gangs that would be equivalent to that?

Page 16

A   There are several that are not the same size and scope but have similar functions. The National Gang Intelligence Center, NGIC, in the FBI of fairly recent creation, probably four years old -- three or four years old -- that's becoming more like the JTTF in terms of structure. There's also in many cities what are called Safe Streets Task Forces that deal a lot with gang issues in addition to violent crimes and other things of which the Bureau is involved in. So there's similar structures out there.

Q   Okay. For the National Gang -- I'm sorry. I just wrote down an acronym, NGIC, and I don't recall exactly what you said that stands for. What is the purpose of that entity?

A   The purpose is to try to enhance systems to share intelligence across different agencies and between states, local jurisdictions and federal jurisdiction.

Q   And how would that entity inform intelligence decisions within the BOP?

A   Could you repeat your question, please?

Q   Sure. How would the NGIC inform intelligence decisions within the BOP?

A   Well, they wouldn't inform decisions. They would provide intelligence. And then decisions based on intelligence would be done by the Bureau. The Bureau of

4 (Pages 13 to 16)

Page 17

Prisons has a staff member that's stationed inside the National Gang Intelligence Center as the liaison full time.

Q   Okay.  What other agencies are involved in this entity?

A   There's dozens.  I don't even know them all. I mean, there's dozens of states, and a lot of other federal agencies have staff assigned to the NGIC.  I don't know the complete menu of who is there.

Q   Okay.  Thank you.  Does the BOP ever use intelligence received from entities such as this to make conditions of confinement decisions?

A   We'll use intelligence as part of an assessment of an individual inmate's threat and risk to the safety and security of an institution.  It would be one piece of information that we may use.  And then manager's -- correctional managers would use that threat assessment, that information, to make decisions regarding where the inmate should be housed, how they should be classified and so forth.

Q   Okay.  Can you tell me what types of intelligence would guide these sort of decisions?

MS. COOK:  Objection, vague.

Q   (By Ms. Godfrey)  You can answer.

A   I mean, any type of intelligence, whether

Page 18

it's the person's criminal activity, whether it's who they're communicating with, whether it's who their affiliations and associations are -- I mean, there's dozens and dozens of types of intelligence that could be gathered.

Q   Okay.  Are you familiar with the Aryan Brotherhood?

A   Yes.

Q   What is the Aryan Brotherhood?

A   The Aryan Brotherhood is a security threat group, which is really what the prison terminology is now, rather than "gangs."  You'll hear that term.  These are groups that are a threat to the safety and security of the institution.  The Bureau has a higher level beyond security threat groups for a very small number of groups that are particularly disruptive, and they call them "disruptive groups."

The Aryan Brotherhood is a disruptive group. And in most analyses that you'll see, the Bureau creates a threat index for each security threat group.  The Aryan Brotherhood is consistently at the top of that threat index as the most violent and disruptive group in the federal prison system.

The Aryan Brotherhood started in California. There's multiple Aryan Brotherhoods throughout the

Page 19

country, in Texas and Arizona.  The one in the federal system that we call the Aryan Brotherhood is a California product that originated back -- you probably could trace it back to the late '60s, early '70s.

Q   Okay.  Thank you.  Do you believe that Mr. Silverstein has an association with the Aryan Brotherhood?

A   I believe he has more than an association.

Q   What do you mean by "more than an association"?

A   He's a validated member of the Aryan Brotherhood, so he has gone through an extensive objective validation process and literally been scored to determine whether he is a certified member of the disruptive group.  And he is a certified member of the Aryan Brotherhood.

Q   Okay.  You said something about an objective validation process.  Can you just expand on that a little bit more?  What does that mean?

A   Sure.  Most prison systems now -- and the Bureau is one of the leaders in this -- have devised scoring systems where you look at a number of criteria to determine whether an individual is a validated member of a group so that they're not just a look-alike or a wannabe.  And those criteria are published.

Page 20

They look at things such as affiliations, tattoos, photographs of individuals, and different pieces of intelligence that can be looked at.  And then based on that validation score, the individual is determined to be a member or not a member.

Q   Okay.  Are you aware of any evidence that Mr. Silverstein has had any contact with members of the Aryan Brotherhood in the past 25 years?

A   I have no evidence of that.  I don't -- I only see what the scoring that was produced for him shows.

Q   When was that scoring done for Mr. Silverstein?

A   I don't know.

Q   Okay.  Do you know if it was done before 1990?

A   I do not.

Q   Once an individual is determined to have an affiliation with a group like the Aryan Brotherhood, is that -- are they always -- will they always be determined to have that affiliation?

A   No.  There are inmates that sometimes separate themselves from security threat groups or disruptive groups.

Q   And how do they do that?

5 (Pages 17 to 20)

Page 21

A   There's multiple ways of doing that. Typically, or many times, inmates will what we call debrief, and that is that they will give up large amounts of information about the gang that proves to be credible. They renounce any membership and affiliation with it. But typically the way we do that is to not only listen to what the inmate says, but observe their behavior over a lengthy period of time to make a determination as to whether they should not be a validated member anymore. It's -- the number of people that are invalidated is probably not a large number.

Q   Okay. Has Mr. Silverstein's association with the Aryan Brotherhood factored into the BOP's decision on his conditions of confinement over the past 25 years?

A   Yes. If you are a disruptive group -- a validated disruptive group member, regardless of Silverstein or others, that will impact how you're classified and what security level of institution you're going to be placed at.

Q   Okay. When we were talking about -- you were talking before about how some inmates can invalidate themselves. What would the BOP look for behavior-wise in determining if they are no longer a validated member?

A   Well, I'm not an intelligence expert. But we would closely watch who they communicate with, possibly

Page 22

who they are assaulted by is an indication, unfortunately, who they associate with, whether they're still involved in drugs and other activity inside the prison that's associated with the gang. You know, we're going to watch and see how the person does.

Q   If the inmate doesn't debrief or renounce the organization, can they be invalidated?

A   I'm not sure. That's a question that's really better answered by an intelligence guy who has actually been through the process of devalidating somebody.

Q   And who would that be?

A   Either someone from the central office intelligence or a special investigative agent at a facility.

Q   Would invalidation occur at the institutional level or at the national level?

A   It would be initiated at the local level. But for a disruptive group member, it's going to have to be reviewed at higher levels because it's -- each of these security threat groups is very different in how they're structured and how organized and committed the members are. So if you're in a loosely structured group like a Surreno, it's going to be easier to drop out.

If you're in a group like the Aryan

Page 23

Brotherhood, which is an extremely structured group and one that is punitive to anyone who tries to drop out, then it's going to be -- the bar is going to be significantly higher for that type of group to prove that you're no longer a member. So it's -- but a disruptive group would have to be reviewed at a higher level in the institution.

Q   Okay. Thank you. Earlier when we were talking about your job duties, you also mentioned psychology services as one of your job duties. What exactly does this entail?

A   That entails the provision of mental health services in each of the institutions, with the exception of psychiatry. Psychiatry is done through the medical department of a prison. But the rest of the mental health care -- whether it's treatment, psychological assessments, suicide assessment and prevention, and some group counseling and therapy -- would fit under the mental health care that I had oversight for.

Q   Okay. How much, if any, would this job duty require interaction with inmates?

A   Which job are you speaking about?

Q   When you are providing oversight for psychology services.

A   You mean my job when I was the assistant

Page 24

director?

Q   Yes.

A   Okay. Well, I mean, I was based in the headquarters in Washington, DC, but I visited facilities frequently. And as I walked through facilities, I interacted with staff and inmates.

Q   Would you interact with them specifically about the provision of psychology services?

A   No. I would just interact with them in terms of how things were going in the institution. And if someone raised a concern to me about psychology services, obviously, I would speak to them about that. But I did not seek them out specifically for that issue.

Q   Okay. During the time that you worked for the BOP, did you ever receive any training regarding the psychological effects of incarceration?

A   Yes.

Q   What did that training entail?

A   Well, I mean, we -- I went through the basic correctional officer academy in Glynco, Georgia. And it started there and then carried on every year, going to annual training with the Bureau where we would teach staff to observe inmate behavior and interpret how they were behaving and speaking and interacting to see if an individual was having problems with decompensating, was

6 (Pages 21 to 24)

Page 25

not dealing with stress, was -- looking for depression issues or suicidal issues.

That was drummed into us, to pay attention to that. And then if we became aware that an individual was having difficulties with their confinement, to notify mental health providers specifically. And then in my background as a social psychologist, I also have a fair knowledge of the issues of mental health and conditions of confinement.

Q   Okay. During the time that you worked for the BOP, did you ever receive any training regarding the psychological effects of isolation?

A   No, because there's nobody in the Bureau that's isolated, so it's not really an issue.

Q   Can you define for me what you would determine to be "isolated"?

A   "Isolated," to me, means that there is no human contact, no social interaction at all with people, no communication with the outside world. That would be my definition of "isolation."

Q   Okay. Do you have an understanding of the term "solitary confinement"?

A   I do not.

Q   Okay. Have you ever used the term "solitary confinement"?

Page 26

A   Not that I'm aware of.

Q   Okay. Earlier when we were talking about your job duties, you also mentioned case management. What exactly does that entail?

A   Case management -- the Bureau has a case manager assigned to each inmate. The case manager is the one that initially determines the best housing placement, job assignments and programs that the inmate should be involved in, and then follows up with the inmate periodically to make sure that the programming and the jobs and the assignments are working properly. And then as the inmate gets towards the end of his sentence, the case manager would work with the individual on discharge planning, at least to the community, sort of future steps, if you will.

Q   And what type of oversight would you, in particular, as assistant director of correctional programs, provide with regard to case management?

A   My oversight would be primarily from a policy perspective at the national level.

Q   Are there any inmates for whom you would be more involved with case management?

A   There are inmates that I would be more involved -- there would be a very small number of inmates where I may get involved in their classification

Page 27

and designation.

Q   Why would you be involved?

A   Typically those inmates would be either high profile inmates, inmates that may be in the media frequently, or inmates that present very unique security issues or threats to the safety and security of a facility.

Q   Can you explain to me a little more what you mean by "high profile inmates"?

A   Most high profile inmates are people that are media people. You know, let's say, Martha Stewart; I was involved in her designation. You'll also get cases of former law enforcement people or congressmen who are incarcerated. They present very unique challenges. And then, as I said, you had certain individuals who, because of the nature of their threat assessment or the nature of their crime, present very challenging security and safety issues.

Q   Would Mr. Silverstein have been one of those inmates who, through the nature of his threat assessment or the nature of his crime, you would have been more involved in?

A   Yes.

Q   Can you elaborate on more specifically what you mean by the nature of his particular threat

Page 28

assessment?

A   Well, of course, his threat is fairly well documented as a matter of record. First, he's a validated Aryan Brotherhood member, attempted escape from a federal correctional institution on Terminal Island, California. He's an escape threat. Extensive armed robbery, bank robbery cases. And then most particular, convicted of three murders while incarcerated in the federal prison system, two of which occurred in the control unit at Marion, which at the time was the most secure unit in the entire Bureau of Prisons, one of those murders involving a horrendous murder of a staff member in the control unit.

Q   Okay. So how, in particular to Mr. Silverstein, were you more involved in his case management?

A   Well, I was involved in discussions as to where he should be designated once we were going to move him from Leavenworth, and then I was involved in periodic reviews of him while he was in ADX Florence.

Q   Okay. Thank you. Is there any classification assignment within the BOP that is a no-human-contact assignment?

A   Not that I'm aware of.

MS. GODFREY: Okay. I would like to take a

7 (Pages 25 to 28)

Page 29

five-minute break, if we could.

MS. COOK: That's fine.

MS. GODFREY: Thank you.

(A recess was taken from 9:20 a.m. until 9:32 a.m.)

Q   (By Ms. Godfrey) Okay.  Does the BOP have an executive staff?

A   Yes.

Q   What is the executive staff?

A   It is made up of the director, the assistant directors, the regional directors, and then the senior deputy assistant director of the program review division, and the director of the National Institute of Corrections.

Q   Okay.  Were you ever a member of the executive staff?

A   I was.

Q   When?

A   From June 2004 through May 2007.

Q   Okay.  And does the BOP have an executive panel?

A   Yes.

Q   What is the executive panel?

A   That's a panel to review control unit inmates on a periodic basis.  The panel is the assistant

Page 30

director of the Correctional Programs Division, the regional director of the north central region -- it's really a two-person panel -- and then the warden of the control unit.  I don't know if he's officially a member of the panel or not.  But that's basically it.

Q   Okay.  And as assistant director of correctional programs, you were a member of the executive panel, then?

A   Yes.

Q   Okay.  And then does the BOP have an executive committee?

A   I don't -- I'm not familiar with that term.

Q   Okay.  I want to talk a little bit more about the executive staff.  Does the executive staff ever meet?

A   Yes.

Q   How often do they meet?

A   It varies year to year, but typically three to four times a year.  Then they occasionally have teleconferences at interim times and as needed.

Q   Okay.  What is the purpose of these meetings?

A   Well, the purpose of the meetings is for the director to give an update on what's going on in the Bureau and to have each assistant regional director give an update on what's going on in their -- under their

Page 31

particular span of control.  The exec staff will also review a number of papers that vary on all sorts of topics but could deal with major policy changes or programmatic changes that the agency is considering, and they'll have discussions about that.  The group will also make selections or recommendations to the director for selections of high ranking positions throughout the agency.

Q   Okay.  And then you also said that the executive staff will have teleconferences as needed.  What would require a teleconference?

A   Well, it could be, for lack of a better word, sort of crisis situations -- not particularly crisis, but let's say there's -- the federal budget has come out and there's going to be a lot of major changes that need to happen or we're going to make a major policy change or programmatic change and we don't -- we need to get that implemented before our next scheduled meeting, or the director really feels the need to keep everybody up to date on a particular issue or concern, so he will have a teleconference.

Q   Okay.  Thank you.  And then at the scheduled meetings, is there a general procedure that's followed at those meetings?

A   Yes.  There's an agenda, a structured agenda.

Page 32

Q   And who determines that agenda?

A   It's determined -- the senior deputy assistant director of the program review division is really the coordinator of the meeting.  They put the agenda together.  I would assume at some point they go to the director and he approves the agenda, although I don't know that.  But it's the director's meeting, but it's really logistically run by the program review guy.

Q   Okay.  And are members of the executive staff provided with a copy of the agenda prior to the meeting?

A   Yes.

Q   And will that agenda include all the topics that will be discussed at the meeting?

A   No.  It's a -- the topics that are on the agenda will likely be discussed.  But there are many other topics that come up.  And there's a variety of ways that the topics can come up, either that -- the conversation on one topic, just like anything other thing, leads to another topic.

Each member, at some point, that goes to the meeting, as I mentioned, gets to sort of give an update or tell people what's going on in their area.  At that time, they could raise a particular issue or even bring in a brief memorandum or paper about an issue that they wanted to share.  So the agenda would certainly not be

8 (Pages 29 to 32)

Page 33

all-inclusive.

Q   Okay.  You had said earlier that the executive staff reviews a number of papers that deal with a number of different topics at these meetings.  Can you -- would these papers be disseminated to the executive staff before -- prior to the meeting?

A   Most are, but there are some papers that are hand delivered at the meeting.

Q   Is there a reason that a particular paper would be hand delivered at the meeting?

A   There's a variety of reasons, some of which is, the deadline to get the paper submitted is several weeks prior to the meeting.  So it may be that you didn't get your paper in on time or that the particular topic occurred in the interim before the due date.  And then there's some issues that are more sensitive that they may not want to disseminate in advance.  Most regional and assistant directors let their staff review the papers that are sent out in advance to get their feedback on them.  And so there may be papers or issues that you don't want disseminated like that.

Q   Can you give me an example of a topic that you wouldn't want disseminated like that?

A   Yeah.  I mean, I'll give you a perfect example.  We were -- because of budget situations, we're

Page 34

actually going to eliminate hundreds of positions in the Bureau, and it would force people out of their jobs and to take jobs outside of their current assignment.  That is not the kind of paper you want floating around or out in the public domain, if you will, or have other employees be aware of until you've made a decision and communicated it.

Q   Okay.  Are these papers called information papers?

A   They're different types of papers.  There's some papers that are called decision papers, there are some papers called concept papers, there are some that are called information papers, and then sometimes they just come in as memorandum that may not even have that type of title at the top of them.

Q   Is there a reason that a particular paper would be called a decision paper?

A   Yes.  Usually you're talking about a major policy change where there's multiple options that the Bureau is going to look at.  And so the paper will lay out the various options and the cost benefit of each option and then look for a decision as to which option we were going to pursue in that policy area.  So it's very structured.

Q   And how is a concept paper different?

Page 35

A   A concept paper is more of an idea paper.  Let me give you a perfect example.  The Bureau, years ago, was looking into creating faith-based units.  And so the initial paper that went in was to sort of lay out what that unit might look like and determine whether there was interest in that concept.  And then if you had an interest in that concept, you would probably come back later, the next meeting or two, with a decision paper that now begins to lay out, We buy into the concept of a faith-based unit.  Where is it going to be?  How is it going to be structured?  How is it going to be funded?  How is it going to be operated?  So you sort of move into a decision paper.

Q   Okay.  And how would an information paper differ from those?

A   An information paper usually is what it sounds like.  It's informing someone of the status of a particular project or a particular issue.  It may or may not -- sometimes it doesn't ask for any response back from the executive staff.  It may have a brief recommendation or suggestion at the end of it.  But it wouldn't be as detailed in terms of options and cost benefit analysis as a decision paper.

Q   Okay.  I'm going to introduce -- actually, first, have you ever heard of anything called an

Page 36

executive staff paper?

A   I mean, all the papers I'm talking about would be executive staff papers.

Q   Okay.  So as assistant director of correctional programs, did you ever attend the meetings of the executive staff of the BOP?

A   I did.

Q   And at any of those meetings, did the executive staff discuss the conditions of confinement of Mr. Silverstein?

A   Yes.

Q   Were the conditions of confinement of any other inmates ever discussed at those meetings?

A   Yes.

Q   How many other inmates?

A   Oh, I don't know.  But specifically -- I mean, we had discussions regarding a lot of the inmates and detainees related to terrorism cases.  We had discussions on inmates that were high ranking drug cartel and security threat group members.  I mean, there were discussions on occasion about -- sometimes specific inmates; sometimes, for lack of a better word, sort of groups of inmates.

Q   Okay.  And at those meetings where you would discuss the conditions of confinement of

9 (Pages 33 to 36)

Page 37

Mr. Silverstein, what was the purpose of that discussion?

MS. COOK:  Objection, foundation and misstates prior testimony as to "meetings."

Q   (By Ms. Godfrey)  You can answer.

A   I don't recall that there were multiple meetings involved in that.  I can't recall one meeting.  What was the rest of your question?

Q   You had said earlier you discussed the conditions of confinement of Mr. Silverstein at an executive staff meeting.  What was the purpose of that discussion?

A   The purpose was to review his current status at the time there that dates far before my placement on the executive staff.  There was an annual review of his status.  And there was a paper -- an information paper related to that review.

MS. GODFREY:  Okay.  I'm going to introduce an exhibit.  It was previously marked as Plaintiff's Exhibit Number 23.  The Bates numbers are US 16364 to US 16366.

Marcy, it was Exhibit I in the e-mail.

MS. COOK:  Okay.

MS. GODFREY:  Okay.  This portion of the deposition should be "Confidential for Attorney's Eyes

Page 38

Only."

I want to introduce a new exhibit. The Bates number is 2402. Marcy, it was marked as Exhibit D in the e-mail I sent to you.

MS. COOK: Okay.

(Exhibit Number 39 was marked for identification.)

Q (By Ms. Godfrey) Mr. Vanyur, do you recognize that document?

A I don't. I've never seen it before yesterday.

Q Okay. So this document was not used in the executive staff reviews of Mr. Silverstein?

A I've never seen it.

Q Okay. Thank you. Have you ever seen a document like it?

A No.

Q Okay. Do you know if Mr. Silverstein ever knew that these executive staff reviews were conducted?

A I don't know.

Q Do you know if Mr. Silverstein was ever

Page 48

notified of the results of this review?

A I do not.

Q At these executive staff reviews -- or at the one that you attended, what role did Director Lappin play?

A I don't recall him serving in any other role than the rest of the members; to listen to the paper and then concur with the recommendation.

Q How are decisions made to accept or reject a recommendation by the executive staff?

A It is usually done through concurrence, not through any type of vote. Depending on how complicated the issue or how contentious the issue is, sometimes the discussions will go on for lengthy periods of time; sometimes they won't. Usually we're looking for concurrence. And if the director believes there is concurrence and he agrees, then the issue moves on.

Q So would the director be determining if the concurrence was there?

A Yes. Typically he's trying to get a feel for where the group is headed on a particular issue.

MS. GODFREY: Okay. All right. I would like to take another five-minute break, if we could.

MS. COOK: That's fine.

MS. GODFREY: Thank you.

12 (Pages 45 to 48)

Page 49

(A recess was taken from 10:09 a.m. until 10:16 a.m.)

Q   (By Ms. Godfrey) Okay. Mr. Vanyur, have you ever heard of the term "regional director special interest case"?

A   Not before yesterday, no.

Q   Okay. Do you know if there are particular inmates for which a regional director will, for lack of a better term, take a special interest in?

A   Yes. I believe that there are certain inmates that the regional director will want to be notified about if the person is leaving the institution or has a medical emergency or has a significant event.

Q   And why would the regional director need to know about those particular inmates?

A   Well, I mean, either they're -- similar to the group we talked about before, that they're either high-profile people that are likely to be in the media or they're complicated security cases -- maybe witness security cases -- where the regional director just wants to be sure that he's in the loop of what's going on with that particular inmate.

Q   Do you know if Mr. Silverstein would have been one of those inmates?

A   I don't know that, other than when I was

Page 50

prepping yesterday for this.

Q   Okay. Thank you. Can you tell me what a CIM assignment is?

A   It's Central Inmate Monitoring assignment. It is an information tool that allows us to track inmates with special security issues so that when we move them somewhere or we assign them to a facility or we take them out for a medical emergency, we have to clear that person to make sure we don't make a mistake and that we're managing their security properly.

I'll give you an example. You can have seperatees in Central Inmate Monitoring; there are certain inmates that cannot mix with certain other inmates. And so if you were going to transfer that person to another prison, you're going to need to check Central Inmate Monitoring that one of their separatees is not in the facility that you're trying to transfer them to, as an example.

Q   Okay. Thank you. Have you heard of the CIM assignment "special supervision"?

A   Yes.

Q   Can you tell me what is it?

A   Special supervision is a category of inmates that require special security needs, complicated security needs, such as an ex-law enforcement officer is

Page 51

maybe someone who is under special supervision. There's probably a number of people. And again, it's an information tool so that before we do anything with that individual, we're going to make sure we know they have some special supervision issues and then make our plans appropriately based on that assignment.

MS. GODFREY: Okay. I'm going to introduce a new exhibit. Marcy, it was Exhibit V in the e-mail I sent to you.

MS. COOK: V, as in Victor?

MS. GODFREY: Yes.

(Exhibit Number 40 was marked for identification.)

MS. COOK: Okay. Just write a number 40 on this.

MS. GODFREY: Marcy, you got that it's Exhibit 40, right?

MS. COOK: Yes.

Q   (By Ms. Godfrey) Mr. Vanyur, do you recognize this document?

A   Yes. It's the program statement on Central Inmate Monitoring system.

Q   Okay. I would like to turn your attention to the fourth page -- I actually think it's the fifth page of the document. It just says page 4 at the top.

Page 52

A   Yes.

Q   The second paragraph says, "Special supervision." Do you see that?

A   Yes.

Q   It says, "Inmates who require special management attention."

A   Uh-huh.

Q   Can you --

A   Yes.

Q   Okay. Can you tell me what is meant by "special management attention"?

A   Well, I mean, it's the correctional management, so it has anything to do with how the inmate is housed and where he's housed, how he's transported, how he's escorted around the institution, how his movement in an emergent -- medical emergency would be done. Anything that deals with how that inmate is housed, transported, and escorted would fit into his correctional management.

Q   Okay. Thank you. Once an inmate is designated as "special supervision," how long does that inmate have that designation?

A   He has it until the assignment is removed.

Q   And how would the assignment be removed?

A   Well, I think it's laid out specifically on

13 (Pages 49 to 52)

Page 53

page 6 in the program statement that talks about removal.

Q   Okay.  Do you know if Mr. Silverstein had the CIM assignment of "special supervision"?

A   I did as of yesterday, yes.

Q   But you -- did you know that when you were assistant director?

A   I don't know that he had that specific Central Inmate Monitoring assignment.  I knew he was a Central Inmate Monitoring case, but what his specific assignments were, I did not know.

Q   Okay.  I want to turn back to page 5 of this where it says page 5 at the top.

A   Yes.

Q   Number 3, "Special Supervision," it says, "Placement in this assignment may be made only upon the authorization of a Regional Director or the Assistant Director, Correctional Programs Division."  Do you see that?

A   Yes.

Q   So if Mr. Silverstein had received this assignment while you were assistant director, would you have known?

A   Not necessarily because it's an either/or.  It's the regional director or the assistant director.

Page 54

Q   Okay.  So if the regional director put this assignment onto an inmate, he wouldn't necessarily have to notify the assistant director?

A   That's correct.

Q   Okay.  Are you familiar with security threat group assignments?

A   Yes, in broad terms.

Q   Can you tell me how security threat group assignments are determined?

A   As I mentioned earlier when we discussed the validation process, if there is any indication or intelligence that an individual may be a member of a security threat group, then the special investigative supervisor or special investigative agent at a facility will begin to do a validation process on the individual to determine if they're a member; and if they're a member, a member of what particular group.

Q   Okay.  Have you heard of the security threat group assignment of "BOP Top 40"?

A   Not prior to yesterday, no.

Q   Okay.  When you were assistant director of the Correctional Programs Division, would you have known if there was a security threat group assignment of "BOP Top 40"?

A   I'd never heard the term in my life prior to

Page 55

yesterday.

Q   Right.  But would you have known in your position if it existed?

A   I can't speculate whether I would or should have known.  One would think I would know, but I can't say that I should have or I would absolutely know.

Q   Okay.  Thank you.  Mr. Vanyur, I want to talk about Mr. Silverstein's confinement at Leavenworth.  Did you ever see the areas where Mr. Silverstein was confined while he was confined at USP Leavenworth?

A   I did not.

Q   Did you ever see those areas of confinement after Mr. Silverstein was transferred from Leavenworth?

A   No.

Q   Okay.  I want to talk about Mr. Silverstein's transfer from Leavenworth to ADX.  And you had said earlier that you were involved in that decision.  How were you involved?

A   I spoke with Mr. Nalley about where the proper place would be to house him.

Q   Okay.  So Mr. Nalley was also involved in that decision.  Was anyone else involved?

A   No.  It was really -- other than, I'm assuming, members of Mr. Nalley's staff and other people under his chain of command -- no, it was really him and

Page 56

I that reviewed the options.

Q   Okay.  And when you say "reviewed the options," what were the options?

A   Well, I mean, one option would have been to leave him at Leavenworth, which we felt was inappropriate because Leavenworth was changing missions to a medium-security prison, and their perimeter security was going to decrease significantly.  One of the other options would be to retrofit another facility with the type of cell that Mr. Silverstein required.  And then the option which we agreed on was to move him to the administrative maximum penitentiary in Florence, Colorado.

Q   Okay.  You said "the type of cell that Mr. Silverstein required."  What type of cell is that?

A   Structurally it's the type of cell that requires us to have the least amount physical contact between him and staff in terms of movement and escort around the facility.

Q   Okay.  And you said you determined that the ADX would be able to meet his security needs.  Were there -- are there any other areas of confinement in BOP facilities that would have met those needs?

A   Not really, because the administrative maximum penitentiary is the -- their mission is to

14  (Pages 53 to 56)

Page 57

manage maximum-custody inmates and inmates that are particularly threatening to the safety and security of institutions; so ADX's sole mission is that. And it was really the ideal place to move him to.

Q   Okay. When this decision was being made, was it ever contemplated that Mr. Silverstein no longer required these type of security controls?

A   I think that's fair. As part of the review in terms of moving him to ADX, did he still require that type of structural cell design that minimized staff physical contact? And our belief at that time was that he still required that type of structural cell design.

Q   What was that belief based on?

A   That belief was based on his prior pattern of behavior in terms of the murders, particularly the murders that occurred while in the control unit in the most secure unit in the Bureau of Prisons.

Q   Was Mr. Silverstein's clear conduct while confined at Leavenworth considered at all?

A   Yes, to some degree.

Q   In what way?

A   Well, he has maintained clear conduct. But as a correctional manager, you can't look at that in the vacuum of a file. You have to also look at that he has not been given the opportunity or we've minimized, to

Page 58

the extent possible under current policies and regulations, to minimize the opportunity for him to assault or murder other people. So one has to look at the clear conduct in the context of how he's being managed and also the historical context of his prior behavior.

Q   Okay. If UPS Leavenworth had not changed from a high to a medium security, would Mr. Silverstein still be confined at Leavenworth?

A   I don't know that. That's an interesting question. I don't know.

Q   Do you know if any inmates have been confined in areas where Mr. Silverstein was confined at Leavenworth since his transfer?

A   I don't know.

Q   Okay. Who made the decision to house Mr. Silverstein on Range 13 once he was transferred to ADX?

A   That decision was made by Mr. Nalley and with my concurrence.

Q   Was Director Lappin involved in that decision at all?

A   Director Lappin was informed that it was our plan to move Silverstein to ADX Florence and where we would house him. And he raised no objection to that

Page 59

plan, so we moved ahead with it.

Q   If he had raised objections to that plan, would the decision have changed?

A   I mean, it could have. He's the director of the Bureau of Prisons and we are his subordinates. So certainly at the end of the day, if he disagrees with a decision or raises objections, we're going to have to respond to that.

Q   Okay. Was it ever considered that Mr. Silverstein be placed in a general population unit at ADX rather than Range 13?

A   I don't recall a specific discussion of that. Mr. Nalley and I spoke about that in more hypothetical terms. And one of the advantages to sending him to ADX Florence is that if he adjusted well in Range 13, that we do have the option at ADX, which we wouldn't have at any other facility, really, to move him into general population. So we -- I think, as part of our decision making, saw that down the road as a potential change.

Q   Just so I'm clear, that possibility was contemplated when you were deciding where to transfer Mr. Silverstein from USP Leavenworth?

A   I believe so. I believe that we saw down the road that at some point, he may be able to move off of Range 13.

Page 60

Q   Okay. What in particular were you looking for to determine that he could be moved off of Range 13?

A   The same things we would look at for any inmate; again, how he adjusts to his new environment, whether he continues to be behaved properly, how he interacts with staff. Again, we're going to defer a lot of this to the people who deal with him every day and make a individualized judgment as to whether we may be able to house him somewhere else and give him a little more opportunity to see if he still does present a threat.

MS. GODFREY: Okay. Thank you, Mr. Vanyur. Would you guys be okay with breaking for lunch now?

MS. COOK: How long do you want to take?

MS. GODFREY: Forty-five minutes.

MS. COOK: We can do that.

MS. GODFREY: Okay. Thank you.

(A recess was taken from 10:38 a.m. until 11:26 a.m.)

Q   (By Ms. Godfrey) Okay. I want to go back to a few things we discussed before lunch. First, you talked about -- that you had testified in a number of different depositions. And I was wondering if you could remember any of the issues or inmates involved in the cases that were not involving the EEO issues?

15 (Pages 57 to 60)

A   Well, it's the case that I'm sure your familiar with, Nosair -- is it Saleh or Salameh? I always get confused. And Elgabrowny, I guess, is the third. Those guys were convicted of terrorist-type activities prior to 9/11. We moved them to ADX Florence after 9/11, so there was issues there; why they were moved to ADX and so forth.

The other case was on 9/11 detainees. These were not convicted fellows. These were people that were detained mainly for immigration charges after 9/11. And they were detained at some Bureau of Prisons facilities. And there was questions as to how they were detained, why they were detained in a special housing unit, and a bunch of very complicated issues as to whether they were cleared from any concern and being related to terrorist organizations.

Prior to that -- I'm trying to remember prior depositions. The testimony in court cases, two of them were in the penalty phase of death penalty cases where I was an expert witness. The other one was a case involving a haircutting policy imposed on DC inmates housed at a Virginia contract prison. Those are the ones that come to mind. I'm sure if you LexisNexis me, you'll be able to dig up a few cases.

Q   Okay. Thank you. Do you recall if you gave

Q   Okay. Thank you. And then I just want to clarify: With the transfer to ADX, the decision was made to transfer Mr. Silverstein from Leavenworth to ADX because ADX had Range 13?

A   Well, yeah, because ADX had the physical structure that I was told was similar to Leavenworth in terms of his being able to access recreation, visitation, and other services without requiring the physical escort by staff. And also, ADX is really the appropriate place for a maximum-custody guy like Silverstein. I mean, that's the mission of that facility, is to house the most dangerous inmates inside the Federal Bureau of Prisons. And he certainly fits into that category. So it's both the structural issues in Range 13 and also the mission and security provided by ADX in general.

Q   Okay. Why if the mission -- if Mr. Silverstein's security needs to fit into the mission of ADX, was he not moved prior to 2005?

A   I don't know. Because it's -- that's a good question. I don't know why he -- once we opened ADX, why he would not have been moved there. And I don't have an answer for that.

Q   Okay. And when this decision was being made to transfer Mr. Silverstein from Leavenworth to ADX, you

depositions when you were the associate warden at the ADX?

A   Not that I recall.

Q   Okay. Thank you. And then I want to talk -- I have one more question about the executive staff review that we talked about of Mr. Silverstein. And could any changes to Mr. Silverstein's conditions of confinement have been made without the executive staff approving?

A   Yes. I mean, the warden has discretion over a lot of different conditions on the day-to-day level. I think it's fair to say that movement to a different type of cell or different unit in the facility would have required certainly the regional director's concurrence.

Q   Okay. So if Mr. Silverstein would have been moved to a different area of confinement, would that have been at the regional director's discretion or at the executive staff's discretion?

A   It's really the regional director's call. You know, he would inform people. He would probably seek my concurrence on it when I was the assistant director, and inform the director. But it's really the regional director who has authority over his confinement.

had said that you were involved in the decision with Mr. Nalley. When you were making this decision, was this a meeting in person that you had with Mr. Nalley?

A   No. I think most of it was done by -- via telephone.

Q   Okay. And is there -- aside from what we've discussed already, is there anything else that you remember about that conversation with regard to Mr. Silverstein?

A   No.

Q   Did you take any notes during that conversation?

A   Not that I recall.

Q   Okay. Now I want to talk about Mr. Silverstein's reviews at ADX. Did you attend any reviews of Mr. Silverstein at ADX?

A   I did.

Q   How many?

A   I don't know exactly. I would -- if I were to guess, I would say at least two and probably three, that I was actually at ADX. Sometimes we did the reviews for the control unit in general via picture-tel like we're doing now. But I definitely had in-person interactions with him at least twice and possibly three times.

Page 65

Q   Okay.  And how often did these reviews of Mr. Silverstein occur?

A   I believe they were every six months.

Q   And was this different than the process for reviewing Mr. Silverstein when he was confined at USP Leavenworth?

A   Yes.  I believe that his in-person reviews were done just by someone from the regional office and other staff and not necessarily by the -- by the regional director and the assistant director of correctional programs.

Q   Do you know why that changed?

A   I don't recall exactly.  It made his reviews more consistent with a control unit level of review.  It also really gave him greater access -- in-person access to higher ranking officials in the BOP, which I think is a positive.  And that's really the primary reasons.

Q   Do you know who decided to change this review process?

A   I think Mr. Nalley proposed that; that when we moved him, we could build into that move this type of review process that, again, is more similar to a control unit type of review.  So I think it was part of that decision-making process.

Q   Okay.  And after Mr. Silverstein was

Page 66

transferred to ADX, did his conditions of confinement continue to be reviewed annually by the executive staff?

A   I don't recall.  I don't specifically remember that paper coming up again, but I could be mistaken.

Q   Okay.  But if it had been reviewed by the executive staff, you would have continued to be a part of that review process also?

A   I would have.  And let me backtrack a little bit.  I don't believe that it -- I don't believe that the -- I believe the reviews stopped by the exec staff at some point.  I don't know what the timing was in relation to his movement to ADX, how soon thereafter we stopped doing the full executive staff reviews.

Q   Do you --

A   But there did come a point when we did not review him at the full exec staff.

Q   Okay.  And do you know why he was no longer reviewed with the full exec staff -- executive staff?

A   We just felt that with the higher level of review, in-person, by two members of the executive staff, there really was no need to involve 16 other people in this discussion who really don't have any direct contact or review with the individual.  So it just made sense to us to manage it, just as we manage

Page 67

other high profile inmates that -- such as those that are in the control unit that would be more consistent.

Q   Okay.  And for the reviews at ADX, what was your role in those reviews of Mr. Silverstein?

A   My role was to sit on a review board with Mr. Nalley and usually the warden of the facility next to us.  We would be briefed by the staff at ADX in terms of Mr. Silverstein's progress and behavior, any psychological issues or any other issues that might be raised.  And then he was brought into the review panel room, given an opportunity to discuss or raise any issues or questions that he had that we would then respond to.  And then we would make a decision after he left the room as to whether we were going to continue his current conditions or make a move to change him significantly.

Q   Okay.  And earlier you said that you stopped working for the Bureau of Prisons in, I believe you said, May 2007; is that correct?

A   That's correct.

Q   And who was your successor as the assistant director of correctional programs?

A   Joyce Conley.

Q   Do you know if she is still in this position?

A   She is.

Page 68

Q   Okay.  And would Ms. Conley have continued to play the same type of role that you did in these reviews?

A   I wouldn't know that, as a matter of fact.  I would assume so.

Q   Okay.  You also said when you were talking about the reviews that the warden of ADX was next to you.  Do you know who this was during that time period?

A   It was definitely Warden Wiley.  I'm trying to remember if he was there the entire time.  That's going back.  But Warden Wiley -- I don't remember, going back.  I can't quite remember, going back to 2004.

Q   And what -- does the warden play any role in these review processes?

A   Yes.  I mean, the warden gives input because he's the most familiar with the inmate.  He basically briefs the regional director and assistant director on issues that the inmate's raised, how those issues have been resolved or not resolved, what's the status of the inmate, what's their current progress.  So he performs a critical role.

Q   Okay.  And then when it comes time to make the decision whether or not for Mr. Silverstein you would change the conditions, did Warden Wiley play a role in that?

17 (Pages 65 to 68)

Page 69

A   Yes.  We would ask for his recommendation.

Q   And then would you follow his recommendation?

A   We would not be bound to follow his recommendation.  But when you look across all the inmates in the control unit, I would venture to say we followed his recommendation the majority of the times.

Q   Do you know if you followed his recommendation with regard to Mr. Silverstein?

A   I believe we did.

Q   Okay.  Did you take any notes during these reviews of Mr. Silverstein?

A   No, I did not take any notes.

Q   And did you review anything in advance of the reviews of Mr. Silverstein?

A   Yes.

Q   What would you review?

A   For each inmate that was being reviewed, we got a summary document that basically gave their background, their reason for placement at ADX, their progress to that time; you know, in essence a thumbnail sketch and an update of how the inmate was doing.

Q   Okay.  Do you know if these reviews of Mr. Silverstein were recorded in any manner?

A   I do not believe there was any type of audio or video recording.  There are summary minutes or

Page 70

summary -- a summary of the review and the recommendation of the panel.

Q   Okay.  Did Director Lappin ever attend these reviews?

A   Not while I was doing them.

Q   Okay.  Do you know of any time that he attended them when you were not doing them?

A   I don't know of any time.

Q   Okay.  You had said that these would be done in conjunction with the control unit reviews.  Are there any -- aside from the inmates in the control unit and Mr. Silverstein, were there any other inmates that would be given these six-month reviews in front of the executive panel?

A   No, not that I'm aware of.

Q   Why Mr. Silverstein, then?

A   Well, because as I've articulated, he presents very special security needs.  He's housed in a unique portion of the institution, certainly, that we just felt that we could review him, we could be more familiar with his case, more familiar with his progress, and give him greater opportunity and access to in-person hearings with top executives in the agency.

MS. GODFREY:  Okay.  I want to introduce an exhibit.  It was previously introduced as Plaintiff's

Page 71

Exhibit Number 9.  The Bates number is US02306.  Marcy, it was Exhibit G.

Q   (By Ms. Godfrey) Mr. Vanyur, do you recognize this document?

A   Only from seeing it yesterday.

Q   Can you tell me what it is?

A   It appears to be a file or a memo by Thomas Gomez, the unit manager of the control unit.

Q   Okay.  If you look at the first paragraph, the last sentence, it says, "John Vanyur, assistant director, was present at the review."  Do you recall being present at this review?

A   In general terms, yes.

Q   Okay.  I want to direct your attention to the third paragraph where it says, "Inmate Silverstein was assured that he was not transferred to ADX Florence as punishment."  Do you see that?

A   Yes.

Q   Do you recall Mr. Silverstein asking you about this?

A   Yes.

Q   Do you recall why Mr. Silverstein thought that he was transferred to ADX Florence as punishment?

A   Yes.  He felt that he had more privileges and less restrictions while he was at Leavenworth.

Page 72

Q   Okay.  You had said earlier that you -- after Mr. Silverstein was brought into the review and he raised issues, you would then make a decision to change the -- whether or not to change his conditions of confinement.  Do you recall that?

A   Yes.

Q   Okay.  Do you know what you would consider in making this determination?

A   Well, we would consider the legitimacy of the inmate's issues that he's raising.  For example, some inmates will raise issues that -- Hey, I've had a dental problem and the dentist has had me on a waiting list for three months.  And we would investigate whether that's the case.  And if the inmate needs dental care, we would basically tell the warden to get him some dental care.

So we would look at each individual who comes in and the issues they raise to determine their legitimacy, first of all; and second, determine what the appropriate action needs to be made on that issue that he raised.

Q   Okay.  Do you recall during these reviews of Mr. Silverstein if Mr. Silverstein ever raised any issues about his continued confinement on Range 13?

A   Yes.

Q   Do you recall what he said?

18  (Pages 69 to 72)

A   He said in general terms that he believed he didn't require that kind of security anymore, that he'd had clear conduct for a long period of time, and that he had interest in moving out to the general population and through the step-down program.

Q   And do you recall whether or not you considered whether or not to move him into the step-down program at these reviews?

A   We did.  We considered whether he should continue where he was at and -- or whether we should make a move.  And we told Silverstein several times that we are open to looking at where he should be placed in the future and that if he would demonstrate continued compliance with institutional rules and programs, that the panel would be open to looking at changes in his placement in the facility.

Q   How long would Mr. Silverstein need to demonstrate continued compliance with the institutional programs in order for the panel to determine he was ready to be moved?

A   Well, as I mentioned before, there's no fixed time period on that.  We've got to make a judgment, based on our correctional management experience, when the best time is.  It's my understanding that he has since been moved from Range 13.  But that was after my

follows the institution rules and programs for periods of time, he can be moved into another unit, stepped down to another unit where he has greater access to privileges, such as recreation, and greater access to communal activities, recreation with small groups of others and so forth.

And then as they move down each step, greater privileges, less restrictions on movement, greater access to communal activities, to see if the inmate is able to adjust to that.  If they violate the institution rules, have other problems at any phase of the step-down, then they can be stepped back up into prior units.

Q   Okay.  If Mr. Silverstein -- if Mr. Silverstein was meeting all of those institutional guidelines, do you know of any reason that he wouldn't be able to move through the step-down program at ADX?

A   Yeah.  There are some inmates -- and I think if you look at the institution supplement, from my recollection, there are some inmates that present such significant security threats that it may be that they end up at some phase of the program that they may not be able to work their way to a lower phase.

Q   And do you think Mr. Silverstein possesses those security threats?

Page 74

time.

Q   When you stopped working for the Bureau of Prisons in 2007, did you think that Mr. Silverstein would be moved from Range 13 in the near future?

A   I never really thought about it.

Q   Okay.  You had just said that you know that Mr. Silverstein is now in the general population unit -- in a general population unit at ADX.  Do you think that Mr. Silverstein should remain in the general population at ADX indefinitely?

A   Well, I can't make that judgment.  I don't have the information or access to any issues of his progress or how he's doing at ADX.  So it would not be fair for me to answer -- that's a hypothetical question to me since I'm really not involved in his case anymore.

Q   Okay.  Do you know anything about the step-down program at ADX?

A   I do.

Q   What do you know?

A   Well, I know that it's clearly laid out -- or at least it was in the '90s when we first opened the place.  The criteria for inmates who can work their way from general population eventually, hopefully, out to an open-population penitentiary down the road, it's a program based on incentives.  The more the inmate

Page 76

A   I think he did at the time I retired from the Bureau.

Q   Do you know of a way that Mr. Silverstein could show that he no longer has those security threats?

A   Again, as I mentioned before, if he complies, if his interactions with staff are positive, if he continues to program, then they'll make decisions of whether he can change into a different unit, as they already have, apparently.  So I would expect that that same process will continue.

MS. GODFREY:  Okay.  I would like to take a five-minute break, please.

MS. COOK:  That's fine.

(A recess was taken from 11:57 a.m. until 12:07 p.m.)

Q   (By Ms. Godfrey)  I just have a couple more questions for you.  Earlier I had asked you about whether or not you took notes of the reviews, and you said that there was a summary created.  Do you know if the exhibit I had you look at, Exhibit 9, is that the summary that's created from those reviews?

A   Now, I seem to recall -- and again, I can't recall specifically for Silverstein -- but for the other guys in the control unit, there was a shorter sort of summary statement made at the end of this profile that I

19 (Pages 73 to 76)

Page 77

sort of laid out before. Remember, I told you we sort of had the picture of the inmate, his background, his current progress. My recollection is they later went in and put a paragraph or two summary in that. But content-wise, it's not going to differ substantially from what this looks like. But I remember a different format.

Q   Okay. Just so I'm clear, you would receive, before the reviews a, like, profile summary of the inmates to be reviewed; and then you think after the reviews, they would put something in about those inmates?

A   That's my recollection, yes.

Q   Okay.

A   Now, I'm speaking in broader terms about control unit reviews.

Q   Right.

A   I don't remember if Silverstein's looked like that or not.

MS. GODFREY: Okay. Marcy, I think we have the profile for Tommy. I'm not sure if -- for Mr. Silverstein. I'm not sure if we have anything after the review. So if those exist, we would like them.

MS. COOK: Right. And as Mr. Vanyur has indicated, he doesn't remember if that existed for

Page 78

Mr. Silverstein. We'll look to see if it does. And if it does, we'll produce it.

MS. GODFREY: Okay. Thank you.

Q   (By Ms. Godfrey) And then I just have one other question. You were saying that Mr. Silverstein would need to maintain clear conduct and continue programming in order to show that he no longer needs the security controls. What about Mr. Silverstein's complying with the programming would show that he was no longer a security threat?

A   Well, I mean, we -- the programming, his interactions with staff, his clear conduct -- I mean, it's all sort of part of the profile of the picture of the individual and how he's adapting to the institution rules and regulations. So in the programming piece, if his case manager is recommending he needs anger management or whatever other type of programming, we expect him to comply and be active in that program. We expect him to be active in betterness of and keeping himself busy while he's -- not just him, but all these guys -- while they're incarcerated. So we look at that.

MS. GODFREY: Okay. Thank you, Mr. Vanyur. That's all I have for right now. We would like to reserve the rest of our time, though.

MS. COOK: For what purpose?

Page 79

MS. GODFREY: In the event that more documents are produced that we would like to ask him about.

MS. COOK: Have you asked for any, other than those -- so you mean the limited documents that you just recently identified at the end of the deposition?

MS. ROVNER: Well, documents continue to trickle in. We just received some yesterday. So to the extent that any of those are relevant to the testimony that Mr. Vanyur has given today or to his knowledge about the events related to this case, we're leaving it open to be able to inquire about those.

MS. COOK: Right. But you designated those documents you received yesterday as potential exhibits for this deposition. So I'm just asking you to identify what you want to leave the deposition open for, with some specificity.

MS. GODFREY: Well, Mr. Vanyur referenced, when he was deputy assistant director, seeing other information papers that we have yet to see. So, something like that.

MS. COOK: All right. That's fine. I would like five minutes to determine if I will ask any follow-up questions.

MS. GODFREY: Okay.

Page 80

(A recess was taken from 12:12 p.m. until 12:15 p.m.)

MS. COOK: We're ready if you guys are.

MS. GODFREY: We are.

MS. COOK: Okay. I don't have any follow-up questions for Mr. Vanyur.

MS. GODFREY: Okay. Thank you, Mr. Vanyur.

THE WITNESS: Okay. Thank you very much.

MS. ROVNER: Mr. Vanyur, thank you for your assistance with the service of the subpoena. We appreciate your cooperation with that.

THE WITNESS: Oh, not a problem at all. Thanks. I'm getting to know the server now by name.

MS. ROVNER: Thanks again.

MS. COOK: Thank you.

(The videoconferenced deposition was concluded at 12:16 p.m., on Friday, January 27, 2009.)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014   (720) 449-0329   FAX (720) 449-0334

I, JOHN MARTIN VANYUR, do hereby certify that I have read the above and foregoing videoconferenced deposition, and that the above and foregoing transcript and accompanying Amendment sheet(s), if any, constitute a true and complete record of my testimony.

Amendment sheet(s) attached [ ]
No changes, therefore no Amendment sheet(s) attached [ ]

_____
JOHN MARTIN VANYUR

Subscribed and sworn to before me this _____ day of _____, 2009.
My commission expires: _____.

_____
Notary Public

_____

_____

Page 82

VIDEOCONFERENCED DEPOSITION OF JOHN MARTIN VANYUR

REPORTER'S CERTIFICATE

I, Wendy Evangelista, Registered Professional Reporter and Notary Public in and for the State of Colorado, do hereby certify that prior to the commencement of the examination the Witness was by me first duly sworn to testify the truth; that said videoconferenced deposition was taken in shorthand by me at the time and place hereinabove set forth and was thereafter reduced to typewritten form under my supervision, as per the foregoing transcript; that the same is a full, true, and correct transcription of my shorthand notes then and there taken.

I further certify that I am not related to, employed by, nor counsel for any of the parties or attorneys herein, nor otherwise interested in the event of the within action.

My commission expires August 12, 2012; and I have hereunto set my hand March 11, 2009.

_____
Registered Professional Reporter
and
Notary Public

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION


- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,                :

                                         :

                                         :

-vs-                                     : CRIMINAL ACTION
                                         : NO. 3:96CR66

DEAN ANTHONY BECKFORD, et al.,           :

                                         : July 21, 1997

                        Defendants       :

- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROBERT E. PAYNE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

DAVID J. NOVAK, Assistant United States Attorney
ANDREW G. McBRIDE, Assistant United States Attorney
STEPHEN W. MILLER, Assistant United States Attorney
Richmond, Virginia

        Counsel on behalf of the United States

GERALD T. ZERKIN, ESQ.
Richmond Virginia

WAGNER & WAGNER, ESQS.
Richmond, Virginia
BY:  ROBERT J. WAGNER, ESQ.

        Counsel on behalf of the Defendant Beckford

JOHN C. JONES, ESQ.
Providence Forge, Virginia

SCOTT BRETTSCHNEIDER, ESQ.
Kew Gardens, New York

        Counsel on behalf of the Defendant Dennis

SANDRA M. BEVERLY, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

REGINALD M. BARLEY, ESQ.
Richmond, Virginia

BOWEN & BOWEN, ESQS.
Richmond, Virginia
BY:  CARY B. BOWEN, ESQ.

          Counsel on behalf of the Defendant Cazaco

MORCHOWER, LUXTON & WHALEY, ESQS.
Richmond, Virginia
BY:  ELIZABETH D. SCHER, ESQ.

DAVID P. BAUGH, ESQ.
Richmond, Virgninia

          Counsel on behalf of the Defendant Thomas

RICE, EVERHART & BABER, ESQS.
Richmond, Virginia
JEFFREY EVERHART, ESQ.

          Counsel on behalf of the Defendant Smith


                    I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| John Vanyur | 2 | 19 | 36 | 41 |


                    SANDRA M. BEVERLY, RPR
                  OFFICIAL COURT REPORTER
                 UNITED STATES DISTRICT COURT

(The following is an excerpt from trial day 7-21-97)

MR. McBRIDE:  Call Mr. John Vanyur.

JOHN VANYUR, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. McBRIDE:

Q.  Good afternoon, sir.  State your full name for the record, please.

A.  My name is John Martin Vanyur.

Q.  How are you presently employed?

A.  I'm employed by the Federal Bureau of Prisons.

Q.  What is your present duty assignment?

A.  I'm the warden of the low security federal prison in Butner, North Carolina.

Q.  Mr. Vanyur, how long have you been with the Bureau of Prisons?

A.  Over seventeen years.

Q.  Could you briefly list the facilities that you have been at for the jury?

A.  Prior to my current assignment, which I have been in one year, I was the associate warden of operations for the United States Penitentiary Administrative Maximum in Florence,

Colorado, and I opened that facility and been there for two and a half years.  I have also worked in a medium security federal correctional institution and a number of other posts at headquarters at the Bureau of Prisons.

Q.  Now, you indicated the Ad-Max facility, when did that open?

A.  We took our first inmates in November 1994.

Q.  And prior to joining BOP or during the time at BOP, just summarize, if you would, your educational background for the jury.

A.  I've got a bachelor's degree in psychology and a master's and doctorate degree in social psychology from the University of Maryland.

Q.  And have you also taken the basic officer correctional course for BOP?

A.  I have.

Q.  Let's talk about Ad-Max if we could.  You were the first deputy warden at Ad-Max; is that correct?

A.  That's correct.

Q.  And could you tell the jury how many inmates is Ad-Max capable of housing?

A.  Our capacity was 484.

Q.  How many inmates are there now?

A.  388.

Q.  And do you know, out of that 388.  How many inmates have homicides in their background?

A.   Just over 150.

Q.   Now, Ad-Max is a maximum security facility in BOP; is that correct?

A.   That's correct.   It's the most secure facility in the system.

Q.   Then there are also a number of United States penitentiaries that are labeled high security; is that correct?

A.   That's correct.

Q.   How many of those are there?

A.   There are eight others, in addition to Ad-Max.

Q.   Could you tell us what those are?

A.   I can try.   United States penitentiaries in Lewisburg, Leavenworth, Atlanta, Lompoc, Marion, Terre Haute, Allenwood, I believe, and Beaumont.

Q.   You got it.   At what is the total population that BOP has under its control right now?

A.   Roughly 110,000 inmates.

Q.   Do you know how many of that group have homicide in their background?

A.   Just over 1,200, but that's a slight underestimate because that only includes inmates that are doing time for federal crimes of murder.   If an inmate has state murder charges somewhere in their past, that doesn't show up in that listing; so over 1,200.

Q.   Now, how many inmates are presently at the Ad-Max facility?

A.   388.

Q.   And could you tell us what is the purpose of the Ad-Max facility?

A.   The purpose of the Administrative Maximum is to house inmates that are not functioning properly inside the federal prison system.  Either they have attempted escape or escaped from secured prisons or they have seriously assaulted inmates or staff or they have murdered inmates or staff.  And because they cannot function in a normal, open population environment, we move them for a temporary basis to a more restrictive environment.

Q.   What percentage of inmates at Ad-Max come from other institutions?

A.   Over 91 percent.

Q.   And where do the other 9 percent come from?

A.   The other 9 percent are direct court commitments.  They are very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists, people that would have the potential to have resources enough to garner an outside assisted escape.

Q.   Now, for instance, is John Gotti at Ad-Max?

A.   No, but he's at Marion, which is a similar program.

Q.   Now, is the purpose of Ad-Max for people to go there and remain there?

A.   No, it's not.  Ad-Max is a correctional program.  It's meant

to bring an inmate into a more restrictive environment, and then over several years, three years, four years, depending on the individual, allow them to work their way out of that prison and into an open population penitentiary.

Q.   What is the goal time frame to move them from the highest level of security, Ad-Max, out to another institution?

MR. BAUGH:   Objection to the goal, Your Honor.   That's speculative, has no relevance to this case.

THE COURT:   Overruled.

BY MR. McBRIDE:

Q.   What is the time frame that the Bureau of Prisons has set as its goal?

A.   To move from general population to outside the Ad-Max, three years is our goal.

Q.   And within Ad-Max, there are different levels of security; is that correct?

A.   That's correct.

Q.   And the highest level of security is the controlled area for those who have violated the rules at Ad-Max; is that correct?

A.   The control unit -- or committed murder, serious assault or escape inside BOP facilities.

Q.   If I could have the assistance -- we saw some pictures before, Mr. Vanyur.   The jury has already seen these photographs.   They have been admitted.   Since you have been at Ad-Max, maybe you could describe what we are seeing there.

Could you tell the jury what that is?

A.   That is a typical cell inside Ad-Max.   There are 500 or 602 cells.   Over 400 resemble this type of cell.   You are looking from the back of the cell out towards the front door, out towards the range or hallway.

Q.   Is that, in fact, one of the control area cells for people who have violated the rules within Ad-Max?

A.   It's a similar cell.   A control unit cell would have a 12 inch black and white television.   This cell has a radio.   So it's the administrative detention part of the special housing unit.

Q.   That's for the worst of the worst?

A.   This is the most secure cells, yes.

Q.   And what percentage of the cells at Ad-Max are designed like this?

A.   Over two-thirds.

Q.   What are the other cells like?   How do they differ?

A.   Well, they are just not as self-contained.   They don't have a shower facility inside them, and they are slightly smaller. Other than that, they still have a poured concrete cell.   Some of them just have one steel door, instead of two steel doors, but they are not all that dissimilar.

Q.   Now, let's take the most secured area, the area you have described with the control area.   Even in that area, are inmates allowed to recreate?

Case 1:02-cv-06998   Document 88-3   Filed 12/21/09   Page 10 of 46   PageID 1229
Case: 11-1443      Document: 4-5         Filed: 03/04/2011      Pages: 260

8

A.  Yes.  Every inmate is required to recreate by law.

Q.  And, also, do they have access to a law library?

A.  Yes.  We operate nineteen law libraries inside the institution.  We are required to provide access.

Q.  Now, when the inmates, even in the most secured area, recreate, where do they do that?

A.  In the control unit, they recreate by themselves, and we have both indoor and outdoor recreation yards.  The indoor room is probably about 15 by 20 feet.  And the outdoor room is probably 20 by 15.  It's a triangular shape with two story walls around it.

Q.  In the general population at Ad-Max, how long are the inmates allowed to recreate each day?

A.  Two to two and a half hours a day.

Q.  How do they recreate?

A.  They recreate in small groups of eight to twelve in a larger rec area, probably about the size of this courtroom.

Q.  Entire courtroom?

A.  Yes.

Q.  And what sports are they allowed to play?

A.  They have a basketball and a hand ball.

Q.  How many inmates are allowed out there at one time?

A.  At the most twelve.

Q.  Now, is there a metal detector that's used prior to inmates going out there to recreate?

A.  Yes, there is.  There is a hand-held metal detector.

Q.  Even with that, have you had incidents of shivs, knives, homemade knives being used in the recreation area?

A.  We had an incident where an inmate introduced a wooden shank, which, of course, the metal detector did not pick up, and he assaulted another inmate with that shank.  Unfortunately for him, the individual he assaulted took that shank away from him and then used it on him.

Q.  And have you also had violence occur in that recreation area without weapons involved?

A.  Yes.

Q.  Have you witnessed that yourself, sir?

A.  Yes.  I witnessed a very serious assault where three inmates literally stomped on the head of an inmate for several minutes.

Q.  You mentioned the law library.  Have you had occasion to view homemade knives or instruments that inmates at Ad-Max have manufactured from items in law libraries?

A.  Yes.  I have seen one.  It was a flat piece of steel that came out of the inside of a stapler.  There is a sort of U-shaped piece of steel in a stapler.  The inmate removed it and then got it back to his cell and then flattened it out into a shank.

Q.  What did the inmate do with that?

A.  That particular shank we found in his property before he got to use it.

Q. And was there another shank that was made from a typewriter piece?

A. Yes. After I left, they discovered the steel rod from a typewriter had been taken out, and the inmate did attempt to stab an officer with that weapon.

Q. Now, are you generally familiar with the assignment procedures for BOP, the program statement in the various prisons where people would go?

A. Yes, I am.

Q. Now, if I could put up the program statement. As to assignment to ADX Florence, where you worked, if that comes up on your screen, the criteria for assignment to U.S.P. Marion and ADX Florence -- I don't know if you are going to be able to do that, if it's going to work. I will just hand it to the witness, if I could.

        MR. BAUGH: I have no objection to counsel reading it if it would help.

BY MR. McBRIDE:

Q. I will read this and ask you if this is a correct statement of BOP policy. ADX Florence: ADX Florence general population units are used for those inmates who have demonstrated an inability to function in a less restrictive environment, without being a threat to others, or to the secure and orderly operation of the institution. Is that the general criteria for assignment to ADX?

A. Yes.

Q. So, essentially, to put it colloquially, you have to mess up, have some kind of incident in some other institution before you'd even get to ADX; is that correct?

A. That's correct, the vast majority of cases.

Q. Is that also true of Marion?

A. That's correct.

Q. So, for instance, take someone who is convicted of homicide in furtherance of a drug enterprise and has a significant violence -- excuse me, significant background of dealing drugs and firearm violence. In your opinion, where would that person go to start out their incarceration at BOP?

A. Probably to an open population United States penitentiary.

Q. Of which there are how many, you indicate before?

A. Not including ADX, there would be eight others.

Q. Now, let's talk about those high security facilities. Do they have recreation where they recreate with other inmates?

A. Oh, yes. They would have open access to large recreation yards, similar to what you would see on television, and a full recreation program.

Q. Would they have double bunking?

A. Probably.

Q. Two inmates to a cell?

A. Yes, probably.

Q. And would feeding be done in a dormitory fashion at a high

security facility?

A.   They would eat in a dining hall, similar to a military style dining hall.

Q.   So there would be access to utensils then?

A.   That's correct.

Q.   Would they also have an opportunity to work in uniform?

A.   Yes.   They would be required to work at some job.

Q.   So there would be access to tools as well?

A.   That's correct.

Q.   Now, even at Ad-Max, once you have advanced in the program, you do receive certain liberties; is that correct?

A.   That's correct.

Q.   And so are there inmates at Ad-Max who are allowed to eat in a dormitory type fashion with other inmates?

A.   Yes, and there are also inmates that work in a factory setting.

Q.   So even during the three year program at Ad-Max, the liberties increase over time; is that correct?

A.   That's correct.

Q.   Now, let me ask you, have you had a look at the statistics on the rates of violence in the high security facilities at BOP?

A.   I have.

Q.   If I could put up the first chart.   If you would look at your screen, is that the BOP statistics for high security facilities for the period from May '95 to May '97, a two year

period?

A.   Yes, it is.

Q.   Now, does that population include Ad-Max?

A.   Yes, it would.

Q.   And it includes Marion as well?

A.   That's correct.

Q.   And then the other less restrictive high security facilities, correct?

A.   Yes.

Q.   What was the average daily population in those high security facilities for that two year period?

A.   I cannot read it, 9,981.

Q.   Almost 10,000 inmates; is that correct?

A.   That's correct.

Q.   And how many total assaults occurred in that two year period?

A.   I did some tallying.  If I could pull my --

Q.   Sure.  How many total assaults out of almost 10,000 inmates?

A.   1,462.

Q.   So assuming that no inmate committed more than one assault, what percentage of inmates committed assaults in the high security facilities?

A.   Roughly 14 percent.

Q.   And of those assaults, those 1,500 assaults, how many involved a weapon of some kind?

A.   384.

Q.   What percentage is that of the total assaults?

A.   26 percent.

Q.   And how many of those assaults were on staff?

A.   800, both with and without weapon.

Q.   And that was one two-year period in the high security facilities; is that correct?

A.   That's correct.

Q.   If we could go to the next one.  If we could go back to that one.  How many homicides were there in high security facilities for that two year period?

A.   Nine.

Q.   How many of those involved staff?

A.   One.

Q.   If we could go to the next one then.  Now, this is for the period 1993 through 1995, same statistics.  How are those statistics generated by the Bureau of Prisons?

A.   Any time an incident occurs within a facility, we generate something similar to a police report, whether there was an assault or any kind of serious misconduct.  So those are automated, and then they are fed into a computer system and tallied.

Q.   For this period 1993 through 1995, for most of that period, or some of that period, Ad-Max was not operating; is that correct?

A.   That's correct.

Q.   So this would include Marion and then the other high security prisons?

A.   Except for Beaumont, which is also brand new.

Q.   Except Beaumont?

A.   That's correct.

Q.   What was the average daily population of inmates during this two year period?

A.   7,912.

Q.   And how many total assaults occurred among that group?

A.   1,572.

Q.   And, again, assuming that no inmate was charged with more than one assault, what percentage of inmates committed assaults in the BOP high security prisons?

A.   19 percent.

Q.   And how many of those assaults were with a weapon?

A.   420.

Q.   What percent of that is of the total assaults?

A.   26 percent again.

Q.   How many assaults were committed on staff members in that two year period?

A.   921.

Q.   Now, how many murders were committed in that two year period in your high security facilities?

A.   Sixteen.

Q.   And how many of those homicides involved corrections officers?

A.   One.

Q.   If we could go to the last statistics.  Have you also reviewed the statistics for the years 1991 through 1993 for high security facilities?

A.   Yes, I have.

Q.   And that would not include Ad-Max at all; is that correct?

A.   That's correct.

Q.   It was not even open at that point.  What was the average daily population of the Bureau of Prisons high security level institutions for that two year period.

A.   7,274.

Q.   And, again, how many total assaults occurred in that population?

A.   586.

Q.   Assuming that only one assault per inmate, what percentage of inmates committed some kind of assault?

A.   8 percent of them.

Q.   And what percentage of those assaults involved a weapon of some kind?

A.   Over one third.

Q.   And how many deaths, homicidal deaths, occurred in BOP high security facilities in that period of time?

A.   Ten.

Q. Did you also keep statistics regarding drug use in high security federal prisons?

A. Yes, we do.

Q. In your experience, sir, is the distribution and use of drugs in federal prisons associated with violence in those prisons?

A. Yes, it is.

Q. Could you tell the jury why that is?

A. Well, you sort of have the direct effect of the inmate who is using drugs, if he's using amphetamines or another drug that would get him hyped up, you've got to deal with that individual in a confined setting.  So you have the immediate violence.

But probably more important to that is the secondary violence that you get.  You have turf wars with gangs over who is going to distribute the drugs inside the institution, just as you would have on the street.  And then people sometimes don't pay their debts for drugs they bought or they made promises they couldn't keep.  So there is retribution based on that failure to pay debts or failure to follow through on distribution promises.

Q. Now, let me ask you to look, if you could, at the 1993 to 1995 statistics on your drug testing program and how many -- what was the average daily population in that period?

A. Again, 7,912.

Q. And how many total positive tests did you have?

A. 1,980.

Q.  Now, a lot of those are repeat offenders; is that correct?

A.  That's correct.

Q.  So what percentage of positive tests for controlled substances did you have in random testing of this population?

A.  About 3 percent of the random tests were positive.

Q.  So 3 percent of the people in your high security prisons test positive for drugs?

A.  Randomly, yes.

MR. McBRIDE:  If I could have Exhibit DAB-11, that's been admitted into evidence.

BY MR. McBRIDE:

Q.  Mr. Vanyur, take a look at that item.  In your experience, in your seventeen years with the Bureau of Prisons, have you ever seen an item like that before?

A.  Similar.

Q.  Many times, in fact?

A.  Yes, usually with a tooth brush handle is the most common.

Q.  In other words, the razor welded onto the toothbrush?

A.  Yes.  A toothbrush handle is typically longer, and you get more leverage with it.

Q.  How do people shave at Ad-Max?

A.  With a disposal razor.

Q.  Similar to that one right there?

A.  Yes.

MR. McBRIDE:  Thank you.  I have nothing further.

CROSS EXAMINATION BY MR. BAUGH:

Q. Mr. Vanyur, all the statistics you gave us have to do with all of the inmates in the maximum security prison; am I correct?

A. High security prisons.

Q. High security. How many homicides have there been in your Florence ultra security section?

A. None so far.

Q. None so far. Are you expecting any?

A. With the type of population we have, one never knows.

Q. Also, you told this jury that usually people are sent there after they misbehave in another facility; am I correct?

A. That's correct.

Q. Do you mean to tell me that if the Bureau of Prisons decides that someone is so dangerous that they should either be executed or sentenced to a cell, you people wouldn't stick him in there immediately?

A. As I said, about 9 percent of the inmates are direct court commitments.

Q. So you don't mean to tell this jury that someone cannot be committed there immediately if the United States is of the opinion they are that dangerous?

A. That's correct.

Q. Now, concerning inmate violence at Ad-Max, am I correct, sir, that not in your open population -- well, strike that. In

your high security jails, Beaumont, Marion and all those, they have a section that's just open, like on television, a yard, right?

A. That's correct.

Q. And people can mingle?

A. That's correct.

Q. And they can have visitors?

A. Contact visiting.

Q. Contact visiting. They can actually meet with loved ones and friends in a room and pass things back and forth sometimes?

A. That's a fact.

Q. Now, when someone is in Ad-Max security, that doesn't happen, does it?

A. No. The visiting is noncontact.

Q. In fact, not only is it noncontact, but you people, meaning BOP people, had the kind of glass you can't even break through with a hammer hitting on it for two hours.

A. That's a fact.

Q. They must speak over the telephone?

A. Correct.

Q. And the cells at Ad-Max, am I correct, they are approximately, what, 6 feet 6 inches by 9 feet 6 inches?

A. The controlled units are 90 square feet. The general population area is 85 square feet.

Q. And in that 90 square feet, you got your bunk?

A.   Correct.

Q.   Your toilet?

A.   Yes.

Q.   And your shower?

A.   Correct.

Q.   You have one window, 5 inches by 24 inches, looking outside?

A.   That would be about right.

Q.   Then you got a set of bars?

A.   Correct.

Q.   And then you got a solid metal door with another small window about the same size?

A.   Yes, with a small vestibule in between the bars and the solid door.

Q.   And am I correct that the vestibule is there so that the inmate can be fed in their cell?

A.   That's correct.  The staff steps into the vestibule.

Q.   So the staff can't even -- I mean, there is a row of bars between the staff when they feed them.

A.   That's a fact.

Q.   In fact, because of the lessons that were learned at other facilities, when Ad-Max was designed, you can even change the light bulb without going inside the cell through a little --

A.   Through a pipe chase.

Q.   So it is possible that if someone is particularly dangerous, it is possible that that person could live, breathe, shower, eat

and never have direct contact with another human being in the Bureau of Prisons.

A.   That's not possible.

Q.   Well, am I correct that the only time you take them out would be for recreation, right?

A.   For recreation, medical examinations, visiting.

Q.   Well, am I correct that if someone doesn't play by the rules, they lose visitation rights?

A.   That's a fact.

Q.   And if it's a medical necessity, the doctors can go to them, right?

A.   For very limited care.  If they need an x-ray or dental care, obviously, they have to come out.

Q.   If someone had appendicitis, you might want to move them.  I mean, if someone has complaints, to determine if the complaint is valid, the doctor can actually go look at them, right?

A.   They have to go into an open area to see the inmate.

Q.   And, further, when Ad-Max was designed, wasn't it originally designed that there wouldn't even be bar soap?  Didn't they originally decide to use powder soap?

A.   That's correct.

Q.   Do you all still do that?

A.   Yes, we do.

Q.   There is not even a little roller for the toilet paper to go on; is that correct?

A.   That's correct.

Q.   Because that might turn into a weapon?

A.   That's correct.

Q.   And, further, if someone -- you get fifteen minutes on the phone per month?

A.   That's correct.

Q.   And if you don't play by the rules, that can be cut back too, can't it?

A.   That's correct.

Q.   All your mail is opened?

A.   Correct.

Q.   Any pictures that you might receive from loved ones that are viewed to be suggestive or racy are confiscated?

A.   That's true bureau-wide.

Q.   All mail has to be read, coming in and going, except for legal mail?

A.   That's a fact.

Q.   Even a letter from a lawyer though has to be opened in the presence of the inmate?

A.   Correct.

Q.   By a guard.  The officer opens it, makes sure there is nothing in it and then hands it to them?

A.   That's bureau-wide also.

Q.   So all these statistics you were talking about with homicides and stuff, those include those facilities that have a

yard where people mingle and have contact with others and all that?

A. That's correct.

Q. Now, of the 9,000 -- I'm sorry, 10,000 inmates who are in high security, how many of them are in segregation?

A. I don't know that. It would vary from day to day. I would say a safe estimate would probably be 10 percent.

Q. About a thousand. And of the thousand, about 400 of them are at Florence?

A. That would be in addition. Florence is not segregation.

Q. When I say segregation, for instance, at Marion there was a bank of cells that are very small and people aren't let out of very often; am I correct?

A. If it's disciplinary segregation, they are let out one hour five days a week.

Q. And in Florence, how often are the inmates let out of the Ad-Max security area? How long are they let out?

A. It depends on the unit. In the control unit, the most secure unit, one hour a day, seven days a week.

Q. And if they are good, they get to go to the outside room. If they are not so good, they go to the inside room?

A. No. They rotate.

Q. When the cell is opened to let them go to the recreation room and they are in maximum security, they recreate by themselves, don't they?

A.   That's correct.

Q.   And when the cell door is opened, they are shackled, right?

A.   That is correct.

Q.   And for people who don't know what shackling is, it's like handcuffs on the ankles, right, with a long chain?

A.   In the control unit, they have leg irons and they are cuffed from behind.

Q.   And they are cuffed from behind.  Is there a belly chain?

A.   No, not on recreation escort.

Q.   When they get to the recreation room, they are put inside the door.  And then the little doors open up, and they put their hands through the locked door, and they are uncuffed from the outside of the locked door?

A.   That's correct.

Q.   And then they are allowed to sit there in that room.  And then when it comes time for them to remove, they come back, put their hands back through the hole in the door and are handcuffed before the doors is ever opened.

A.   That's correct.

Q.   And then somebody escorts them back to their cell?

A.   Correct.

Q.   And, further, only one of those metal doors at a time is opened as the inmates are let out, am I correct, to go to the recreation area?

A.   Only one inmate would go out to recreation, be escorted at a

time.

Q. Plus, the inmates at Florence in the high security area, they are kind of shuffled periodically, am I correct, so that they can't communicate possibly with people next door to them?

A. We have mandatory cell rotation.

Q. How often do you rotate?

A. Fourteen days typically.

Q. So every two weeks everybody gets moved?

A. Right, but on the same range, they just rotate the cells in that range.

THE COURT: Mr. Baugh, didn't we cover most of this with Doctor Cunningham? It seems to me like I have heard a good deal of this before recently.

MR. BAUGH: Forgive me.

BY MR. BAUGH:

Q. Am I correct, sir, that the cell walls at Florence are 5,000 test concrete, reinforcing bar every 6 inches?

A. Class A wall, what the prisons defines as a Class A wall, precast concrete, 8 inch rebar.

Q. So that nobody can get through them.

A. Well, we've only been open two years. So we don't know all the possibilities that can happen over the course of history.

Q. The doors, not the bar door, but the metal door, that's electronic, isn't it?

A. That's correct.

Q.   And in the time that it has been open, has anyone gotten out?

A.   No.

Q.   If an inmate does not abide by the rules, other than cutting off his visits or limiting his visits, can they also limit his telephone time?

A.   Yes, if the offense is related to misuse of the telephone.

Q.   And what is the -- can you cut off the telephone completely to him?

A.   Probably for a year, if the misuse was significant.

Q.   What would be a misuse on the telephone?

A.   Conducting business on the telephone, discussing escape plots or introduction of contraband.

Q.   Telephone calls are monitored?

A.   That's correct.

Q.   In the language of the person speaking?

A.   Generally.  You mean if it's a foreign language?

Q.   Yes.

A.   We try to have people on the monitors that can speak foreign languages.

Q.   Am I correct that if inmates want to use the telephone, he must file a written request identifying the person to whom he's going to speak?

A.   That's correct.

Q.   So that everyone knows ahead of time when it's going to

happen so it can be approved?

A.   Yes.

Q.   And the reason for Florence is not only to protect officers but, am I correct, also to protect inmates from each other?

A.   Yes.

Q.   Because inmates have been known to hurt each other?

A.   That's a fact.

Q.   Would you say that, in the world, based upon your knowledge, that there is a safer facility for an inmate than Florence?

A.   There are similar facilities, about twenty-seven states operate super maximum facilities that are similar.  So we are on par, I think, with where technology is heading.

Q.   Would you say that those are the safest institutions there can be?

A.   As far as I can tell.

Q.   And Beaumont is how old?

A.   Brand new.

Q.   Beaumont, Texas?

A.   Yes, within the last couple months.

Q.   And does it have a segregation unit, like we are talking about here, where single cells exist?

A.   Yes.  Every penitentiary -- my prison, current prison, will have a segregation unit.

Q.   So we are building more of these?

A.   We are not building Florences.

Q.   But Florence has a capacity of 484.   So you have empty bunks in Florence.

THE COURT:   Segregation is different than maximum.

BY MR. BAUGH:

Q.   They call them different things in different facilities.   So there is still room in Florence.   There are empty bunks.

A.   Yes.   We only use Florence for people that require that level.   We don't just fill it up to fill it up.

Q.   Now, you say there are 150 people at Florence with homicides in their background.   Are they there for murder or are they there for other crimes and they have committed murders in the past?

A.   They are there primarily for what they have done inside the prison system.   Some of them have committed murder once they have entered the prison system.

Q.   And others --

A.   Others, it's just part of their history.   They are there for other reasons, whether they tried to riot or --

Q.   What percentage of the inmates at Florence are in Florence because they committed a homicide while a prisoner?

A.   I don't know that number.

Q.   Could you estimate it less than ten?

A.   No.   I would say it's higher than that.   I would say it's probably thirty or forty.

Q.   Of those thirty or forty, some of them come from high

security facilities, right?

A.  That's correct.

Q.  Others come from medium security or low security facilities?

A.  If they were involved in types of behavior that would place them in Florence, they could come from any other facility.

Q.  So, hypothetically, if someone were sentenced to prison in a minimum security facility for some significant felony, but nothing involving violence, and they defended themselves and hurt someone, they could get sent to Florence?

A.  They defended myself --

Q.  If they defended themselves from assault from other inmates.

A.  Then they would not have been charged with assault, and they would not end up in Florence.

Q.  They wouldn't be charged with assault?

A.  Not if we can prove that they were -- or they can prove that they were defending themselves.

Q.  Oh, I'm sorry, if they can prove that they were the victims, they don't get sent, right?

A.  Right.

Q.  But if they were the victims and they can't prove it, they go, right?

A.  Well, you are twisting my words.  What I'm saying is that if the individual is found guilty of a serious assault, then he is punished like anyone else would be punished when they are

involved in that type of behavior.

Q. Would spitting on an officer be an assault?

A. To be put in Florence?

Q. Is it classified as a serious assault and be in that stat you just read?

A. On occasion.

Q. Yes. Would pushing an officer out of the way, would that be considered an assault?

A. Yes.

Q. Would that be considered in your statistics?

A. Yes.

Q. So any misdemeanor touching would be classified as an assault and would fit in those statistics you just went over with Mr. McBride, right?

A. Any physical use of force against an individual would be considered an assault.

Q. Would you consider spitting at someone use of force?

A. I consider it an assault, yes.

Q. Okay. So that could get you -- you could get on that statistical pool that Mr. McBride just read from?

A. Right.

Q. Is there any rule that prohibits a new inmate who has been classified as dangerous from being sent to Ad-Max in Florence?

A. No, but that's not the Bureau's goal in Ad-Max.

Q. Okay. This will got faster if you answer my question. Is

there any rule that says they can't go there?

A.   No.

MR. BAUGH:   Thank you.   Pass the witness.

CROSS EXAMINATION BY MR. ZERKIN:

Q.   Good afternoon.   When you talk about turf wars against gangs, the gangs you are talking about in the federal prison system are things like the Hells Angels, Pagans, Arian Nation; am I correct?

A.   Not necessarily.   The broader group is actually what we call disruptive groups, and sometimes they are street gangs as you mentioned.   Other times they are just loosely geographic gangs. African American inmates from Washington, D.C., if they are in one facility, may get together to run turf issues.

Q.   And you have the ability in your classification system to determine who might align themselves with other inmates; is that correct?

A.   We attempt to.

Q.   And you attempt to disassociate people who were involved in crime on the outside from being with each other on the inside; is that right?

A.   That's correct.

Q.   In fact, that would be one of your clear criteria you would rely upon when you are making assignments?

A. Yes, codefendants. We usually try to separate codefendants.

Q. And what information -- when you determine what level of security is necessary for an inmate coming into the system, what sources of information do you have?

A. We have the presentence investigation report. We rely heavily on that.

Q. That's done by a probation officer and the court; is that correct?

A. That's correct.

Q. What else do you have?

A. Their instant offense. Those are the primary sources.

Q. Do you do a psychological assessment?

A. We do a screening. And if that screening indicates that the individual may have some issues, then we do further assessment.

Q. When you say screening, what are you talking about?

A. It's both a written tool, and then we do a brief diagnostic with a psychologist, a brief interview.

Q. And that's a psychological profile to determine whether the person would be at high risk for committing violence in the institution; is that correct?

A. That would be putting it too strongly. Mainly, we're looking at tendencies toward suicide and then whether the individual has some severe mental functioning. That's about it at that point.

Q. If the gentlemen to my right, the United States Attorneys in

this case, thought that a particular defendant posed a high risk of danger in the prison system, do they have a means of communicating that to the prison system for classification purposes?

A.   Yes, they do.

Q.   I assume that you would willingly accept such information from them; is that correct?

A.   We'll accept the information, yes.

Q.   Is there, in fact, a form for that purpose?

A.   I'm unsure, but given that it's the Government, I would believe there probably is a form.

Q.   Touche.   These programs, like Florence, and which I guess is in similar form at Marion; is that correct?

A.   We took all the inmates out of Marion, most of them, and moved them to Florence.   So Marion's program is very different than it was several years ago.

Q.   But the basic concept existed at Marion before Florence?

A.   That's correct.

Q.   And that program, in fact, with this goal of thirty-six months being able to release them back to the population, has been quite successful, hasn't it?

A.   It has been very successful.

Q.   In fact, you only have a return rate, once they are released, of about 15 percent?

A.   That's correct.

Q.   Isn't it also true that most murderers in the system are not classified as -- when I say murderers in the system, I mean people convicted of murder, serving terms for murder -- are not classified as appropriate for settings such as Ad-Max and Florence or at Marion; is that correct?

A.   That's correct.  The vast majority of them are in open population facilities.

Q.   In fact, if I got your numbers -- do you know what the percentage would be?

A.   Well, there is roughly just over 1,250 inmates in our system that have a current offense of murder, and only 158 of those are in ADX.

Q.   So it comes out to about 12 and a half percent; does that look about right?

A.   Yes.

Q.   Mr. Baugh asked you about the definition of assault.  What's the definition of weapon in those statistics you showed us?

A.   It would require some piece of hardware that's actually used on an individual.

Q.   I mean, anything other than your fist; is that right?

A.   That's correct.

          MR. ZERKIN:  That's all I have, Judge.

          THE COURT:  Any other questions?

REDIRECT EXAMINATION BY MR. McBRIDE:

Q.   Now, Mr. Vanyur, you mentioned that you HAD taken soap, hard soap away at Ad-Max, and you have taken the rollers for the toilet paper out of the cells; is that correct?

A.   That's correct.

Q.   Do you think you've thought of all the things that an inmate could make a weapon out of?

A.   Not at all.

Q.   Now, by law, these inmates have to go to the law library; is that correct?

A.   That's correct.

Q.   And by law, they have to recreate?

A.   That's correct.

Q.   Now, Mr. Baugh indicated that in the high security part of Ad-Max, people are cuffed behind their back, and they have these leg irons on; is that correct?

A.   That's correct.

Q.   But there are inmates at Ad-Max who are not moved around in that fashion; is that correct?

A.   That's correct.

Q.   In fact, at the latter stages of the program, they are allowed to move about freely to some extent; is that correct?

A.   Yes.   They move about unrestrained.

Q.   And receive cable television and other privileges at that

point; is that correct?

A.   Well, they see that in even the most secure units.

Q.   Cable television?

A.   That's correct.

Q.   Now, let me ask you this.  There was a lot of questioning about Ad-Max and Marion and high security.  Based upon the crime of homicide, is there any limit as to how low an inmate could work himself in the BOP system over the years if they were incarcerated for a long period of time?

A.   If it's just homicide?

Q.   Just homicide.

A.   I have nine in my low security facility.  So I would assume a low security facility would probably be as low as they could go.

Q.   And you're at a low security facility?

A.   That's correct.

Q.   How many inmates in total are at your facility?

A.   1,160.

Q.   And nine of them --

A.   Have homicide in their background.

Q.   How about someone who is sentenced to prison for life without parole, what is the lowest they could work themselves in the system?

A.   They could work themselves down to a medium security facility.

Q.   Then by rule they could go no further; is that correct?

A.   That's correct.

Q.   What is the difference between a medium security facility and a high security like the U.S.P.

A.   More the level of control of movement and the perimeter security.  But in terms of open movement to recreation areas, access to education programs, access to open feeding, they are going to be very similar.

Q.   Now, BOP has to house international terrorists and leaders of drug cartels from South America; is that correct?

A.   That's correct.

Q.   And those people pose a threat from the outside as well as the inside; is that correct?

A.   That's correct.

Q.   Now, these four defendants here who have been convicted of serious crimes, drug murder and participation in a continuing criminal enterprise, in your opinion, with your seventeen years experience in BOP, where are they going to be sent if they are sentenced?

          MR. BAUGH:  Objection, Your Honor, irrelevant.

          MR. ZERKIN:  It's way beyond -- I think way beyond the cross.

          MR. McBRIDE:  I don't think it is at all, Your Honor.

          MR. ZERKIN:  It's certainly beyond mine.

          MR. BAUGH:  It's speculative, Your Honor, in that Mr.

Vanyur --

THE COURT:  Come up here.

BENCH CONFERENCE:

MR. ZERKIN:  I just think it was beyond cross, that's all, Judge.

MR. BAUGH:  Mine is, Your Honor, that Mr. Vanyur has indicated that the criteria for the determination of that placement, all of which involved, he mentioned input from the United States Attorney's Office, presentence report, all those things, without that information, that is a pure guess he's been asked to give.

THE COURT:  Also, I haven't heard anything about them being involved in the decisional process.  Maybe I missed it.  Is there anything in his background that had him involved in placement?

MR. McBRIDE:  Well, he's familiar with the regulations.  Those are what he quoted about Ad-Max and Florence.  And I think Mr. Baugh certainly suggested that all these guys are going to Florence, based upon a number of criteria.  Mr. Zerkin's cross suggested that the U.S. Attorney's Office would have some influence on that.  I think I'm entitled to ask him, as a BOP professional, where do you think these guys are going to go.

MR. BAUGH:  If I might, Your Honor, the purpose of my questioning was not to show that they would go there, but the purpose of my questioning was to show, if the Bureau of Prisons deemed them dangerous enough, they could.  That is all.  I don't think anyone can say they are going there.

THE COURT:  I don't think direct assignment is appropriate.  So I will sustain the objection.  You are not going to argue anything beyond what you just said.

MR. BAUGH:  Yes, sir.

END BENCH CONFERENCE

BY MR. McBRIDE:

Q.  Out of your total population of 110,000, how many inmates have homicide in their background?

A.  Roughly 1,250.

Q.  And the vast majority of those are in high security facilities?

A.  579 are at the highest.

Q.  And where are the rest of them?

A.  They are spread out in the system.  As I said, I have nine in my low security.  We have eighty-five facilities.  So I'm sure they are spread out, medium, low and high.

Q.  Now, that razor item that I showed you earlier, would you classify that as a weapon?

A.   Definitely.

Q.   Have you ever seen anyone do arts and crafts with an item like that?

THE COURT:   All right, let's go.

MR. McBRIDE:   I have no further questions.

MR. BAUGH:   I have very few, Your Honor, if I may.

RECROSS CROSS EXAMINATION BY MR. BAUGH:

Q.   Just so people in the audience don't misunderstand, when you say cable television, am I correct that at Florence each inmate gets a 12 inch black and white television and religious services and education channels and some entertainment are broadcast over those?

A.   That's correct.

Q.   They are not getting HBO or CSPAN or anything like that?

A.   Well, they have ESPN and several other channels similar to that.

Q.   In black and white?

A.   In black and white.

THE COURT:   ESPN?

THE WITNESS:   Yes, sir.

MR. BAUGH:   That's what he said.

By MR. BAUGH:

Q.   Is one thing, can you cut off their television?

A.   Yes.   We have had some destroy their televisions.

MR. BAUGH:   Thank you, sir.

THE COURT:   All right.

MR. JONES:   Your Honor, a couple questions if I might.

RECROSS EXAMINATION BY MR. JONES:

Q.   Mr. Vanyur, you indicate that you have nine prisoners who have been charged with murder, or is that in their history or is that a federal charge of murder?

A.   That's in their history.

THE COURT:   Are you talking about in his facility?

BY MR. JONES:

Q.   At your facility.

A.   It's somewhere along their criminal --

Q.   Okay.   So they are not in the federal system for murder?

A.   Not necessarily, no.

Q.   And do you know individually how long they have been in the system before they got to the security level that you are at?

A.   No.   They have to have generally less than seventeen years left to serve to get down to a low security.

Q.   Do you know the average age of the individuals that -- these nine individuals that are in your facility?

A.   I do not.   The average age of my total inmate population is around thirty-seven or thirty-eight.

Q. Okay. But your total inmate population -- Butner has a special treatment program; is that correct?

A. That is the facility next door to mine. There are two facilities at Butner.

Q. Okay. But we don't consider that program as part of your inmates?

A. No, I do not.

MR. BAUGH: In light of that, may I?

RECROSS EXAMINATION BY MR. BAUGH:

Q. Sir, when you talk about these gangs, does the occurrence of gang violence drop off --

THE COURT: He didn't talk about gangs. Mr. Jones didn't ask --

BY MR. BAUGH:

Q. Sir, do you find older inmates involved in gang activity, like fifties and sixties?

A. Yes. Most of the gang leaders typically are older. It takes them a few years to work their way up.

MR. BAUGH: Thank you, sir.

THE COURT: Can he be excused?

MR. McBRIDE: Yes, Your Honor.

THE COURT: Thank you for being with us and giving us your evidence. You are excused from your subpoena.

(The witness was excused from the witness stand.)

I, Sandra M. Beverly, certify that the foregoing transcript is a correct record of the proceedings taken and transcribed by me to the best of my ability.

_____     _____
SANDRA M. BEVERLY, RPR          Date

Case 1:02-cv-06998   Document 88-4   Filed 12/21/09   Page 1 of 9   PageID 1266
Case: 11-1443     Document: 4-5     Filed: 03/04/2011     Pages: 260

# EXHIBIT C

STATE OF ARIZONA     )
                   ) ss
COUNTY OF PINAL     )

## AFFIDAVIT OF MARK A. BEZY

MARK BEZY, after being duly sworn, deposes and states under oath as follows:

1.      I am over the age of 18, and I am competent to testify to the matters stated herein. I make the statements in this affidavit based upon my personal knowledge.

2.      I worked for the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006, starting my career as a Correctional Officer and working my way up.  During that time, I held a number of positions, including:  (a) Warden of the Federal Correctional Complex at Terre Haute, Indiana from August, 2004 through October, 2006; (b) Warden of the Federal Correctional Institution in Elkton, Ohio from December, 2002 through August 2004; (c) Associate Warden at the United States Penitentiary in Leavenworth, Kansas, a high security facility, from July, 1999 through November, 2002; (d) Correctional Services Administrator of the North Central Regional Office of the BOP in Kansas City, Kansas from May, 1995 through July, 1999; and (e) Captain at the maximum security U.S. Penitentiary in Marion, Illinois ("USP Marion") from February, 1992 through May, 1995.

3.      I received a number of awards during my service with the Bureau of Prisons, including being named a Member of the Senior Executive Services; being named Associate Warden of the Year for the North Central Region; and receiving a Director's Award in 1997.

4.      While I was Warden at Terre Haute, I was responsible for the operation of, among others, the high security penitentiary and the Federal Death Row which is located at the FCC in Terre Haute.  As Warden at Terre Haute, I oversaw 1,500 adult male high security offenders, as well as 37 inmates who were under death sentences.  I managed several emergency situations that

occurred while I was Warden at Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.

5.     As Correctional Services Administrator for the North Central Regional Office of the BOP, my duties included providing consultation, advice and on-site assistance to 18 federal correctional institutions within the North Central region of the United States, which included at the time the states of Illinois, Wisconsin, Minnesota, Missouri, South Dakota, Kansas, and Colorado. I also oversaw the regional disciplinary transfer program for the North Central Region, and the Control Unit Hearing Program for the entire BOP.

6.     When I worked at USP Marion, that facility was the highest security prison in the United States.  USP Marion housed the "worst of the worst" of federal prisoners in its general population, and did so under highly secure and restrictive conditions of confinement, including, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  While the hope of the BOP was that inmates sent to the general population at USP Marion would modify their behavior and return to a mainstream maximum security facility after two to three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened.  In addition, there were some inmates who were assigned directly to USP Marion from the sentencing court.  For example, John Gotti was an inmate sent directly to USP Marion from the sentencing court.

7.     While I worked there, USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of

confinement than those imposed on USP Marion's general population.  These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness.  For example, USP Marion had a Control Unit within the prison where the most violent offenders, including particularly those who were deemed to pose a future danger of violence and/or criminal activity, were housed prior to the opening of the Super-Max ADX facility in Florence, Colorado.  Typically, inmates could be assigned to the Control Unit at USP Marion for a specific amount of time, up to five years, based on their offense.  The specific amount of time that an inmate was committed to the Control Unit was determined by the BOP.  Moreover, if an inmate engaged in additional criminal or violent activity, they could be re-committed to the Control Unit for additional time beyond the five years.  Inmates assigned to the Control Unit were housed in that Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

8.      The Super-Max ADX facility in Florence, Colorado opened in approximately 1994. I know that a number of inmates who, due to security and/or "future dangerousness" concerns, had been housed at Marion under very strict conditions of confinement for years prior to the opening of the ADX facility in Colorado, were then transferred to the ADX facility where they continued to be held under very strict conditions of confinement due to the same long-standing security and/or future danger concerns.  Inmates who fit this description that I can recall at this time include Barry Mills, and T.D. Bingham, high ranking members of the Aryan Brotherhood gang, as well as leaders of other gangs and disruptive groups.  In addition, shortly after ADX was opened, a number of other

-3-

violent inmates, including gang members, domestic terrorists, and organized crime figures, were also

were transferred directly from USP Marion to the ADX facility.  At ADX, both before and after

1998, these types of inmates were housed in conditions that were even more restrictive than the

conditions had been at USP Marion in terms of their ability to interact or communicate with staff,

other inmates, or persons outside the facility.

9.      USP Marion also had what was called the "K-Unit" from at least the mid-1980's

through the mid-1990's in which inmates who were a security risk were housed under extremely

strict conditions of confinement.  Inmates housed in the K-Unit due to security and/or future

dangerousness concerns that I can recall included John Walker, a convicted spy, Ed Wilson, a

former CIA operative, Jonathan Pollard, a convicted spy, and Christopher Boyce, a former CIA

operative.  These inmates were held in K-Unit because of security and/or future danger concerns,

and were held there for as long as the BOP deemed it necessary to ensure security and that these

individuals did not constitute a future danger.  Inmates housed in K-Unit were housed in single cells

and had no physical interaction with other inmates.  All their mail was screened by BOP officers,

all telephone calls had to be arranged through BOP officers who would bring the phone to the inmate

in his cell.  Those calls could only be made to people who were on an approved phone list, and all

such calls were recorded and monitored by the BOP.  All visitors to any inmates on K-Unit had to

go through a somewhat intensive background screening process, and had to be pre-approved by the

BOP before they could visit.

10.     Also at the USP Marion, there is an inmate housing unit above the hospital called the

"I-Up Unit".  Similar to the K-Unit, in the I-Up Unit, all inmate mail was screened and/or copied,

and all telephone calls were recorded and monitored.  I know, for example, that gang leader David

Sahakian, whose crimes included ordering the murders of others, was held in the I-Up Unit during his pre-trial detention in order to protect others and ensure that he did not commit, order or direct any additional criminal activity. I believe this was after 1998, but inmate Sahakian was held under conditions of confinement that were available to the BOP at USP Marion in and prior to 1998.

11.     The Super-Max facility in Florence, Colorado, was designed to hold the most dangerous inmates under extremely strict conditions of confinement, including with strict limitations on any communications with people outside the prison, whether by phone, mail, or visits, whenever deemed necessary by the BOP. It is my understanding that inmates were in 1998 and prior thereto (and have been from 1998 through the present) held at the ADX facility under strict conditions of confinement, including severe restrictions on their communications, whether by mail, phone or visitation, whenever that was deemed necessary by the BOP or the ADX Warden, and for as long as necessary to deal with the security or future danger concern raised by a particular inmate. I also know that some inmates have been assigned to the ADX facility directly from the sentencing court, when the circumstances warranted. The ADX facility also has areas within the prison that are referred to as "side pockets" or "special cells," which are used to hold prisoners who are deemed to be exceptionally dangerous. For example, inmate Luis Felipe was assigned to ADX directly from the sentencing court and inmate Felipe was held in one of these "side pockets" after being sentenced in 1997 due to concerns about security and/or his future dangerousness as set forth by the sentencing court. It is my belief that other inmates, too, were housed in these "side pockets" in order to address concerns about security and/or future dangerousness in and before 1998.

12.     I know of some other examples of inmates who, in 1998 and prior, were housed under strict conditions of confinement specifically in order to reduce or eliminate their potential future

-5-

dangerousness.  For example, Federal inmate Rodney Hamrick, a convicted bomber, was housed at USP Marion when I worked there.  All of Hamrick's mail, including his legal mail, was specially monitored by the BOP in order to reduce or eliminate his future dangerousness.  Inmate Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the assessed risk that he posed to be a future danger by ordering crimes or violence while incarcerated. Other inmates that I can recall who, in 1998 and prior, were housed under very strict conditions of confinement due to security concerns include Thomas Silverstein and Clayton Fountain.  Again, these strict conditions of confinement were (and are, to my knowledge) imposed on high security inmates by the Bureau of Prisons for as long as the BOP deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).  In the years after 1998, there have been a great many more federal inmates housed under such strict conditions of confinement in order to address security and/or future dangerousness concerns.

13.     All maximum security BOP facilities also have what is called a Special Housing Unit ("SHU") within the facility.  SHU's are, in essence, a prison within a prison where security and conditions of confinement are more strict than those imposed on the general population within the maximum security facility generally.  Both before and after 1998, inmates could be and were housed in a SHU for a variety of reasons, including because of concerns about security and/or an inmate's "future dangerousness."

14.     Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the

-6-

most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's "future dangerousness." This included, but was not limited to, housing inmates in conditions of confinement where they did not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or mail. The BOP could, and did, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deemed it necessary to do so for the security of either prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" and not "rights," so they could be taken away whenever it was deemed necessary. Moreover, these strict conditions of confinement could be, and were, imposed for as long as the BOP deemed it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

15.     When strict conditions of confinement, such as being sent to the Control Unit or a SHU, or having mail, visiting and/or phone privileges taken away, were imposed on federal inmates for security reasons or concerns about violence, documentation of that action would normally be created and maintained in one or more places within the BOP. Information about both the restrictive conditions imposed and the reason(s) for imposing those conditions could be contained in one or more of the following: (a) in the DHO (Disciplinary Hearing Officer) record which is kept at the individual BOP facilities; (b) in the SIS (Special Investigation Supervisor) Files, which are kept at all high and maximum security BOP facilities; and (c) when the Warden imposed such conditions, s/he would write a memo which should be contained both in the inmate's file and the files of the BOP facility where the conditions were imposed. In order to ascertain all the inmates on whom these types of restrictive conditions were imposed based on security and/or "future dangerousness"

-7-

concerns, at a minimum, one would need to review the above files at each of the high and maximum security BOP facilities.

16.     While restrictive conditions of confinement, including taking away communication privileges such as mail, phone and correspondence, could be imposed for a variety of reasons, I know that, in 1998 and prior thereto, those conditions were imposed on a number of inmates specifically in order to address security and violence/future danger concerns, and that those strict conditions of confinement were maintained for as long as the BOP deemed necessary to address the security of violence concerns regarding the particular inmate. I do not know the names of all the inmates who had strict conditions of confinement imposed on them in order to address security and/or future dangerousness concerns, but believe that, in 1998 and prior, there were a number more such inmates beyond those that I have recalled and described in this affidavit.


Further, Affiant sayeth not.


Mark A. Bezy


Subscribed and sworn to
before me this 21st day
of November, 2008.


Notary Public

AARON HALLSTROM
Notary Public - Arizona
MARICOPA COUNTY
My Comm. Exp. 04-30-2011


-8-

# EXHIBIT D

STATE OF ARIZONA          )
                          ) ss
COUNTY OF PINAL           )

### SUPPLEMENTAL AFFIDAVIT OF MARK A. BEZY

MARK A. BEZY, after being duly sworn deposes and states under oath as follows:

1.     I am over the age of eighteen, and I am competent to testify to the matters stated herein. The statements in this affidavit are based upon my personal knowledge.

2.     I am the principal/owner of Mark A. Bezy and Associates, LLC, a consulting firm specializing in corrections management; conditions of confinement; correctional facility activation, operation, and management; inmate transportation; correctional work programs; prison gangs and security threat groups; and institutional disturbances and crisis management. Additionally, I worked as a consultant to Creative Corrections, LLC, a company charged with inspecting state and local correctional facilities housing detainees under the auspices of the federal Department of Homeland Security and Bureau of Immigration and Customs Enforcement.

3.     Prior to these positions, I was employed by the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006.  I began my BOP career as a correctional officer at the Federal Correctional Institution in Oxford, Wisconsin.  Three years later, I was promoted to the rank of lieutenant and served in that capacity at the Federal Prison Camp in Duluth, Minnesota and the Federal Correctional Institution in Phoenix, Arizona.  In 1988, I was promoted to the rank of captain and served in that capacity at the Federal Correctional Institution in Ray Brook, New York, the Federal Medical Center in Lexington, Kentucky, and the United States Penitentiary in Marion, Illinois ("USP-Marion").

1

4.      At the time I served as a captain at USP-Marion, that facility was the highest-security federal correctional facility in the country and housed many of what were considered the most incorrigible and difficult inmates in the BOP, and did so under highly secure and restrictive conditions of confinement.   This included, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through the facility's step-down process.

5.      While the hope of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and cycle out of USP-Marion to a mainstream maximum-security facility after two to three years, there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program.  The BOP recognized that a small percentage of individuals would most likely require such restrictive security measures during the entire term of their incarceration because of the potential future dangerousness posed by those inmates.  These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX" or "SuperMax") when that facility opened in 1994, and they remain housed at ADX today.  Although many inmates came to USP-Marion as a result of a demonstrated inability to function properly in other, less-restrictive environments, a number, such as John Gotti, were assigned directly to USP-Marion from the sentencing court.

6.      From 1995 to 1999, I served as correctional services administrator for the BOP North Central Regional Office in Kansas City, Kansas.  In that management position, I provided

2

on-site advice and consultation to 18 BOP facilities in that region. I also created and implemented the tactical inmate movement plan for "Flo-Max II," the final movement of high-security offenders from USP-Marion to ADX. In this position, I administered the disciplinary transfer program and was responsible for evaluating and classifying all disciplinary transfers and close supervision and protective custody cases – some 4,000 cases in all.

7. In 1999, I was named associate warden at the United States Penitentiary in Leavenworth, Kansas, an institution housing up to 2,500 inmates. At USP-Leavenworth, I directed the "KC Model Program" which effectively managed disruptive and violent inmates within the general population through identification, classification, and housing changes. The KC Model Program has since been successfully implemented in other penitentiaries.

8. In 2002, I was named the chief executive officer (warden) of the Federal Correctional Institution in Elkton. There, I managed the safe and secure operation of this low-security facility and was responsible for providing programs and services to 2,300 adult male offenders. I supervised a staff of 300 and managed an annual budget of $42 million.

9. In August 2004, I became chief executive officer (Warden) of the Federal Correctional Complex at Terre Haute, Indiana ("FCC-Terre Haute"). At FCC-Terre Haute, I managed programs and services provided to 1,500 adult male high-security offenders at the U.S. Penitentiary ("USP-Terre Haute"), 1,200 adult male medium-security offenders at the Federal Correctional Institution, 450 minimum-security adult male offenders at the Federal Prison Camp and 37 adult offenders under death sentences, including Darryl Lamont Johnson. I oversaw 675 personnel and managed an annual budget of $64 million. At FCC–Terre Haute, I implemented a number of security enhancements that have now been adopted throughout the BOP. Moreover, I

3

managed several emergency situations that occurred while I was warden at FCC-Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.  As warden, I received top-secret clearance in order to review classified documents relating to particular inmates.  I retired from the BOP in October 2006.

10.    I received a number of awards during my service with the BOP, including being selected for the Senior Executive Services, a merit-based special compensation program; being named Associate Warden of the Year for the North Central Region in 2001; and receiving the Director's Award in 1997 for my contributions to security technology.  As that honor demonstrates, I am very familiar with the security capacity of BOP facilities and have in fact pioneered the use of some of the security protocols and equipment that the BOP employs to this day.

11.    For example, when I activated the current USP-Terre Haute in March 2005, that facility was the first in the nation to deploy a wireless microwave camera system.  That system was part of my changes in the deployment and accessibility of emergency response equipment which were designed to allow the facility to deal better with serious disturbances.  Subsequently, other BOP facilities adopted the use of wireless microwave camera systems.  In fact, the equipment at USP-Terre Haute was transferred to and installed at ADX after I retired from BOP.

12.    After my retirement from the BOP in 2006, I served as the warden of Central Arizona Correctional Facility, a private prison for sex offenders in Florence, Arizona.

13.    I previously have been certified as an expert in BOP policies and procedures by the United States District Court for the Eastern District of Missouri and as an expert in prison

4

adjustment by the United States District Courts for the Central District of California and the Eastern District of Pennsylvania.

14. In the instant case, I have been retained by counsel for Darryl Lamont Johnson and have been asked to provide my opinion and evaluation, based on my thirty-year history in corrections, regarding the following matter:

A. The ability of the Bureau of Prisons to neutralize inmates deemed to be a threat to institutional security and/or to alleviate the threat to the safety and well-being of other individuals, whether inside or outside prison walls, at the time of Mr. Johnson's 1997 trial (*i.e.* future dangerousness).

15. In the course of my evaluation, I have reviewed the following materials:

a. Portions of the trial record, including the opening and closing statements of the government and the defense and the testimony of John Vanyur, Ph.D. and Mark Cunningham, Ph.D.;

b. July 21, 1997 Testimony of John Vanyur, Ph.D. in United States v. Dean Beckford et al, Case No. 3:96CR66 (E.D. Va.);

c. The direct appeal opinion affirming Mr. Johnson's convictions and sentences;

d. The Affidavit of BOP Case Manager B. English, filed in Mr. Johnson's current case;

e. Various BOP regulations and Program Statements.

16. The BOP's primary mission is to safely and securely house individuals accused and/or convicted of federal criminal offenses, ranging from nonviolent drug and fraud-related offenses to more serious offenses, such as treason, acts of terrorism, racketeering, and murder.

5

The 200,000 inmates in federal custody are classified according to their criminal history; history and circumstances of incarceration; the circumstances of the current offense(s); affiliations with gangs, militant organizations, or other security threat groups; medical and mental health needs; and length of sentence(s) for the current offenses. The stated purpose of the BOP's classification system is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." Program Statement 5100.08, p. 1.

17. As Dr. Vanyur correctly noted during his testimony in Mr. Johnson's case, prior convictions and prison behavior are part of the BOP's classification calculus. Johnson Trial Transcript at 2470-2471 (hereinafter "Johnson T. at ___"). As it did during my entire tenure, the BOP retains a great deal of discretion to fashion conditions of confinement and classify inmates to meet its penological objectives and mission, including to ensure the safety and security of BOP facilities and people both inside and outside such facilities. The BOP's discretion is not absolute – it must comply with the United States Constitution as well as those mandates handed down by Congress, the courts, and the Department of Justice. In keeping with these principles, the BOP has many tools in its arsenal that it may use to deal with inmates presenting both commonplace and extraordinary threats to the security of prison staff, other inmates, and those in society at large.

18. Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and imposed, there is no doubt that the BOP had, at all times, the authority and ability to house inmates in severely restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future

6

dangerousness. This includes, but is not limited to, housing inmates in conditions of confinement where they do not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or by mail. The BOP can, does, and did at the time of Mr. Johnson's trial in 1997, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" – not "rights" – so they can, and could at the time of Mr. Johnson's trial in 1997, be taken away whenever it is deemed necessary by the BOP. Moreover, these strict conditions of confinement can be, and were at the time of Mr. Johnson's trial in 1997, imposed for as long as the BOP deems it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

## I.   Inmate Classification and Placement and Facilities

19.   One way in which the BOP can deal with the dangers posed by prisoners at the outset is through the initial classification process. At the time of Mr. Johnson's trial in 1997 (the same is true today), inmates convicted of federal offenses could, generally speaking, be sent to four types of federal institutions (in increasing order of security): (1) Federal Prison Camps (minimum security); (2) Federal Correctional Institutions (low/medium security); and (3) United States Penitentiaries (high security); and (4) ADX (high security/control unit).[1] Due to the circumstances of Mr. Johnson's offenses, he would not have been eligible for placement anywhere besides a United States Penitentiary (high security) or ADX (the SuperMax facility),

---

[1] There are a number of other specialty prisons, such as medical and reception centers, but the vast majority of federal inmates have no contact with these specialty institutions.

7

despite Mr. Vanyur's suggestion that an individual with Mr. Johnson's history could be sent to a medium- or low-security facility. Johnson T. at 2471-2473.  As described further below, in my professional opinion, ADX is a facility that maintains security protocols capable of neutralizing the threats of future danger that the Government alleged warranted Mr. Johnson's death sentence, and placement at that facility could have effectively limited or eliminated his contact with any individual, both within and outside the confines of the prison, absent consent from the BOP (*i.e.* for mail, telephone or correspondence privileges with particular individuals). Indeed, given the circumstances of his current convictions, his history and his status as a high-ranking gang leader, Darryl Johnson was one of those "very special cases" (a phrase used by Dr. Vanyur in his Beckford testimony) eligible for direct ADX placement if deemed necessary and appropriate by the BOP.

20.     Although direct court commitments to ADX are not the norm, they are neither prohibited nor unheard of.  The vast majority of ADX inmates come directly from other institutions. However, at the time of Mr. Johnson's trial, approximately ten percent of ADX inmates were direct commitments from the sentencing courts.  In a capital trial that occurred a few months before Mr. Johnson's (United States v. Dean Beckford, et al.), former ADX Associate Warden Vanyur testified that some nine percent of ADX's 388 inmates were direct court commitments. According to Dr. Vanyur, that nine percent was composed of "very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists." Beckford T. at 5.  Dr. Vanyur's testimony on this point in Beckford was accurate and consistent with my knowledge and experience.  Similarly, his affirmative response to the question, "So you don't mean to tell this jury that someone cannot be committed [to ADX]

8

immediately if the United States is of the opinion that they're dangerous?" was also accurate and consistent with my knowledge and experience. Beckford T. at 19. Accordingly, the suggestion that Mr. Johnson was not eligible for placement at ADX immediately after sentencing, if deemed necessary and appropriate, is false and is belied by ADX's history. Similarly, the notion that the BOP is somehow powerless to prohibit specific inmates from committing serious crimes while incarcerated is also false.

21.     In the Beckford case, Dr. Vanyur correctly testified that ADX is "the most secure facility" in the federal prison system. Beckford T. at 4. All the cells at that facility – whether they are in the general-population area of the prison or in the control unit – hold a single inmate. Generally speaking, in 1997, inmates in general population had the opportunity to recreate with other inmates, but there was no requirement that they be allowed to do so and, as discussed below, there are a multitude of examples where inmates are prohibited from congregating or having any contact whatsoever with other inmates. Indeed, now, inmates in the general population at ADX do not have the privilege of recreating with other inmates; rather, they recreate individually. Moreover, those in the control unit have no opportunity to recreate or otherwise have any contact whatsoever with other inmates and have no interactive human contact with anyone except guards during cell extractions or staff rounds. Given the nature of Mr. Johnson's convictions, and if the BOP determined it was warranted based on his behavioral history and perceived "future dangerousness," he could have been placed in the control unit at ADX.

22.     Regardless of whether Mr. Johnson was eligible for direct placement in ADX's general-population unit or its control unit, the BOP had both the authority and the ability to craft

9

conditions of confinement that would alleviate any risk presented by Mr. Johnson that he would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public. Indeed, the BOP individualizes conditions of confinement on a regular basis. The either/or proposition that an inmate receives a great deal of freedom if not incarcerated at ADX advanced in Mr. Johnson's trial by Dr. Vanyur (see Johnson T. at 2475 (general population means that an inmate would have "open and frequent contact unrestrained with staff and inmates"); Johnson T. at 2472 (inmates have "virtually unlimited access to telephones and a great deal of open visiting contact"); Johnson T. at 2477 (an inmate at high-security facilities has "a great deal of open contact visiting," "virtually unlimited phone access," and "unlimited correspondence privileges"); Johnson T. at 2485 (even in a control unit, inmates have "virtually unlimited correspondence with the outside world"); Johnson T. at 2504 (dangerous inmates cannot be separated at high-security institutions)) are at best serious misstatements and are at worst gross distortions and mischaracterizations of the BOP's role, function, authorities, and abilities, at the time of Mr. Johnson's trial and presently, to house prisoners under secure and restrictive conditions of confinement for as long as deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

23.     For many years, the BOP has maintained and set aside facilities, units, and cells for difficult and dangerous inmates. For example, ADX and numerous other prisons have cells that are termed "side pockets." These side pockets, which operate separate from the general population housing, provide for the holding of inmates under highly-secure control-unit type conditions. For example, Luis Felipe – considered by the BOP to be exceptionally dangerous

10

and sent to ADX directly by the sentencing court – was held in a side pocket at ADX immediately upon his arrival there.  In the side pocket, Felipe was kept in total isolation from other inmates and all of his communications were both severely restricted and strictly monitored.  Similarly, ADX has a wing known as "bombers' row" where those inmates (such as Theodore Kaczynski) convicted of using bombs and other explosive devices to commit their crimes are held under strict, individualized conditions.

24.     These strict conditions are not solely the province of ADX and are nothing unusual or novel in the BOP.  Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons, including, as discussed further below, imposing restrictions on contact with people on the outside by telephone and mail.

25.     For example, USP-Marion had what it termed the "K-Unit" from at least the mid-1980s through the mid-1990s.  The K-Unit held inmates who posed a high security risk and housed them under extremely strict conditions of confinement.  These inmates were held in single cells, recreated by themselves, and had no contact with other inmates.  There was one officer assigned for every six inmates (a very low guard-to-inmate ratio).  Additionally, K-Unit inmates conducted their work (electronic cable assembly) in their cells instead of reporting to a workshop within the prison.  Inmates housed in the K-Unit due to security and/or future-dangerousness concerns included convicted spies John Walker and Jonathan Pollard and former CIA operatives Ed Wilson and Christopher Boyce.  These inmates were held in the K-Unit 1for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the

11

public.

26.     Furthermore, USP-Marion maintained an inmate housing unit called the "I-Up Unit." David Sahakian, an inmate affiliated with Aryan Brotherhood, who was accused of serious crimes, including ordering the murders of others, was held in the I-Up Unit during his pretrial detention in the mid-2000s in order to protect others and ensure that he did not commit, order, or direct any additional criminal activity.   Sahakian and another Aryan Brotherhood member were separated from the rest of the prison population (they were held on the top floor of the prison hospital) and were continuously monitored by an officer.   The conditions of confinement created by the BOP for Sahakian were certainly available at the time of Mr. Johnson's trial in 1997.

27.     Thus, Dr. Vanyur's assertion that it would be "extremely difficult, at best" for officials at a BOP facility such as USP-Marion to separate Mr. Johnson from other Gangster Disciples is simply false.   At USP-Marion, we frequently and successfully separated inmates like Sahakian, Pollard, Walker, and others from the rest of the prison population.

28.     The BOP has likewise used other facilities within the system to hold pretrial defendants with special security needs.   For example, Timothy McVeigh and Terry Nichols were held at the Federal Correctional Institution at Englewood, Colorado prior to their trials on charges stemming from the 1995 bombing of the federal building in Oklahoma City, Oklahoma. An entire wing of the facility was cleared out to accommodate the two defendants.

29.     There are numerous other examples of individuals who have been subject to special security measures due to the special challenges that they present.   Rodney Hamrick, a convicted bomber, was housed at the USP-Marion when I worked there.   I recall that all of

12

Hamrick's mail was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Former Panamanian leader Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the risk that he would order crimes or violence while incarcerated. Other inmates that have been, or continue to be, housed under very strict conditions of confinement due to security concerns include T.D. Bingham, Terry Mills, Thomas Silverstein, Clayton Fountain, Eric Rudolph, Ramzi Yousef, Anthony Ayeni Jones, Terry Nichols, and Theodore Kaczynski. Silverstein has been held in conditions at various prisons – including USP-Atlanta, USP-Leavenworth, USP-Marion, and ADX – where he has had virtually no human contact since the 1980's. Unlike Mr. Johnson, many of these individuals have shown an inability to positively adjust to incarceration in the federal prison system. However, to my knowledge, the strict conditions of confinement detailed above have very successfully alleviated the risk that these inmates might pose a future danger to individuals inside or outside the prisons in which they are housed.

30.     Additionally, the BOP maintains specialty units at various prisons that are designed to deal with problematic inmates. The Special Management Unit at the United States Penitentiary in Lewisburg, Pennsylvania has controls similar to those found at ADX and is designed to house inmates who have had difficulty abiding by the rules and regulations of other institutions.

31.     USP-Terre Haute's Communications Management Unit ("CMU") isolates inmates away from the general population and is designed to monitor any and all inmate communication. That prison also maintains a Special Confinement Unit ("SCU"). Although the SCU is home to the federal government's death row, the BOP may also place non-condemned

13

inmates with disciplinary problems in that unit if deemed necessary and appropriate given the facts. Indeed, as FCC-Terre Haute warden, I housed individuals in the SCU who had previously been involved in an incident at another prison. For example, Hakeem Shaheed and Tyrone Davis were involved in a major disturbance at USP-Marion in 2005 and were immediately transferred to USP-Terre Haute, where I was warden at the time. My superiors at the BOP instructed me to put Shaheed and Davis into the SCU indefinitely so that they could be closely monitored. I followed these instructions, and these two men were not involved in any incidents, violent or otherwise, while they were in the SCU.

32.    Moreover, most maximum-security federal prisons contain a Special Housing Unit ("SHU") where inmates can be placed when they have violated (or are suspected of violating) prison rules. A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the maximum-security facility generally. Each BOP warden has the authority to place any inmate into a SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, with the only limitation being that facility administrators must periodically review placement to determine continued appropriateness.

33.    Special Administrative Measures ("SAM's") also allow the BOP to construct individualized conditions of confinement as are "reasonably necessary to protect persons against the risk of acts of violence or terrorism." See 28 CFR §501.3(a). Each SAM's order is totally unique and is nearly limitless in terms of the conditions of confinement available to be imposed

14

by BOP personnel (subject to the constraints of the United States Constitution, of course). Although SAM's orders are required to be periodically reviewed, they may be extended for as long as conditions persist (*i.e.*, indefinitely). A number of inmates have been held under SAM orders for more than a dozen years. SAM's orders were available to the BOP and the Department of Justice at the time of Mr. Johnson's trial in 1997 had officials been concerned that Mr. Johnson presented a risk of violence while incarcerated.

34. Again, contrary to Dr. Vanyur's assertions at Mr. Johnson's trial, these strict conditions of confinement were (and are, to my knowledge) routinely imposed on high-risk inmates by the BOP for as long as it deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

## II.     Telephone, Visitation, and Correspondence Restrictions

35. Generally speaking, federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these <u>privileges</u> consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused or are deemed to constitute a threat to the security of the institution or the safety of individuals, whether inside or outside the prison. As Dr. Vanyur correctly stated in <u>Beckford</u>, inmates can have their phone privileges revoked for up to a year at a time in the case of significant misuse. Beckford T. at 27. There is no limit on the number of consecutive year-long revocations that can be imposed on a prisoner if it is deemed to be warranted.

15

36.   Misuse of telephone, mail, and visitation privileges are of particular concern to BOP personnel because of the possibility that a federal inmate will facilitate the commission of a crime through communications with other inmates or associates in society at large.   The BOP retains a large amount of flexibility in dealing with this potential threat, as well.   As the Justice Department's Inspector General found in a 1999 report:

> According to the BOP's program statement "Telephone Regulations for Inmates," conditions and limitations may be imposed on an inmate's telephone use to ensure that it is consistent with the BOP's correctional management responsibilities. Additionally, *inmate telephone use is subject to any limitations that individual wardens determine are necessary to ensure the security or good order of the institution or to protect the public*. Restrictions on inmate telephone use may also be imposed as a disciplinary sanction.

> BOP regulations direct wardens to refer incidents of unlawful inmate telephone use to law enforcement authorities. According to BOP regulations, telephone "misuse" refers to such things as using the telephone to intimidate a potential witness or for other criminal purposes.   Using another inmate's phone access code (PAC) or providing a PAC to another inmate is considered "misuse" and is subject to discipline. *Inmates who violate the telephone rules may have their privileges restricted or revoked*.

> Each warden is required by BOP's program statement to establish procedures to enable monitoring of inmate telephone conversations on any telephone located within the institution.   The term "monitoring" is not defined in the BOP program statement, so it is not clear whether this means recording of calls or live-monitoring by the BOP staff.   According to the BOP's program statement, the purpose of monitoring is to preserve the security and orderly management of the institution and to protect the public.

> In all BOP facilities, a notice is placed on inmate telephones advising the user that all conversations are subject to monitoring. Use of the telephones by inmates, therefore, constitutes their consent to this monitoring.   Inmate calls to attorneys are an exception to this rule and will not be monitored by BOP staff if the

16

inmate follows proper procedures, established by the warden at each institution, to arrange and place attorney calls.

BOP Headquarters has not issued any policy detailing how much "live monitoring" or review of recorded calls staff at each institution should conduct. Rather, determinations about the amount and methods of monitoring are left to individual wardens. Some institutions have remote monitoring locations. At these locations, officers randomly listen to some calls as they are occurring. This monitoring is in addition to their regular duties. Most of these institutions require the officers to monitor a minimum number – usually five – telephone calls during their shift. The officers are required to fill out a form describing the content of each monitored call and submit these reports to the institution's SIS office. The SIS offices are supposed to review the reports and decide if any further action is required.

Most institutions without remote monitoring locations have established a fixed listening post where a staff member assigned as the telephone monitor listens to inmate calls in addition to other duties, such as reviewing inmate mail. This telephone monitor normally works only during the day shift. However, wardens at several institutions have assigned a telephone monitor to the evening shift as well.

In its "Special Investigative Supervisors Manual" (SIS Manual), the BOP encourages a proactive approach to deterring criminal conduct by inmates. The SIS Manual directs SIS staff to use threat analysis, risk assessment, analysis of connections between inmates, and intelligence sources to prevent illegal conduct by inmates while still in the planning stage. The manual also states that the SIS should determine which inmates are engaged in activities that pose a threat to the welfare of the community. The SIS Manual provides examples of how the current version of ITS can assist staff in this task.

In August 1997, the Intelligence Section at BOP Headquarters issued an Inmate Telephone Monitoring field guide for wardens and SIS staff. The guide states that one of the BOP's primary concerns is to ensure that inmates who were convicted for playing leadership roles in major drug trafficking organizations do not continue their criminal operations using prison telephones. The guide stresses that

17

> inmates should not be permitted to talk on the telephone when they should be at their job or educational assignments. The guide notes that some inmates may require reassignment from orderly jobs or similar positions that provide them a great deal of flexibility and autonomy so that their time is more fully engaged. The guide also cautions against permitting a small number of inmates to dominate the telephones.
>
> In addition, the guide suggests that "population profiling" should be a major component of an institution's monitoring operations. For example, the guide acknowledges that it is not possible for staff to consistently listen to 100 percent of inmate calls. For this reason, the guide states that any inmate telephone monitoring should place the highest priority on identifying and tracking inmates with the greatest likelihood of using their telephone privileges to engage in criminal or illicit activity. Inmates identified as having a high likelihood of engaging in crime while incarcerated, such as drug dealing and escape plots, should be targeted and their telephone conversations subject to intense review.

See USDOJ/OIG Special Report: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges, August, 1999 (Found online at: http://justice.gov/oig/special/9908/) (emphasis added).

37.    As a captain, associate warden, and warden at numerous federal correctional facilities, I recall numerous instances where prison management (myself included) completely suspended or otherwise severely restricted telephone privileges because of concern that an inmate was abusing the privilege. While no system is 100 percent foolproof, we were successful in curbing inmate abuse of telephones in the overwhelming majority of cases where the issue arose through the use of targeted and contemporaneous monitoring and severe restrictions on numbers of calls and to whom inmate calls could be made.

38.    The same can be said for inmate abuse of correspondence and visitation privileges. In his testimony in the Beckford case, Dr. Vanyur correctly noted that mail, phone,

18

and visitation privileges can be severely restricted. Beckford T. at 22-24. He did not testify similarly in Mr. Johnson's case. Indeed, as a senior manager or head of numerous correctional facilities, I was involved in countless decisions to closely monitor visitation of, and correspondence to and from, specific individuals where there was a concern about institutional or individual safety. Actions taken to deter or detect unlawful conduct included, among other things, real-time monitoring and recording of visitation, review of correspondence, and the interception and translation of letters written in foreign languages or code. For example, at USP-Marion, Yu Kikumura, a member of the Japanese Red Army, a terrorist organization, had all incoming and outgoing mail inspected and translated. It was not uncommon for prison officials to inspect every piece of incoming and outgoing mail pertaining to a targeted inmate. Gotti and Felipe are additional examples of inmates who received this sort of treatment.

39.     Given facts underlying Mr. Johnson's convictions, including the use of telephones to commit crimes, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, were clearly available to the BOP in 1997 (and are today) – no matter where his placement.

40.     Notably, it is my knowledge and understanding that during the term of his federal incarceration (more than 13 years at this point) the BOP has not deemed it necessary or appropriate to house Darryl Johnson under the strict conditions of confinement available to it as described above (e.g., intensive restriction and/or supervision of communications by mail, phone, or in-person visitation; or segregation from staff and other inmates) whether based on any perceived "future dangerousness" or otherwise. In addition, the information available to me clearly suggests that Mr. Johnson has been housed by the BOP under conditions that have, in

19

fact, negated any potential "future dangerousness," and he has demonstrated that he is a well-adjusted inmate, as evidenced, for example, by the affidavit of BOP Case Manager B. English previously submitted to the Court in this case which states, "I consider [Darryl] Johnson to be a well-adjusted inmate without any out of the ordinary management concerns. ...   Overall, Johnson is a quiet and civil individual." (BOP Case Manager B. English Affidavit 8/25/08).

Further affiant sayeth naught.

_____
Mark A. Bezy

Subscribed and sworn to
before me this _14_ day
of December, 2009.

_____
Notary Public

OFFICIAL SEAL
**TERESA SEVERSON**
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 2, 2011

20